**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HISPANIC AFFAIRS PROJECT, *et al.*,

        Plaintiffs,

        v.

THOMAS E. PEREZ, in his official capacity as Secretary of U.S. Department of Labor, *et al.*,

        Defendants.

Civil Action No. 15-cv-01562 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The Court is confronted with a request for a preliminary injunction to halt a government visa program for temporary agricultural workers based on an administrative rule that has already been held invalid after extensive litigation, including an appeal, and is due for replacement in less than one month. The challenged rule is, consequently, operating on borrowed time. Yet, despite belatedly raising their particular objection to the challenged rule several years after the original litigation was begun and over one year after a remedial order was put in place, the plaintiffs nevertheless claim irreparable harm from its continued operation and, further, that imposition of an injunction, which would effectively result in an abrupt modification of the remedial order, would serve both equitable and the public interests.

Specifically, on October 7, 2011, a group of Americans, who were formerly open-range agricultural workers, brought an action against the United States Secretary of Labor and United States Department of Labor ("DOL"), challenging the validity of two Training and Employment Guidance Letters ("TEGLs") issued in 2011 for failing to comply with the notice-and-comment

requirements of the Administrative Procedural Act ("APA"), 5 U.S.C. § 553.[1]  *Mendoza v. Solis*, 924 F. Supp. 2d 307, 310 (D.D.C. 2013).  These TEGLs provide special procedures for hiring foreign temporary workers on general agricultural H-2A visas to work as cattle, goat and sheep herders on the open range on terms intended to avoid adversely affecting the wages and working conditions of U.S. workers similarly employed.  Almost three years later, the D.C. Circuit reversed this Court's finding that the plaintiffs lacked standing and, on the merits, held that the 2011 TEGLs were subject to the APA's notice-and-comment requirements and, thus, were procedurally invalid.  *Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014).  On remand, this Court entered a remedial order, directing the government to promulgate a new rule according to notice-and comment procedures and, with the consent of all parties, required vacatur of the invalid 2011 TEGLS upon the effective date of the new rule.  *Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) ("Remedial Order").

Nearly a year after entry of the Remedial Order, and less than three months shy of the effective date of the new rule, on August 18, 2015, the plaintiffs—an American former sheepherder, a foreign sheepherder currently employed on a temporary H-2A visa and a nonprofit membership organization for Hispanic immigrant workers, Compl. ¶¶ 3–5, ECF No. 2—filed this lawsuit against the defendants United States Secretary of Labor, the Department of Labor, and the Assistant Secretary of Employment and Training Administration, Department of

---

[1]      The two 2011 TEGLs are: TEGL No. 15-06, Change 1, Special Procedures: Labor Certification Process for Occupations Involved in the Open Range Production of Livestock under the H-2A Program ("2011 Cattleherder TEGL"), 76 Fed. Reg. 47,243 (Aug. 4, 2011), which provided special regulations governing certification of the temporary employment of nonimmigrant cattleherders; and TEGL No. 32-10, Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program ("2011 Sheepherder TEGL"), 76 Fed. Reg. 47,256 (Aug. 4, 2011), which provided special regulations for the certification of the temporary employment of nonimmigrant goatherders and sheepherders.

Labor (collectively, "defendants"), *id.* ¶¶ 6, 8, challenging DOL's application of one component of the soon-to-be-superseded 2011 Sheepherder TEGL.[2]

The challenged component of the 2011 Sheepherder TEGL outlines the methodology to be used by DOL in determining the minimum offered wage rate required for DOL's certification of employer applications for H-2A visas for foreign sheep and goatherders. This methodology is entirely changed in a new rule, which was published on October 16, 2015, and becomes effective on November 16, 2015. *See* Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States ("2015 Rule"), 80 Fed. Reg. 62,958 (Oct. 16, 2015) (to be codified at 20 CFR pt 655). Under this new rule, the new monthly prevailing wage rate will be phased in over two years and will be determined by using the base federal minimum wage of $7.25 per hour, multiplied by 48 hours per week, multiplied by 4.333 weeks in a month, multiplied by 80% for the first year, resulting in a new monthly wage of $1206.31 as of the effective date. 2015 Rule, 80 Fed. Reg. at 63,014 n.62.

The 2015 Rule, when it becomes effective, will replace and vacate both of the invalid 2011 TEGLs. Remedial Order, 72 F. Supp. 3d at 175. Now pending before the Court is the plaintiffs' Motion for Preliminary Injunction ("Pls.' Mem."), ECF No. 1, to enjoin DOL from certifying any new H-2A applications at the current, challenged wage rate. Although DOL has conceded the deficiencies in the methodology provided in the 2011 Sheepherder TEGL and acknowledged that these procedures have resulted in stagnant wages for herders on the open range, *see* 2015 Rule, 80 Fed. Reg. 62,986, the plaintiffs have not carried their burden of

---

[2]    Concurrent with the initiation of this lawsuit, the plaintiffs filed an *Ex Parte* Motion for a Temporary Restraining Order, Pls.' Mem. at 2, which the District Court for the District of Colorado denied without explanation on August 19, 2015. Order Denying Ex Parte Motion for a Temporary Restraining Order and Scheduling Briefing on Motion for Preliminary Injunction, ECF No. 7.

demonstrating that the extraordinary remedy of a preliminary injunction is warranted. Consequently, the plaintiffs' request for preliminary injunctive relief is denied.

## I.    BACKGROUND

Background relating to the operation of the H-2A visa program and the reasons for invalidation of the 2011 TEGLs are fully described by the D.C. Circuit in *Mendoza,* 754 F.3d at 1007–1010, and, consequently, only briefly summarized here.

### A.    The H-2A Statutory Regime

The Immigration and Nationality Act ("INA") authorizes the grant of temporary work visas to any nonimmigrant alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a).  In order to hire such foreign workers, American employers must first obtain certification from the Secretary of Labor, who may certify, or approve, the temporary work visas, called H-2A visas, when, *inter alia,* (1) "there are not sufficient workers who are able, willing and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."  *Id.* § 1188(a)(1).

In order to ensure that the employment of H-2A workers does not "adversely affect the wages and working conditions" of domestic workers, DOL has adopted regulations setting minimum wages and working conditions provided to domestic and foreign workers. *Mendoza,* 754 F.3d at 1008.  In particular, DOL requires H-2A employers to pay their hourly workers the highest of what is known as an adverse effect wage rate ("AEWR"), "the prevailing wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage."

20 C.F.R. § 655.122(l).   The AEWR, calculated using the Department of Agriculture's Farm Labor Survey ("FLS"), is intended to "approximate[] what the prevailing wage would be if not for the hiring of foreign workers." *Mendoza*, 754 F.3d at 1008 (citing Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed Reg. 6884, 6891–93 (Feb. 12, 2010)).

DOL does not apply the AEWR to open-range herders, such as cattleherders, sheepherders and goatherders, however, because of the "unique occupational characteristics of herding—including spending extended periods in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock." *Mendoza*, 754 F.3d at 1008–9 (internal citations omitted).   Instead, the 2011 TEGLs provide special variances from the default AEWR and impose different methods of calculating the prevailing wage for each state, which is the minimum the employers are required to pay foreign H-2A open-range herders. *Id.* at 1008.

## B.   The *Mendoza* Litigation and Remedial Order

In October 2011, Americans who were formerly open-range herders filed a lawsuit in this Court against the Secretary of Labor and the Department of Labor, challenging the validity of the 2011 TEGLs for lack of notice-and-comment procedures required under the APA. *Mendoza*, 924 F. Supp. 2d at 314.   The plaintiffs succeeded in their challenge, and, in June 2014, the D.C. Circuit remanded the case to "craft a remedy to the APA violation," taking into consideration "various factors including whether vacating the TEGLs would have a disruptive effect on the herding industry and how quickly the Department of Labor might be able to promulgate, pursuant to the procedural requirements of the APA, new H-2A regulations for herding operations." *Mendoza*, 754 F.3d at 1025.

Following ample briefing and consideration of multiple factors, including those expressly cited by the D.C. Circuit, in October 2014, this Court, with the consent of all parties and to

minimize disruptive effects on the industry, retained in effect the invalidated TEGLs until the effective date of the new rule, which was set "to be no later than 30 days after the rule's publication or December 1, 2015, whichever is earlier." Remedial Order, 72 F. Supp. 3d at 175. In accordance with the time schedule set out by this Court, in April 2015, DOL published notice for comment of a proposed rule to replace the 2011 TEGLs. *See* Notice of Proposed Rule on Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States ("NPRM") (Apr. 15, 2015), 80 Fed. Reg. 20,300. Towards Justice, counsel to the plaintiffs in this case, along with fifty-three other groups and three individuals, commented on the NPRM, noting that the proposed rule "is a welcome change that begins to address the wage stagnation in the industry." Comments of Farmworker Justice, *et al.* at 1, Docket No. ETA-2015-0004-0460 (June 1, 2015).

> C.     **The Instant Case**

On August 18, 2015, four months after the publication of the NPRM, and less than three months before publication of the final new rule, the plaintiffs filed the instant action in the United States District Court for the District of Colorado. Compl. ¶ 37. The plaintiffs—Hispanic Affairs Project, an organization with members who are both former and current H-2A sheepherders, Pls.' Mem. Ex. J ("HAP Director Decl.") ¶¶ 4, 13, ECF No. 1-10; Rodolfo Llacua, a former sheepherder and U.S. citizen who avers that he cannot pursue his preferred profession of sheepherding because of the low wages set by DOL, Pls.' Mem. Ex. K ("Llacua Decl.") ¶ 12, ECF No. 1-11; and John Doe, a current H-2A sheepherder who avers that he is hardly making enough, at the challenged wage rate, to support himself and his family, Pls.' Mem. Ex. L ("Doe Decl.") ¶ 5, ECF No. 1-12—claim that the defendants did not follow the 2011 Sheepherder

TEGL when determining the prevailing wage rates at which it certifies H-2A sheepherder applications, and that they have been harmed by the illegally low wages. *See* Pls.' Mem. at 1–2.

After the United States Court for the District of Colorado denied the plaintiffs' *ex parte* motion for a temporary restraining order and set a briefing schedule for the plaintiffs' motion for a preliminary injunction, the parties filed, on September 21, 2015, a Joint Motion to Transfer Case to this Court, ECF No. 15. The case was subsequently transferred to this Court, *see* Order, dated September 25, 2015, ECF No. 19, where both parties provided notice that this case is related to the *Mendoza* litigation, *see* Pls.' Notice of Related Case, dated September 29, 2015, ECF No. 23; Defs.' Notice of Related Case, dated September 30, 2015, ECF No. 24, prompting reassignment of the case to the undersigned Judge, *see* Order, dated October 5, 2015, ECF No. 5.[3]

The plaintiffs seek preliminary injunctive relief "enjoin[ing] DOL from certifying any additional H-2A Applications for Temporary Employment Certifications ("H-2A Applications") for H-2A sheepherders at the illegal wage floor."[4] Pls.' Mem. at 2. For the reasons outlined below, the Court denies the plaintiffs' motion. [5]

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 A C. Wright, A. Miller, & M. Kane, FEDERAL

---

[3]        Upon reassignment, a hearing was promptly scheduled on the plaintiffs' pending Motion for Preliminary Injunction. *See* Minute Order, dated October 6, 2015.

[4]        As part of their initial requested relief, the plaintiffs also sought an order directing "DOL to issue notice . . . to all current H-2A sheepherder employers, making them aware that the DOL will soon issue a new sheepherder wage floor rule and that employers will be liable for at least any difference between the amount paid to current H-2A sheepherders and the new minimum as of the date of the issuance of the notice." Pls.' Mem. at 2. During the hearing on the motion for a preliminary injunction, in response to a question from the Court, the plaintiffs withdrew their request for such a notice, choosing instead to "focus . . . on preventing any other certifications at that $750 a month rate." Rough Transcript of Hearing (October 15, 2015) ("Hrg. Tr.") at 40:2–8.

[5]        Also pending but not yet ripe is the plaintiffs' Motion for Class Certification. *See* Pls.' Motion to Certify Class Under FRCP 23(b)(2), ECF No. 27.

PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)), requiring the plaintiffs to show clearly (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest," *Glossip v. Gross*, 135 S. Ct. 2726, 2736–37 (2015) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). "'When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (*quoting Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). The Supreme Court in *Winter*, 555 U.S. at 22, made clear that a court may not issue "a preliminary injunction based only on a possibility of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

## III.   DISCUSSION

The plaintiffs argue that the current prevailing wage rates at which DOL certifies H-2A applications for visas for foreign sheepherders and goatherders are illegal because DOL did not apply the methodology authorized under the 2011 Sheepherder TEGL. Pls.' Mem. at 1. The 2011 Sheepherder TEGL directs DOL to annually determine the prevailing monthly wage for the sheepherding and goatherding industry in each state based on annual surveys of domestic herders conducted by each local State Workforce Agency ("SWA"). 2011 Sheepherder TEGL, 76 Fed. Reg. at 47,258. "[W]here a SWA is unable to produce a wage rate finding . . . due to an inadequate sample size or another valid reason," DOL must either use "comparable survey data from an adjoining or proximate SWA," or "aggregat[e] survey data for sheepherding and/or

goatherding activities across States to create regional prevailing wage rates." *Id*. According to the plaintiffs, DOL has not complied with the 2011 Sheepherder TEGL by (1) failing to determine the prevailing wage rates annually and, instead, last determining the wage rates in 2013; (2) failing to rely on statistically significant SWA surveys and, instead, using surveys with "inadequate sample sizes" of six to nine workers; and (3) failing to utilize fresh SWA surveys and, instead, applying "past survey data" from 2009 to make 2013 prevailing wage determinations. Pls.' Mem. at 5–8.

The defendants do not dispute that DOL issued its last prevailing wage rates in 2013, and that, in making those determinations, it relied on SWA surveys with small sample sizes and sometimes on past SWA survey data. Defs.' Opp'n at 13–14, ECF No. 14; NPRM, 80 Fed. Reg. at 20,307–08. DOL even admits that "for many years, the Department has been unable to determine a statistically valid prevailing wage rate each year in each State in which one is needed" and that wages "effectively have not increased since 1994" in states without higher mandatory minimum wages. *Id*. at 20,307; *see also* Hrg. Tr. at 28:19–25 (government counsel stating that the 2011 Sheepherder TEGL "didn't work" and that the "wage[s] stagnated" as a result).

The plaintiffs have persuasively pointed out the deficiencies in the wage rates implemented under the authority of the 2011 Sheepherder TEGL.[6] Yet, even if the likelihood of

---

[6] In connection with this prong of the preliminary injunctive relief standard requiring a showing of likelihood of success on the merits, the defendants contend that the motion should be denied for lack of standing, since the plaintiffs' injuries are not redressable. Defs.' Opp'n at 8. According to the defendants, "no new wage under any methodology Plaintiffs propose can be effectively calculated," *id*. at 9, and all of the plaintiffs' suggested options "would cause a significant disruption to the program or a program hiatus," *id*. at 8. The plaintiffs' final requested relief, however, only "[r]equire[s] the DOL to promptly issue a wage determination that accords with the regulatory framework of the 2011 [Sheepherder TEGL]," without dictating the specific methods by which the defendants may arrive at that wage determination. Compl. ¶ 61(c). The aforementioned options are merely the plaintiffs' suggestions. *See* Pls.' Mem. at 18 (describing the three methods as "potential options"). The defendants would be free to craft a permitted methodology to make new wage determination should the Court "declar[e] the current wage floor rule employed by the DOL unlawful and in violation of the . . . APA, 5 U.S.C. § 706(1)-(2)." Compl. ¶ 61(b).

success on the merits factor is "the first and most important factor," *Aamer*, 753 F.3d at 1038,

where "especially good reasons for preserving the status quo by denying the petitioners' request"

exist, the injunctive relief should be denied, *id*. at 1043.  Indeed, the plaintiffs bear the burden to

establish "that all four factors, taken together, weigh in favor of the injunction."  *Abdullah*, 753

F.3d at 197; *see also Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694

(D.C. Cir. 2015) ("Failing to satisfy any factor is grounds for denying [injunctive] relief.");

*Asher v. Laird*, 475 F.2d 360, 362 (D.C. Cir. 1973) (*per curiam*) (affirming denial of preliminary

injunction since "[e]ven had appellants demonstrated such a likelihood [of success], there has

been no showing on the other three elements of the [injunction] test").

The defendants argue that the injunctive relief sought should be denied because the

plaintiffs have failed to show irreparable harm or that "the balance of harms/public interest"

favor imposition of the injunctive relief requested. Defs.' Supp. Resp. to Questioning at Oral

Argument at 2, ECF No. 32.  As discussed in more detail below, the plaintiffs have failed to

demonstrate that (1) they are likely to suffer irreparable harm absent the requested injunctive

relief; (2) a remedy in equity is warranted upon consideration of the balance of hardships to the

plaintiffs and other interested parties; and (3) the requested relief is in the public interest. These

considerations are addressed *seriatim* below.

### A.     Irreparable Harm

---

The practical concerns identified by the defendants in actually crafting a new wage rate under the 2011 Sheepherder TEGL, should the current rate be found invalid, may not be sufficient to deny standing but are certainly relevant to other prerequisites for injunctive relief, including the balance of harms and the public interest, as discussed *infra*. Similarly, the defendants also argue that plaintiff Llacua, specifically, lacks standing because "his alleged injury of being unable to secure a herding job at a desirable wage" cannot be redressed by an injunction enjoining the H-2A visa program. Whether the requested injunctive relief can redress plaintiff Llacua's injuries, however, dovetails with consideration of the showing of irreparable harm, as discussed in more detail *infra*. *See Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 247 (D.D.C. 2015) (analyzing under the irreparable harm factor whether requested injunctive relief would necessarily redress plaintiff's alleged harm).

The D.C. Circuit "has set a high standard for irreparable injury" to warrant preliminary injunctions. *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). In order to be considered "irreparable," the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297) (emphasis in original).   Where the injuries alleged are purely economic, as in the instant case, the injuries are irreparable only if "no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

At the outset, the Court agrees with the defendants that the timing of the plaintiffs' lawsuit undermines their argument that they are suffering irreparable harm. Hrg. Tr. at 24:13–25:4.  The D.C. Circuit has found that a delay of even forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered the conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *see also Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.").

Here, the plaintiffs have had ample notice that the challenged wage rates issued under the 2011 Sheepherder TEGL were problematic but failed to bring a lawsuit until just a few months before that rule will be vacated. The validity of the 2011 TEGLs has been subject to scrutiny virtually since its promulgation, when the *Mendoza* lawsuit was filed in October 2011.

11

*Mendoza*, 924 F. Supp. 2d at 314.  In June 2014, the D.C. Circuit held that the 2011 TEGLs were invalidly promulgated requiring remand, *Mendoza*, 754 F.3d at 233, for issuance, in October 2014, of a remedial order, during consideration of which all parties agreed that the 2011 TEGLs should be retained until the effective date of the replacement rule.  Remedial Order, 72 F. Supp. 3d at 175.  The NPRM published, in April 2015, expressly addressed the deficiency in the application of the 2011 Sheepherder TEGL because the prevailing wage rate relied on state-wide surveys that "lack[ed] . . . reportable data," a factor that "likely contributed to the stagnation of wages over the last 20 years," and "[a]s a result, the Department cannot continue to rely on these surveys under current conditions and fulfill its statutory mandate to prevent adverse effect to workers' wages and working conditions."   NPRM, 80 Fed. Reg. at 20,309.  The NPRM prompted over five hundred comments from interested parties, including a comment jointly submitted by the plaintiffs' attorneys, Towards Justice, and other workers' advocate groups. 2015 Rule, 80 Fed. Reg. at 62,958, 62,961, n.5.  The ongoing litigation over the validity of 2011 Sheepherder TEGL, and this Court's Remedial Order retaining the 2011 Sheepherder TEGL as a stopgap measure until replaced, cannot be ignored in evaluating the plaintiffs' current claim of irreparable harm from the methods DOL uses to determine prevailing wage rates in the affected industry.

The plaintiffs' belated initiation of this lawsuit challenging the determination of the prevailing wages belies the plaintiffs' contentions of urgency and immediacy now.  The director of the plaintiff Hispanic Affairs Project avers that he was "informed that the low wages currently paid to H-2A sheepherders are illegal" only a week before he filed suit on August 18, 2015. HAP Director Decl. ¶ 9.  Each of the two individual plaintiffs aver that they were only "recently informed that the way that the government was calculating the minimum wages for herders was

illegal." Llacua Decl. ¶ 14; Doe Decl. ¶ 15. The amount of litigation and administrative activity regarding the 2011 TEGLs, not to mention the public attention garnered by these activities, significantly undermines these excuses, especially where over fifty workers' rights groups submitted comments in response to the NPRM, including the plaintiffs' own attorneys.

Even if any delay in filing the instant lawsuit were discounted in evaluating the plaintiffs' claim of irreparable harm, the Court is not persuaded that the requested relief of halting issuance of new H-2A visas at the current wage rate would actually do anything to address the harms identified by the plaintiffs.

For example, plaintiff Llacua, a former sheepherder, alleges that, absent the requested injunctive relief, he would suffer the irreparable harm of delaying his "return to a preferred job that offers a rationally calculated wage." Pls.' Mem. at 15. Yet, enjoining the issuance of new H-2A visas at the current wage rate would not guarantee this plaintiff any herding job offer, let alone a herding job offer at a sufficiently high wage to be acceptable or an acceptable offer in the short time frame before the new rule with a higher wage rate goes into effect on November 16, 2015. Consequently, whether viewed through the prism of redressability or irreparable harm, the injunctive relief requested would not necessarily help this plaintiff. Moreover, the Court is cognizant that plaintiff Llacua is in the same position as the former sheepherder plaintiffs in *Mendoza*, and the *Mendoza* plaintiffs agreed to delaying the vacatur of the invalid 2011 TEGL until the effective date of the new rule, in recognition of potential disruption to the industry, even though they were ostensibly facing the same harm from delay as plaintiff Llacua here.[7]

---

[7]     In fact, the plaintiffs seek to certify as a class "all current H-2A sheepherders and all persons who would be working as sheepherders in the United States but for the United States Department of Labor's illegal implementation of its 2011 [Sheepherder TEGL]," Compl. ¶ 39, indicating that Llacua's harms are the same as those faced by all other former sheepherders "who would be working as sheepherders" but for the current wage rate, including the *Mendoza* plaintiffs.

Remedial Order, 72 F. Supp. 3d at 174. These factors militate against a finding of irreparable harm as to plaintiff Llacua.

Likewise, plaintiff Doe, a current H-2A sheepherder, as well as any similarly situated members of plaintiff HAP, also fail to demonstrate that they are likely to suffer irreparable harm absent the requested injunctive relief. Plaintiff Doe posits that he will suffer irreparable harm because he will "continue to receive illegally low wages and likely will be unable to obtain backpay according to a yet-to-be determined, rationally calculated wage floor." Pls.' Mem. at 15. Since the plaintiff's harm is purely economic, in order to show irreparable harm, he must demonstrate that his monetary loss would be irremediable at a later date. *Mexichem Specialty Resins, Inc.*, 787 F.3d at 555 (quoting *Wisconsin Gas Co.*, 758 F.2d at 674). To satisfy this standard, the plaintiffs reason that, absent a preliminary injunction, which includes a finding that application of the 2011 Sheepherder TEGL is illegal as to the current prevailing wage rate determination, plaintiff Doe would be unable to make a successful claim for backpay because employers would be able to "claim reasonable reliance" on this invalidated TEGL and that they are "merely complying with what the DOL authorizes." Pls.' Reply Supp. Mot. Prelim. Injunction ("Pls.' Reply") at 18, ECF No. 22 (citing *Frederick County Fruit Growers Ass'n v. Martin*, 968 F.2d 1265, 1274 (D.C. Cir. 1992) and *Morrison v. Dep't of Labor*, 713 F. Supp. 664, 671 (S.D.N.Y. 1989)). In other words, the injunctive relief requested is intended merely to lay the strategic groundwork for a subsequent claim for backpay by providing an argument to defeat the employers' anticipated defense of reasonable reliance on the soon-to-be-superseded 2011 Sheepherder TEGL. *See* Pls.' Reply at 17 ("Plaintiffs' principal theory of remedies is against H-2A shepherd employers[.]").

The Court is not persuaded that the issuance of the requested injunction would, in fact, have any effect, let alone bolster, the claim of plaintiff Doe, or similarly situated current herders, for backpay in some later suit against different parties not present here. *See* Hrg. Tr. at 20:20–22 (plaintiffs' counsel conceding that how the backpay analysis would apply is unclear but that "the main point here is we can have that battle later"). Since the real goal of the plaintiffs is to obtain backpay for some period of time prior to the increase in wages required under the new 2015 Rule, the requested preliminary injunctive relief, standing alone, would be insufficient to redress their alleged irreparable harm; rather, as the plaintiffs concede, they must file a separate lawsuit against the employers to assert any claims for backpay.

Additionally, neither of the cases relied upon by the plaintiffs support their contention that enjoining DOL from certifying any new H-2A applications at the current wage rate would entitle the plaintiffs to "backpay from employers at a correct rate of pay." Pls.' Reply at 17. The first case, *Frederick County,* involved workers' challenges to a DOL interpretation of a 1978 regulation and then a subsequent successor rule concerning wages for foreign fruit workers under the H-2A program when both the challenged interpretation and successor rule effectively depressed wages. *Frederick County,* 968 F.2d at 1266. The challenged interpretation was judicially determined to be improper before the 1982 harvest, and was nonetheless codified in a new rule promulgated in 1983. *Id.* at 1267. Within approximately one week of promulgation, the new 1983 rule was preliminarily enjoined by this Court, until the D.C. Circuit vacated the injunction "prior to the 1984 harvest." *Id.* The D.C. Circuit ultimately concluded, in 1985, that the 1983 rule was invalid on the merits, thereby "in effect reinstat[ing] the 1978 regulation" requiring a higher wage rate. *Id.* As a consequence of these various judicial and agency actions, the higher wage rate required by the 1978 regulation was in effect for both the 1983 and 1985

harvests—due, respectively, to the district court's finding that DOL's interpretation was invalid when the growers completed their employment plans for the 1983 harvest, *id.* at 1273, and the D.C. Circuit's subsequent finding that the 1983 rule was invalid before the growers submitted their job clearance orders for the 1985 harvest, leaving in effect the 1978 regulation, *id.* at 1267—while the depressed wage permitted by the 1983 rule was in effect for the 1984 harvest, due to the D.C. Circuit's vacatur of the preliminary injunction.   Despite the 1978 regulation being in effect for the 1983 and 1985 harvests, the growers nonetheless paid only the depressed wage rate, in violation of the district court's court order that the higher wage rate required by the 1978 regulation governed during the 1983 harvest and the D.C. Circuit's ruling regarding the invalidity of the 1983 rule during the 1985 harvest. *Id.* In 1989, "the district court granted the workers' claim for the backpay for the 1983 harvest . . . and . . . the workers' claim for the 1985 harvest," but not for the 1984 harvest, which backpay remedy was subsequently affirmed. *Id.* at 1268. [8]

The plaintiffs interpret the D.C. Circuit's affirmance of the District Court's backpay remedy for the 1983 harvest in *Frederick County* as demonstrating that "the existence of the injunction," which rejected the validity of the challenged 1983 rule, "proved determinative in the D.C. Circuit's decision that equity favored the workers, and the employers had to pay the higher rate" required in a new rule. Pls.' Reply at 18.   Based on this interpretation of the D.C. Circuit's

---

[8]     After the D.C. Circuit dissolved the injunction and remanded the matter for the district court "to determine the propriety of DOL's rulemaking procedure under the APA," the district court approved the 1983 rule. *Frederick Cty Fruit Growers Ass'n v. McLaughlin*, 703 F. Supp. 1021, 1024 (D.D.C. 1989).   While this ruling was on appeal, the 1983 rule's depressed rate applied to the "growers' 1984 job clearance orders," despite the fact that the D.C. Circuit ultimately found this rule to be invalid and, "[a]s a result," workers were paid a depressed wage for the 1984 harvest "under an invalid rule." *Id.* Despite recognizing that the workers were paid a depressed wage under an invalid rule, the district court did not grant the workers' claim for backpay for the 1984 harvest. *Id.* at 1029.   The workers, however, did not "cross-appeal the district court's denial of their backpay claim for the 1984 harvest," and the question of whether the workers may have been entitled to the higher wage rate under the 1978 regulation for the 1984 harvest under a quasi-contract analysis was not before the D.C. Circuit. *Frederick County*, 968 F.2d at 1268.

ruling, the "Plaintiffs seek to avail themselves of a similar equitable remedy against H-2A shepherd employers, but like the farmworkers in *Frederick County*, they need a finding from this Court that, contrary to the DOL's position, the current shepherd wage-floor rule is an 'invalid administrative edict.'" *Id*. In short, the plaintiffs' interpretation of the D.C. Circuit's ruling in *Frederick County* is the "principal" reason for the injunctive relief sought here, *id*. at 17, but that reasoning is flawed for at least three reasons.

First, the injunctive relief granted in *Frederick County* directly addressed the irreparable injury of a lower wage rate claimed by the workers: the injunction barred enforcement of the new 1983 rule that effectively depressed workers' wage rates, so that the wage rate at issue automatically reverted to the higher rate set by the 1978 regulation. By contrast, here, the plaintiffs do not seek to enjoin the enforcement of the current wage rate as applied to all foreign H-2A sheepherders; instead, they seek only to "enjoin the DOL from certifying *any additional* H-2A applications . . . for H-2A sheepherders at the illegal wage floor." Pls.' Mem. at 2 (emphasis added). Consequently, even if granted, the requested relief would have no impact on the wage rate of foreign sheepherders currently working on H-2A visas, unless and until DOL decides to make a new prevailing wage determination, which, notably, the requested relief does not require. Pls.' Mem. at 18 (acknowledging that "immediately halting reliance on the [current] wage floor will not grind the DOL's certification of H-2A Applications to a halt but will instead encourage the DOL to use one of a variety of alternative (and more rational) methodologies to calculate a wage floor.").

Second, the injunctive relief granted in *Frederick County* had a significantly different effect than the relief sought in this case. In that case, the injunction had the effect of triggering application of the higher wage rate under the 1978 regulation to the 1983 harvest, leaving no

vacuum requiring immediate rule-making as to the applicable rate for foreign workers in the H-2A visa program. By contrast, as the plaintiffs acknowledge, imposition of the requested injunctive relief here is intended only to prompt DOL to find an alternative methodology to determine the prevailing wage rate, and would require further rule-making and leave confusion as to the applicable rate in its wake. Pl.'s Mem. at 18; Pl.'s Reply at 24–25. This is precisely the confusion that the Remedial Order in the *Mendoza* litigation was intended to avoid. Remedial Order, 72 F. Supp. 3d at 175.

Finally, by single-mindedly focusing on the preliminary injunctive relief granted in *Frederick County* as the silver bullet that defeated the growers' reasonable reliance argument under an "equitable restitution" analysis, the plaintiffs miss another important aspect of the D.C. Circuit's reasoning. *Frederick County*, 968 F.2d at 1273–74. The D.C. Circuit made clear that the "equitable restitution" analysis was applied only because none of the parties challenged this framework. *Id.* at 1272 ("Because neither the workers nor the growers challenge the district court's analogy to a rate case, we analyze the parties' arguments within that rubric."). In the Circuit's view, a "more apt[]" approach to the remedial question would be to treat it as a "problem of quasi-contract: The wage term in the 1983 contract between the growers and the workers was unenforceable; therefore, the court must supply a reasonable wage term; in the context of this case the reasonable wage is the minimum wage established by the Secretary; and the growers should be ordered to pay that amount (less what they paid the workers voluntarily)." *Id.* In other words, if the regulation is invalid, the wage amount based on the regulation is also invalid and unenforceable, and the workers would be owed the reasonable wage that that should have been paid. Under the Circuit's preferable methodology, the issuance of an injunction may be beside the point, since a critical issue for a backpay award is the ultimate validity of the

regulation. This undercuts the purported strategic reason the plaintiffs are seeking injunctive relief here. The parties in *Frederick County,* however, simply never made a quasi-contract argument. *Id.* ("The workers do not make this argument, however, and so we do not consider it.").

In any event, in considering the workers' entitlement to backpay for the 1983 harvest under an equitable restitution analysis, the Circuit considered and rejected multiple arguments of the growers, including finding that invalidation of a regulation on procedural, rather than substantive grounds, could nonetheless provide the basis for restitution since "[t]o do otherwise . . . would be to give legal effect to . . . [an] invalid order." *Frederick County,* 968 F. 2d at 1273 (internal citation and quotations omitted). More relevant here, the growers' argument that they reasonably relied upon the 1983 rule in setting the wages for the 1983 harvest was also rejected, but the injunctive relief barring the 1983 rule's enforcement was only part of the reason. The Court considered other factors as well, such as when the growers made plans for the harvest and filed their job clearance orders, the timing of promulgation and adoption of a new rule, and the timing of the injunctive relief, in evaluating whether the growers reasonably relied on the depressed rate provided in the invalid 1983 rule. *Id.* at 1273–74. Even before the injunction had been issued, the Court found "at the least a significant possibility" that the 1983 harvest would be governed by another wage rate due to litigation over the validity of the regulation relied upon and that, by the time the injunction was issued, the employers knew the regulation "was, if not flatly invalid, of at least dubious validity" and could not reasonably rely upon it. *Id.* at 1274. In other words, D.C. Circuit's reason for upholding the backpay award for the 1983 harvest was not solely due to the injunction.

Likewise, the second case relied upon by the plaintiff, *Morrison v. United States*, also involved the wage rate for foreign fruit workers and did not turn on whether a preliminary injunction was entered. While acknowledging "the fact that no injunction was granted is influential," the court expressly opined that it "does not agree with the counsel for the growers that there needs to be 'an injunction in the air [in order] to reach the concept of equitable restitution.'" 713 F. Supp. at 671 (quoting hearing transcript) (alteration in original). Instead, the "weightiest factor for the Court's consideration is whether the growers relied on the approval by the DOL and whether such reliance was reasonable." *Id.* at 673. The *Morrison* court focused on "the timing of both the [DOL] approval and the institution of the lawsuit," which put the growers on notice of the challenge to the wage rate, rather than the issuance of any preliminary injunction. The court reasoned that the growers reasonably relied upon DOL's approval of job clearance orders they submitted "premised on the Farmer Memorandum . . . after what appeared to the growers to be a reasonable internal evaluation and analysis by the DOL" up until the filing of the plaintiffs' suit, three months later. *Id.* The court reasoned that the growers reasonably relied upon DOL's approvals, even after the complaint was filed, because "at that point, on the eve of the harvest, their plans were irrevocably made" and "the approved wage rate played a central part in their economic planning for the harvest season." *Id.* Therefore, the key issue in *Morrison* was not whether a preliminary injunction was issued, but whether the growers had any "alternative but to go forward with the hiring of the H-2[A] workers at the rate approved in their job orders" after they were put on notice, by the complaint, that the regulation may be found invalid later. *Id.* at 374.

In sum, close review of the cases relied upon by the plaintiffs reveals significant questions about whether grant of the preliminary injunctive relief requested would, without

more, remedy the harm of lost backpay wages, which plaintiff Doe and similarly situated sheepherders may claim at some future date in some other litigation against parties not before the Court.

### B.      Balance of Equities

The third factor for injunctive relief requires a showing that the balance of hardships warrants an equitable remedy. In making this assessment, the court may consider whether the requested injunctive relief would "substantially injure other interested parties." *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009) (framing the balance of harms factor as an inquiry into whether "an injunction would substantially injure other interested parties"); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (same). As discussed above, the requested injunctive relief would do little to redress the plaintiffs' alleged harms, and no irreparable harm is likely to inure to the plaintiffs in the absence of immediate injunctive relief. On the other hand, the preliminary injunction will bring the H-2A program to a halt, harming American employers "who rely on H-2A workers and the communities that rely on those industries, and participants in the larger market for goods and services derived from sheep and goats," as well as foreign workers who seek work through the H-2A program. Defs.' Opp'n at 17.

The plaintiffs dismiss these harms as "speculative" and capable of "immediate[] ameliorat[ion]." Pl.'s Reply at 24–25. As the plaintiffs' own evidence demonstrates, however, these harms to American employers and foreign workers who depend on the operation of the H-2A program are real. New and currently pending H-2A applications awaiting certification are being filed by employers. *See* Pls.' Notice Regarding Exhibit M to Motion for a Temporary Restraining Order And/Or Preliminary Injunction at 2, ECF No. 13. Enjoining further

21

certifications at the current wage rate, as requested by the plaintiffs, would effectively result in a moratorium on the H-2A program, leaving in limbo the lives and businesses of those affected, albeit for the short period before the 2015 Rule goes into effect.

The plaintiffs argue, even if the injunctive relief does pose harms to third-parties, the disruptive effect can be "immediately ameliorated" by DOL's issuance of a "temporary emergency regulation." Pl.'s Reply at 25 (citing *Northern Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 19–20 (D.D.C. 2009) for proposition that an agency may "promulgate a narrowly focused and temporary emergency regulation" to address any disruption to a regulatory scheme). Contrary to the plaintiffs' suggestion that DOL can issue an emergency rule virtually overnight, Hrg. Tr. at 18:14–20 ("I think if you were to issue a ruling today . . . the Department of Labor . . . could issue an emergency rule tomorrow[.]"), DOL is required to take administrative steps that may, in fact, delay the effective date of any new rule. For example, to bypass notice-and-comment procedures, an agency must find "good cause" to do so and "incorporate the finding and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(B); *see also Sorenson Communications Inc. v. F.C.C.*, 755 F.3d 702, 706–07 (D.C. Cir. 2014) (noting that an agency invoking "good cause" must present "something more than an unsupported assertion"). In fact, the defendants inform the Court that any invocation of good cause needs to first go "through the bureaucratic process, the office of information, [and] regulatory affairs," potentially delaying the effective date of any emergency rule. Hrg. Tr. 22:7–18.[9]

---

[9]     The defendants also indicate, without explanation, that to issue an emergency rule, DOL would first need to retract the already published new rule, pushing back the effective date of the new rule past the current deadline of November 16, 2015. Hrg. Tr. 22:9–18.

In light of the minimal benefits of the requested injunctive relief to the plaintiffs and the likelihood of substantial harms to interested third-parties, the Court finds that the balance of the equities weighs against issuing the plaintiffs' requested injunction.

### 3. The Public Interest

Likewise, the requested injunction would also not be in the public interest. The Court has already found, after considering "whether vacating the TEGLs would have a disruptive effect on the herding industry," *Mendoza*, 754 F.3d at 1025, that the public interest is best served by retaining the 2011 TEGLs until the effective date of the 2105 Rule, which is fully informed by notice and public comment. Remedial Order, 72 F. Supp. 3d at 174–75. As noted, this portion of the Remedial Order was entered with the consent of all parties. *Id*. Issuance of a preliminary injunction that imposes a moratorium on the certification of any new H-2A application would effectively, abruptly and belatedly, undo this portion of the Remedial Order, which has been in effect for over a year. Accordingly, the Court finds that the public interest does not support a preliminary injunction.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for a Preliminary Injunction is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: October 31, 2015

_____
BERYL A. HOWELL
United States District Judge