# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HISPANIC AFFAIRS PROJECT, *et al.*,

Plaintiffs,

v.

THOMAS E. PEREZ, in his official capacity
as Secretary of U.S. Department of Labor, *et
al.*,

Defendants.

Civil Action No. 15-cv-01562 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiffs—an American former sheepherder, two foreign sheepherders currently

employed in the United States on temporary H-2A visas, one former H-2A herder who intends to

return to the United States to work as a herder on an H-2A visa, and a nonprofit membership

organization for Hispanic immigrant workers, Second Amended Compl. ("SAC") ¶¶ 4–8, ECF

No. 58; Pls.' Notice Regarding Pl. John Doe, ECF No. 81—initially filed this lawsuit, on August

18, 2015, against the United States Secretary of Labor, the Department of Labor ("DOL"), and

DOL's Assistant Secretary of Employment and Training Administration (collectively, "DOL

Defendants"), challenging the DOL's application of two administrative rules set out in Training

and Employment Guidance Letters ("TEGLs") issued in 2011.  *See generally* Compl., ECF No.

2; *see also Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014).  The 2011 TEGLs provided

special procedures for hiring foreign temporary workers on general agricultural H-2A visas to

work as cattle, goat, and sheep herders on the open range on terms intended to avoid adversely

affecting the wages and working conditions of U.S. workers similarly employed.

At the time of filing the instant lawsuit, the 2011 TEGLs had already been held invalid in

the *Mendoza* litigation and were operating on borrowed time, pending the effective date of a

superseding rule, pursuant to a remedial order entered with the agreement of all parties in the *Mendoza* litigation to avoid disruption in the industry. *See Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) ("Remedial Order"). Indeed, less than three months after the instant suit was filed, the 2011 TEGLs were superseded by a new 2015 rule, made effective on November 16, 2015. *See* Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States ("2015 Rule"), 80 Fed. Reg. 62,958 (Oct. 16, 2015) (codified at 20 C.F.R. § 655).

Thereafter, the plaintiffs amended their complaint twice, adding claims as well as defendants, including two federal government defendants, the United States Secretary of Homeland Security and the Department of Homeland Security ("DHS") (collectively with original defendants, "Federal Defendants"), and two private defendants, the Western Range Association ("WRA") and the Mountain Plains Agricultural Service ("MPAS") (collectively, "Association Defendants"), who are alleged to be joint employers of sheepherders subject to the superseded 2011 TEGLS and to the new 2015 Rule. SAC ¶¶ 13–17. The operative complaint now asserts seven claims against the Federal Defendants, challenging DOL's application of the superseded 2011 TEGLS and the substance of the new 2015 Rule, and two additional claims against the Association Defendants, seeking back pay under both the 2011 TEGLs and 2015 Rule, which administrative rules the plaintiffs allege are invalid, thereby entitling the foreign sheepherders "to the difference between the unenforceable wage term and a reasonable wage." *Id.* ¶¶ 103–26.

Pending before the Court are the Federal Defendants' motion to dismiss and the Association Defendants' multiple motions to dismiss, strike, sever, transfer venue, and reconsider the order denying their motion to disallow one of the plaintiffs from proceeding under

a pseudonym.  *See* Gov't Defs.' Mot. Dismiss ("Gov't's Mot."), ECF No. 64; Defs. MPAS and

WRA's Mot. Dismiss Pls.' Second Am. Compl. Pursuant to Fed. R. Civ. P. 12 (B)(1) and (6),

Motion to Strike Pursuant to Fed. R. Civ. P. 12(f), Mot. to Sever and Transfer Venue, and

Motion to Reconsider Order on Motion to Proceed under a Pseudonym ("Ass'n Defs.' Mot."),

ECF No. 63.  For the reasons set out below, the Federal Defendants' motion to dismiss is granted

in part and denied in part, and the Association Defendants' motions to sever and transfer are

granted and their motions to dismiss, strike, and to reconsider the order on motion to proceed

under a pseudonym are denied, without prejudice.

## I.     BACKGROUND

The operation of the H-2A visa program and the invalidation of the 2011 TEGLs leading

to the Remedial Order have been described in detail in prior opinions of this Court and the D.C.

Circuit.  *See Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 63–66 (D.D.C. 2015),

*vacated and remanded Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014); Remedial

Order, 72 F. Supp. 3d at 169–71.  This background is, consequently, only briefly summarized

here, followed by a review of the plaintiffs' claims and the pertinent procedural history.

### A.     The H-2A Statutory Regime and the Open Range Herder Rules

The Immigration and Nationality Act ("INA") authorizes the grant of temporary work

visas to any nonimmigrant alien "having a residence in a foreign country which he has no

intention of abandoning who is coming temporarily to the United States to perform agricultural

labor or services."  8 U.S.C. § 1101(a)(15)(H)(ii)(a).  In order to hire such foreign workers,

American employers must first obtain certification from the Secretary of Labor, who may certify,

or approve, the temporary work visas, called H-2A visas, when, *inter alia*, (1) "there are not

sufficient workers who are able, willing and qualified, and who will be available at the time and

place needed, to perform the labor or services involved in the petition," and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 1188(a)(1)(A). DHS, upon consultation of DOL's labor certification, ultimately issues the visas. *Id.* § 1184(c)(1).[1]

To satisfy the statutory mandate that H-2A workers not "adversely affect the wages and working conditions" of domestic workers, DOL has adopted regulations setting minimum wages and working conditions provided to domestic and foreign workers. *Mendoza*, 754 F.3d at 1008. In particular, DOL requires H-2A employers to pay their hourly workers the highest of what is known as an adverse effect wage rate ("AEWR"), "the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage." 20 C.F.R. § 655.120(a). The AEWR does not apply to open-range herders, such as cattleherders, sheepherders, and goatherders, however, because of the "unique occupational characteristics of herding—including spending extended periods in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock." *Mendoza*, 754 F.3d at 1008–09. Instead, the 2011 TEGLs provided special variances from the default AEWR and imposed different methods of calculating the prevailing wage for each state, which is the minimum that employers are required to pay foreign H-2A open-range herders. *Id.* at 1008.

In October 2011, four Americans, who had all stopped working as open-range herders at least one year before the 2011 TEGLs went into effect, sued the Secretary of Labor and the Department of Labor, challenging the procedural validity of the 2011 TEGLs due to their promulgation without notice-and-comment as required under the Administrative Procedure Act

---

[1] The INA delegates the implementation power to the Attorney General, who, in turn, may delegate this responsibility to the Immigration and Naturalization Service (INS), which is now located within the Department of Homeland Security. *See* INA, § 103(a), 66 Stat. at 173–74; *Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez*, 458 U.S. 592, 595 (1982); Homeland Security Act of 2002, Pub. L. No. 107–296, §§ 402, 471, 116 Stat. 2135 (2002).

("APA"), 5 U.S.C. § 500 *et seq.  See Mendoza*, 924 F. Supp. 2d 307, 310 (D.D.C. 2013).[2]  The

plaintiffs succeeded in their challenge, and this Court, with the consent of all parties and to

minimize disruption in the industry, retained in effect the invalidated TEGLs until the effective

date of the new rule, which was set "to be no later than 30 days after the rule's publication or

December 1, 2015, whichever is earlier."  Remedial Order, 72 F. Supp. 3d at 175.

      In accordance with the court-ordered time schedule, in April 2015, DOL published notice

for comment on a proposed rule to replace the 2011 TEGLs.  *See* Notice of Proposed Rule on

Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of

Livestock on the Open Range in the United States ("NPRM") (Apr. 15, 2015), 80 Fed. Reg.

20,300.  Towards Justice, counsel to the plaintiffs in this case, along with 53 other groups and 3

individuals, commented on the NPRM, with the general appraisal being that the proposed rule "is

a welcome change that begins to address the wage stagnation in the industry."  Comments of

Farmworker Justice, *et al.* at 1, Docket No. ETA-2015-0004-0460 (June 1, 2015).  Towards

Justice stated that they "applaud and appreciate elements of the proposed rule that will greatly

benefit both temporary foreign workers and U.S. workers alike, including long-overdue wage

increases and other proposed provisions that seek to address the poor working conditions."  *Id.*

Echoing their complaints about the 2015 Rule in this case, however, Towards Justice expressed

disagreement with DOL's proposed 44-hour workweek as the basis for the monthly salary

because "worker surveys indicate that most workers average in excess of 80 hours per week

---

[2]      While none of the plaintiffs had worked, or sought work, as an open-range herder after promulgation of the 2011 TEGLs, *Mendoza*, 924 F. Supp. 2d at 318, the D.C. Circuit concluded that they had standing based upon their averment of "their intention to do so if wages and working conditions improve."  *Mendoza*, 754 F.3d at 1013.

while on the open range," and the lack of distinction "between time spent on the ranch performing ranch duties and time spent on the range." *Id.* at 1–2.[3]

On October 16, 2016, DOL published the final rule, which became effective on November 16, 2015, two weeks earlier than the deadline set by the Remedial Order. *See generally* 2015 Rule; 20 C.F.R. § 655. The 2015 Rule effectively raised the prevailing wage from $750 per month in most states under the 2011 TEGLs to around $1206 per month, *see* 80 Fed. Reg. at 62,987 (former prevailing wage rate), 70,840-01 (new prevailing wage rate), in addition to requiring employers to provide, free of charge, all necessary tools, supplies and equipment, *id.* at 62,977, 62,980–81; communication arrangements to enable herders working in remote locations, where electronic communications may not operate effectively, to have a method to provide regular updates, *id.* at 62,977; and either three sufficient meals per day or free kitchen facilities and adequate food provisions, *id.* at 62,981–82.

### B.     The Plaintiffs' Claims

The plaintiffs in this case are (1) the Hispanic Affairs Project ("HAP"), an organization with members who are both current and former H-2A sheepherders, SAC ¶ 4; (2) two current H-2A sheepherders, Alfredo Salcedo and Rafael De La Cruz, who allege they were employed pursuant to DOL certifications issued under both the 2011 TEGLs and the new 2015 Rule, *id.* ¶¶ 6–7; (3) John Doe, a former H-2A sheepherder, who is currently in his country of origin but who intends to return to the United States to work as an H-2A shepherd in the near future and who also alleges that he was employed pursuant to DOL certifications under both the 2011 TEGLs and the 2015 Rule, *id.* ¶ 5; Pls.' Notice Regarding Pl. John Doe; and (4) Rodolfo Llacua, a former sheepherder and U.S. citizen, who avers that he cannot pursue his preferred profession

---

[3]     The final 2015 Rule increased the hours to use a 48-hour workweek as the basis for computing the monthly salary.

of sheepherding because of the low wages set by DOL, SAC ¶ 8.  Overlapping groups of these plaintiffs assert three categories of claims against the Federal Defendants and the Association Defendants.

First, in Counts One through Four, a group of plaintiffs challenge the already invalid and vacated 2011 TEGLs for authorizing the payment of illegally low wages.  Specifically, HAP and the three current and former H-2A sheepherders, on their own behalf, and on behalf of a class of "all persons who worked as shepherds under the United States Department of Labor's 2011 Shepherd TEGL within the relevant statute of limitations" ("2011 Shepherd TEGL Class"), *id.* ¶ 62, allege that DOL violated the APA by not complying with the 2011 TEGLs when determining the prevailing wage rates applicable to certifications of H-2A sheepherder applications, causing the plaintiffs to be harmed by illegally low wages, *see id.* ¶¶ 103–10.

Second, in Counts Five through Seven, all of the plaintiffs, on their own behalf, and on behalf of a class of "all persons who have worked as herders under the United States Department of Labor's H-2A visa programs and were or are subject [to the] 2015 Rule," *id.* ¶ 63, allege that DHS and DOL violated the APA by issuing H-2A visas and approving labor certifications, pursuant to the new 2015 Rule because this new rule (1) "authoriz[es] the creation of permanent herder jobs," in contravention of the statutory mandate; (2) "rel[ies] on data to calculate herder hours and the base-rate of pay that were arbitrarily derived;" and (3) "authoriz[es] an illegally expansive definition of 'herder' and 'range,'" *id.* ¶¶ 111–16.

Finally, in Counts Eight and Nine, the three current and former H-2A herders seek back pay from the Association Defendants, due to the illegal 2011 TEGLs and the allegedly unlawful 2015 Rule, on their own behalf, and on behalf of a class of "all persons who entered into contracts as H-2A Shepherds with the WRA during any time which H-2A shepherd minimum

wages were established by DOL using the H-2A Special Procedures within the relevant statute of limitations," *id.* ¶ 78, and a class of "all persons who entered into contracts as H-2A herders with the MPAS during any time which H-2A shepherd minimum wages were established by DOL using the H-2A Special Procedures within the relevant statute of limitations," *id.* ¶ 91.  The amount of back pay sought is the difference between the minimum wages set under the invalid 2011 TEGLs and the current 2015 Rule and a "reasonable wage." *id.* ¶¶ 117–26.

      **C.**    **Procedural History**

The plaintiffs initially filed the instant lawsuit in the United States District Court for the District of Colorado.  After that court denied the plaintiffs' *ex parte* motion for a temporary restraining order and set a briefing schedule for the plaintiffs' motion for a preliminary injunction, the case was transferred, by joint motion of the parties, to this Court as related to the *Mendoza* litigation.  Joint Motion to Transfer Case to this Court, ECF No. 15; Order, dated September 25, 2015, ECF No. 19; Defs.' Notice of Related Case, dated September 29, 2015, ECF No. 23; Pls.' Notice of Related Case, dated September 30, 2015, ECF No. 24; Order, dated October 5, 2015, ECF No. 25.

The plaintiffs then sought preliminary injunctive relief "enjoin[ing] DOL from certifying any additional H-2A Applications for Temporary Employment Certifications ("H-2A Applications") for H-2A sheepherders at the illegal wage floor."  Pls.' Mem. Supp. Prelim. Injunction at 2.  Following a hearing, the Court denied the plaintiffs' motion for a preliminary injunction, despite finding that "[t]he plaintiffs have persuasively pointed out the deficiencies in the wage rates implemented under the authority of the 2011 [] TEGL." *Hispanic Affairs Project*, 141 F. Supp. 3d at 67.  The extraordinary relief of a preliminary injunction was not warranted because the plaintiffs failed to demonstrate they would otherwise suffer irreparable harm or that

the balance of equities and the public interest weighed in favor of the relief sought.  *Id.* at 68.
The Court noted that the "timing of the plaintiffs' lawsuit undermines their argument that they
are suffering irreparable harm," since "the plaintiffs have had ample notice that the challenged
wage rates issued under the 2011 Sheepherder TEGL were problematic but failed to bring a
lawsuit until just a few months before that rule will be vacated."  *Id.* at 68–69.  Moreover, the
Court rejected the plaintiffs' argument that a preliminary injunction enjoining new labor
certifications was necessary to obtain back pay in the future from employers, who were not then
parties to the litigation, explaining that in other cases, "the key issue [] was not whether a
preliminary injunction was issued, but whether" the employers "reasonably relied upon DOL's
approvals . . . after they were put on notice, by the complaint, that the regulation may be found
invalid later."  *Id.* at 73–74 (discussing *Frederick Cty. Fruit Growers Ass'n v. Martin*, 968 F.2d
1265, 1274 (D.C. Cir. 1992) and *Morrison v. Dep't of Labor*, 713 F. Supp. 664, 671 (S.D.N.Y.
1989)).  At the same time, the Court found that the requested preliminary injunction would
"bring the H-2A program to a halt, harming American employers who rely on H-2A workers[,]
. . . the communities that rely on those industries, [] participants in the larger market for goods
and services derived from sheep and goats, as well as foreign workers who seek work through
the H-2A program."  *Id.* at 74 (internal quotations omitted).

Less than three weeks after the denial of preliminary injunctive relief, the 2015 Rule went
into effect, superseding the 2011 TEGLs, pursuant to which the plaintiffs brought their initial
complaint.  *See generally* 2015 Rule.  The plaintiffs continue, however, to press their challenge
to DOL's application of the 2011 TEGLs in order to bolster their claims for back pay against the
Association Defendants.  *See generally* SAC.

Ripe for resolution are the Federal Defendants' motion to dismiss for lack of standing and for failure to state a claim, and the Association Defendants' motions to dismiss, or, in the alternative, to sever and transfer, to strike, and to reconsider the Colorado court's order permitting the plaintiff John Doe to proceed pseudonymously.[4]

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Under 12(b)(1)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiffs bear the burden of demonstrating the court's subject-matter jurisdiction over their claims. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  Absent

---

[4]    The plaintiffs have sought leave to file a sur-reply on the grounds that the defendants raised new authorities, new factual allegations, and new legal theories in their replies.  *See* Pls.' Mot. for Leave to File a Sur-Reply to Defs.' Replies Supp. Defs.' Mots. Dismiss, ECF No. 77.  All the defendants oppose this motion because all of the new authorities, factual allegations, and theories were made in response to arguments raised by the plaintiffs in their opposition.  *See* Gov't Defs.' Opp'n and Resp. to Pls.' Mot. to File a Sur-Reply at 1, ECF No. 78; Defs. MPAS & WRA's Opp'n to Pls.' Mot. for Leave to File a Sur-Reply at 1–2, ECF No. 79.  The plaintiffs' motion for leave to file a sur-reply is denied because the defendants' replies did not expand the scope of the issues presented or raise any matters for the first time, but merely addressed issues raised in the plaintiffs' opposition.  *See Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011); *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). In any event, the pending motions are resolved on grounds separate from those set forth in the alleged new authorities, facts, or legal theories.  Therefore, the plaintiffs' interests are not harmed in any way despite not having an opportunity to respond to those arguments.

subject matter jurisdiction over a case, the court must dismiss it.  *Arbaugh v. Y&H Corp.*, 546

U.S. 500, 506–07 (2006); Fed. R. Civ. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true

all uncontroverted material factual allegations contained in the complaint, *Am. Freedom Law*

*Center v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016), and "'construe the complaint liberally,

granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged,'"

*Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196,

1199 (D.C. Cir. 2004)).  The court need not accept inferences drawn by the plaintiff, however, if

those inferences are unsupported by facts alleged in the complaint or amount merely to legal

conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may

"'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'"

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107–08 (D.C. Cir. 2005) (quoting *Haase v.*

*Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)), and "consider[] facts developed in the record

beyond the complaint," *id.*; *see also Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir.

1992) (disposing of a motion to dismiss for lack of subject matter jurisdiction and explaining

that, "where necessary, the court may consider the complaint supplemented by undisputed facts

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts").  To do so, "the district court may consider materials outside the

pleadings."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also*

*Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (examining materials outside the

pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction);

*Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that

courts may consider materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

### B. Motion to Dismiss Under 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," but "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" of "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id*. at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact.  *Twombly*, 550 U.S. at 555; *Sissel v. U.S. Dep't of Health and Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014) (in considering a Rule 12(b)(6) motion, explaining that "[t]he court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but

is not required to accept the plaintiff's legal conclusions as correct") (internal quotations and

citation omitted)).  In addition, courts may "ordinarily examine" other sources "when ruling on

Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also English v. D.C.*, 717 F.3d 968, 971 (D.C. Cir.

2013) ("We may consider attachments to the complaint as well as the allegations contained in the

complaint itself.").

## III.   DISCUSSION

The Federal Defendants and the Association Defendants move separately to dismiss the

three groups of claims asserted by the plaintiffs: (1) claims in Counts One through Four

challenging DOL's application of the 2011 TEGLs; (2) claims in Counts Five through Seven

challenging the 2015 Rule; and (3) claims in Counts Eight and Nine against the Association

Defendants for back pay under the 2011 TEGLs and the 2015 Rule.  The Association Defendants

further move, in the alternative, to sever and transfer the two claims for back pay against them.

Since the alleged injuries and causes of action implicated by each group of claims are different,

the Court considers the defendants' motions as to each of the three groups of claims *seriatim*

below.

### A.   Counts One Through Four—Claims Arising from the 2011 TEGLS

The plaintiffs allege that DOL failed to apply properly the now-superseded 2011 TEGLs

to determine the prevailing wage rates for H-2A herders, in violation of the APA, during

virtually the entire period these administrative rules were in effect.  *See* SAC ¶¶ 47–48.  This

failure by DOL led to widespread wage stagnation within the herding industry, a fact

acknowledged by DOL in the NPRM for the 2015 Rule, and resulted in the exclusion of

American citizens who otherwise would have worked as sheepherders, but for the illegally low

wages and the exploitation of foreign H-2A workers. *See id.* ¶¶ 5–8, 47; NPRM, 80 Fed. Reg.

20,300, 20,307–08 (admitting that "for many years, the Department has been unable to determine

a statistically valid prevailing wage rate each year in each State in which one is needed," and

consequently, wages "effectively have not increased since 1994" in states without higher

mandatory minimum wages).

Though the 2011 TEGLs have now been superseded by the 2015 Rule, the plaintiffs—

HAP, two current H-2A herders, one former H-2A herder who intends to work as an H-2A

herder again soon, and the putative class of H-2A herders who worked under certifications

pursuant to the 2011 TEGLs—seek a declaratory judgment that the prevailing wage

determinations under the 2011 TEGLs were invalid because DOL did not apply the methodology

outlined in those administrative rules, and an order directing DOL "to promptly issue a wage

determination that accords with the regulatory framework of the 2011 [TEGLs]."  SAC ¶ 127.

The plaintiffs have made clear here, and in their prior motion for injunctive relief, that they seek

this declaratory judgment for the purpose of "pursu[ing] the separate back-pay claims . . . against

their employers—now parties to this case."  Pls.' Unified Resp. to Defs.' Mots. ("Pls.' Opp'n")

at 1, ECF No. 73.

As the Court indicated in its preliminary injunction opinion, in light of DOL's own

admissions in the NPRM, 80 Fed. Reg. at 20,307–09, and the government counsel's concession

that the 2011 TEGLs "didn't work," resulting in stagnating wages since 1994, the question of the

legality of the wages determined under the authority of the 2011 TEGLs would not appear to be

a difficult one. *Hispanic Affairs Project*, 141 F. Supp. 3d at 68 (quoting Prelim. Injunction Hrg.

Tr. at 28:19–25).  Nonetheless, as the DOL Defendants point out, the Court may not resolve the

merits of plaintiffs' claims about the validity of the wage determinations under the 2011 TEGLs if Article III jurisdiction cannot be properly invoked due to lack of standing. Gov't's Mot. at 1.[5]

"Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" *Mendoza*, 754 F.3d at 1010 (D.C.Cir.2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996)). "Until that jurisdictional threshold is crossed, 'the court cannot proceed at all in any cause.'" *Hancock v. Urban Outfitters, Inc.*, No. 14-7047, 2016 WL 3996710, at *2 (D.C. Cir. July 26, 2016) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Consequently, before engaging in any analysis about whether the plaintiffs have adequately pleaded a cognizable cause of action, the Court must first determine that "proper litigants" are presenting the claims.

To establish standing, the plaintiffs "must demonstrate [they have] suffered an 'injury in fact' that is 'fairly traceable' to the defendant[s'] action and that can likely be 'redressed by a favorable decision.'" *WildEarth Guardians v. EPA*, No. 14-1145, 2016 WL 4056089, at *4 (D.C. Cir. July 29, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Thus, for this Court to exercise subject matter jurisdiction, the plaintiffs must have suffered "'an injury in fact' that is both 'concrete and particularized,' and 'actual or imminent, not conjectural

---

[5]       In addition to challenging the plaintiffs' standing to assert claims in Counts One through Four, arising from the 2011 TEGLs, the Federal Defendants assert alternative grounds for dismissal of these claims, namely, that the plaintiffs fail to state a cognizable APA claim and that these claims are barred by the doctrines of laches and estoppel. Gov't's Mem. Supp. Mot. Dismiss ("Gov't's Mem.") at 9, ECF No. 64-1; Gov't's Mot. at 1–2. Since the plaintiffs lack standing to challenge the 2011 TEGLs against the DOL Defendants, these alternative arguments are not addressed.
        The Association Defendants also criticize the plaintiffs' claims against the DOL Defendants regarding the 2011 TEGLs, asserting these claims are moot and irreconcilable with the Remedial Order in *Mendoza*. *See* Defs. MPAS and WRA's Mem. Supp. Defs.' Mot. Dismiss Pls.' Second Am. Compl. Pursuant to Fed. R. Civ. P. 12 (b)(1) and (6), Motion to Strike Pursuant to Fed. R. Civ. P. 12(f), Motion to Sever and Transfer Venue, and Motion to Reconsider Order on Motion to Proceed Under a Pseudonym ("Ass'n Defs.' Mem.") at 15–20, ECF No. 63. The Association Defendants' arguments, however, misconstrue the crux of the plaintiffs' claims about the 2011 TEGLs. Rather than challenging the validity of the 2011 TEGLs, which have already been found procedurally invalid, the plaintiffs are challenging the validity of DOL's prevailing wage rates determinations as not in compliance with the methodological requirements of the 2011 TEGLs. *See* SAC ¶¶ 30–48. Consequently, the Association Defendants' arguments are misplaced and need not be addressed further.

or hypothetical.'"  *Hancock*, 2016 WL 3996710, at *2 (quoting *Lujan*, 504 U.S. at 560).

Furthermore, there must be a "'causal connection between the injury and the conduct complained

of,' and 'a likelihood that a court ruling in [plaintiffs'] favor would remedy their injury.'"  *Id.*

(alteration in original) (quoting *Lujan*, 504 U.S. at 561).

Here, the DOL Defendants do not dispute that the plaintiffs have alleged an injury in

fact—that they were paid an unlawfully low wage under the 2011 TEGLs—and that the injury is

traceable to the DOL's determination of the prevailing wage rates under those superseded rules.

*See* Gov't's Mem. Supp. Gov't's Mot. Dismiss ("Gov't's Mem.") at 11, ECF No. 64-1.  Instead,

the DOL Defendants contend that the plaintiffs' injury is not redressable even by a favorable

decision against the DOL Defendants.  *Id.*  Since the alleged harm is redressable only by back

pay from the Association Defendants, the DOL Defendants argue that "[t]he speculative

possibility that [a declaratory] judgment . . . on [the plaintiffs' 2011 TEGLs claims] might aid

Plaintiffs in prevailing on [their back pay claims against the Association Defendants] at some

future time is not sufficient to confer standing."  Gov't's Mem. at 12.

The parties generally agree that meeting the redressability prong depends on the impact

of the declaratory judgment sought by the plaintiffs on their claims against the Association

Defendants for back pay.  Indeed, in *Utah v. Evans*, 536 U.S. 452, 463 (2002),  relied upon by

the plaintiffs, *see* Pls.' Opp'n at 11, the Supreme Court found that the plaintiffs had standing

because the relief they sought from the government of a new census report, "[s]hould [it] contain

a different conclusion about the relative populations of North Carolina and Utah," would

mechanically lead to reapportionment, which was the ultimate relief sought for the plaintiffs'

alleged injury that they were deprived of an additional representative.  Essential to the Court's

analysis was the finding that the relief sought would have made "a change in a legal status (that

of the 'report'), and the practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Evans*, 536 U.S. at 464.

Likewise, the D.C. Circuit found redressability in *Lichoulas v. FERC*, 606 F.3d 769, 774–75 (D.C. Cir. 2010), where the plaintiff's license to operate a power plant was terminated by the Federal Energy Regulatory Commission ("FERC"), which led to the taking of his plant by the city of Lowell, Massachusetts, under eminent domain.  The relief the plaintiff sought against FERC was the reversal of the license termination decision and this relief, even if obtained, would not directly return ownership of the plant to him.  Nevertheless, obtaining the relief of reversal would be "[a] significant increase in the likelihood that [he] would obtain relief that directly redresses the injury suffered" because "both the federal and state courts in Massachusetts have noted that the resolution of [the plaintiff's] petition to [the D.C. Circuit] will have a significant impact on his eminent domain challenges." *Id.* at 775.  In fact, the District Court for the District of Massachusetts expressly stated that "[t]he validity of [the plaintiff's] license lies at the heart of [the eminent domain] case." *Id.* (quoting D. Mass. Order at 4).

By contrast, in *Fulani v. Brady*, 935 F.2d 1324, 1329–30 (D.C. Cir. 1991), the D.C. Circuit found no redressability where the plaintiff sought a change to the tax-exempt status of a presidential debate sponsor to remedy the plaintiff's alleged injury of not being invited to participate in presidential debates.  The Court reasoned that even if the relief sought were granted and the debate sponsor's tax-exempt status were revoked, the sponsor "might decline to sponsor presidential debates" thereby still preventing the plaintiff from debating, or the sponsor "could choose to include [the plaintiff] within the debates in order to retain its tax-exempt status, in which case the two major-party candidates might decline to participate in debates that do not

17

present them as the two salient candidates, thus depriving the debates of the media appeal that [the plaintiff] seeks." *Id.* at 1329. "[G]iven the number of causal factors significant to [the plaintiff's] alleged injury," the Court concluded that "the claim lacks sufficient redressability to warrant standing." *Id.*

In sum, these cases instruct that the plaintiffs may establish the redressability prong required for standing to bring their claims arising from the 2011 TEGLs against the DOL Defendants only if the declaratory judgment sought were the *sine qua non* for, or would "significantly increase [their] likelihood" of, *Lichoulas*, 606 F.3d at 775, obtaining back pay from the Association Defendants. *See also Scenic America, Inc. v. U.S. Dep't of Transp.*, No. 14-5195, 2016 WL 4608153, at *8 (D.C. Cir. Sept. 6, 2016) (finding no standing for lack of redressability where "[plaintiff] has introduced no evidence showing that vacating the [Department of Transportation's] 2007 Guidance would remove an 'absolute barrier' to its efforts." (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). Thus, the Court examines whether a favorable judgment for the plaintiffs on Counts One through Four against the DOL Defendants is necessary for the plaintiffs' back pay claims in Counts Eight and Nine against the Association Defendants to succeed.

Here, the plaintiffs seek back pay from the Association Defendants on the basis of quasi-contract. *See* SAC ¶¶ 117–26. They reason that because the "minimum wages set under the 2011 TEGL[s] and the 2015 Rule are invalid," "the wage terms in the service contracts" entered into with the employers are "unenforceable," triggering entitlement by the foreign H-2A workers "to the difference between the unenforceable wage term and a reasonable wage," *id.* ¶¶ 119–20, 124–25. Alternatively, they claim that they are entitled to restitution, under unjust enrichment

and *quantum meruit* theories, so that the employers are not unjustly enriched by the payment of "illegally low amount[s]." *Id.* ¶¶ 121, 126.

Parties may bring a quasi-contract claim, also known as an implied-in-law contract claim, where there is no contract between the parties or where the contract is invalid or unenforceable. *See* 1-1 Corbin on Contracts § 1.20.  Conversely, "[w]here . . . there is an enforceable express or implied-in-fact contract that regulates the relations of the party or that part of their relations about which issues have arisen, there is no room for quasi contract."  *Id.*; *Levine v. Am. Psychological Ass'n*, 766 F.3d 39, 46 (D.C. Cir. 2014).  As opposed to bargained-for contractual obligations, "quasi-contractual obligation[s] [are] created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent."  *Id.* Thus, to succeed on such a claim, the plaintiffs must "plausibly allege that [they] conferred a benefit on [the Association Defendants,] that [the Association Defendants] retained the benefit, and that [the Association Defendants'] retention of the benefit is unjust under the circumstances."  *Berry Law PLLC v. Kraft Foods Grp., Inc.*, 777 F.3d 505, 508 (D.C. Cir. 2015).

No party can seriously dispute that the foreign sheepherders conferred a benefit on the employers by working on the range.  Thus, the remaining questions are (1) whether the plaintiffs can establish that wage terms in employment contracts with foreign sheepherders, which terms were based on minimum wages set under the 2011 TEGLs, are invalid and give rise to a contract implied-in-law requiring judicial crafting of the wages to which the foreign sheepherders are reasonably entitled, and (2) whether the Association Defendants' retention of the benefit—in this case the difference between what a reasonable wage would have been and the wage that was actually paid—is unjust.  The sought-after declaratory judgment in favor of the plaintiffs' on the

2011 TEGLs claims against the DOL would not significantly increase the likelihood of proving either of these two elements.

As the Court explained in the preliminary injunction opinion in this case, whether the plaintiffs may plausibly argue that no enforceable contract existed between the foreign sheepherders and the Association Defendants is predicated upon the "validity of the regulation." *Hispanic Affairs Project*, 141 F. Supp. 3d at 73.  The validity of the 2011 TEGLs, however, is not an outstanding question.  Not only did the D.C. Circuit hold, in June 2014, in a lawsuit filed only two months after the challenged TEGLs were first issued in August 2011, that the 2011 TEGLs were procedurally invalid for failure to comply with the notice and comment requirements of the APA, *Mendoza*, 754 F.3d at 1025, but also DOL's April 2015 NPRM admitted that due to the "sustained scarcity of U.S. workers employed in open range herding and livestock production" and the fact that "[f]ew employers provide U.S. worker wage information in response to prevailing wage survey requests," the methodology for determining the prevailing wage rate established in the 2011 TEGLs was essentially unworkable.  *See* NPRM at 20,302, 20,309 ("The lack of reportable data in the [State Workforce Agencies] surveys have likely contributed to the stagnation of wages over the last 20 years in these occupations, which has a prohibited adverse effect on the domestic labor market.  As a result, the Department cannot continue to rely on these surveys under current conditions and fulfill its statutory mandate to prevent adverse effect to workers' wages and working conditions.").

This litigation history demonstrates that the validity of the 2011 TEGLs has been questioned since shortly after their issuance in 2011 and that question was resolved definitively by the D.C. Circuit's finding of procedural invalidity in June 2014, and only compounded by DOL's own admissions in April 2015 regarding the lack of reliability of the data used to make

wage determinations under those rules.  A procedurally invalid regulation is just as invalid as a substantively invalid regulation, and both may provide the basis for restitution.  *See Hispanic Affairs Project*, 141 F. Supp. 3d at 73 (citing *Frederick Cty. Fruit Growers Ass'n, Inc.*, 968 F.2d at 1273).  Thus, any request now for a declaratory judgment that the wages determined under the procedurally invalid 2011 TEGLs are also substantively invalid appears superfluous and merely gilding the proverbial lily.[6]

Upon consideration of the third element of a quasi-contract claim—whether the defendant's retention of the benefit of the plaintiff's labor is unjust under the circumstances— courts often look to what the parties' reasonable expectations were.  *See Berry Law*, 777 F.3d at 508 (discussing whether the defendant "reasonably [could] have known [the plaintiff] contemplated [] payment" for its services); *Levine v. Am. Psychological Ass'n (In re APA Assessment Fee Litig.)*, 766 F.3d 39, 46–47 (D.C. Cir. 2014) (finding the defendant's retention of the plaintiffs' special assessment fees was unjust because the plaintiffs expected the special assessment fees to be part of their membership dues, when they were not); *Bregman v. Perles*, 747 F.3d 873, 877 (D.C. Cir. 2014) (finding the defendants' "enrichment became unjust[] when they unequivocally refused to compensate [the plaintiff] for the services he had performed" upon the understanding that he would be compensated); *cf. Albrecht v. Comm. on Emp. Bens. of Fed. Reserve Emp. Bens. Sys.*, 357 F. 3d 62, 69 (D.C. Cir. 2004) (finding no unjust retention of surplus employee contribution by the defendant Board where the plaintiff employees had no reasonable expectation that any surplus funds would be returned); *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C. Cir. 1998) (upholding a restitution award where the defendant had

---

[6]       The plaintiffs' insistence that the sought-after declaratory judgment is a prerequisite for the back pay claims may, in fact, be counter-productive to the extent this position may be construed as a concession that the procedural invalidity of the 2011 TEGLs is insufficient to give rise to a quasi-contract claim.

been notified in writing that the plaintiff insurance company "expected reimbursement for benefits for which [the defendant] was not eligible").

This last element of a quasi-contract claim is similar to the discussion of "reasonable reliance" in the equitable restitution analyses in both *Frederick County* and *Morrison*.  As the Court previously explained during consideration of the plaintiffs' preliminary injunction, the relevant inquiry in determining the parties' reasonable expectations and reliance is whether at the time the employers submitted their job orders they "knew the [relevant prevailing wage] regulation 'was, if not flatly invalid, of at least dubious validity.'"  *Hispanic Affairs Project*, 141 F. Supp. 3d at 73 (*quoting Frederick Cty.*, 968 F.2d at 1274); *see also Morrison*, 713 F. Supp. at 673 (focusing on whether the growers were put on notice that the wage rate was invalid at the time they submitted their job orders).  The issuance of a declaratory judgment at this stage that the prevailing wage rates issued under the 2011 TEGLs were invalid is completely irrelevant to any necessary analysis of the parties' expectations at the time the employers made their economic plans for the various sheepherding seasons.

Furthermore, to the extent the plaintiffs reason that receiving a judgment against the DOL Defendants on the 2011 TEGLs may be helpful to their back pay claims because DOL may be ordered to "'go[] back to the drawing board' and 'issue[] some sort of new rule or wage' for purposes of the backpay claim," Pls.' Opp'n at 15 (quoting Hrg. Tr. at 34–35 (government attorney speaking)), they are mistaken.  Under a quasi-contract claim, the court has the freedom to determine the appropriate remedy, guided only by the value of the plaintiffs' services.  *See Majlessi v. Parman*, No. B241063, 2013 WL 3654162, at *7–8 (Cal. Ct. Appeal 2013) (unpublished) (collecting cases from California that under quasi-contract, the plaintiff can recover the reasonable value of his services); *Redland v. Redland*, 288 P.3d 1173, 1208 (Wyo.

2012); *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012).[7] Any new rule or wage determined by DOL, while potentially helpful, is unnecessary to that analysis.

The unique procedural posture of the plaintiffs' challenge to the 2011 TEGLs proves fatal to their standing. Even if the plaintiffs were to prevail on their claims against the DOL Defendants in challenging the validity of wage determinations under the 2011 TEGLs, this "win" would not significantly add to the extant judicial and administrative record regarding the invalidity of the challenged rules, nor significantly address the other elements the plaintiffs are required to show to recover back pay from the Association Defendants. In other words, the declaratory order sought by the plaintiffs here against the DOL Defendants is attenuated from the ultimate relief they seek of back pay from the employers and, even if granted, would not considerably help them obtain that particular remedy.

Accordingly, the plaintiffs' claims against the DOL Defendants set out in Counts One, Two, Three, and Four of the Second Amended Complaint challenging the wage determinations under the now defunct 2011 TEGLs are dismissed for lack of redressability and standing.

### B.  The 2015 Rule Claims

All plaintiffs—HAP, two current H-2A sheepherders, one former H-2A sheepherder who intends to return to the United States to work as a herder under an H-2A visa soon, and an American former sheepherder—on their own behalf and on behalf of a class of "all persons who have worked as herders under the United States Department of Labor's H-2A visa program and

---

[7]    The plaintiffs have not clarified under which state law their quasi-contract claims should be analyzed and it is not immediately clear which states' laws are implicated. *See* SAC at 25 ("Quasi-Contract Under the Laws of Several States"). The individual plaintiffs appear to be based in Colorado, as is HAP. *See id.* ¶¶ 4–8. One of the Association Defendants, WRA, is a California entity with a principal place of business in Utah, and the other Association Defendant, MPAS, is a Wyoming entity with a principal place of business in Wyoming. *See id.* ¶¶ 16–17. Presumably, the Association Defendants have member employers operating elsewhere, including in Colorado. The valuation of damages under quasi-contract theories may be the same across many jurisdictions.

were or are subject to 2015 Rule" assert claims against the Federal Defendants alleging that "DOL's actions in certifying labor certification applications and DHS's actions in issuing H-2A herder visa authorizations in accord[ance] with the" 2015 Rule violate the APA, and such actions are subject to judicial review under 5 U.S.C. § 706 (2)(A), (C), and (D).  SAC ¶¶ 52, 63, 112, 114, 116.  Specifically, the plaintiffs challenge the 2015 Rule for three reasons, alleging that this rule: (1) violates the congressional mandate in 8 U.S.C. § 1101(a)(15)(H)(ii)(A) to create a program for "temporary or seasonal" foreign agricultural workers by "[a]uthorizing the creation of permanent herder jobs that are not temporary or seasonal;" (2) relies on "inadequate data" to determine "the number of herder hours worked," *id.* ¶ 54, resulting in arbitrarily low prevailing wage rates; and (3) creating an "illegally expansive definition of 'herder' and 'range' that locks current H-2A shepherds into a lower wage and adversely affects the wages of American workers."  *Id.* ¶¶ 112 (Count Five), 114 (Count Six), 116 (Count Seven).

The Federal Defendants, again, seek to dismiss these 2015 Rule Claims for lack of standing on the part of any plaintiff and, even if any plaintiff were to have standing, for failure to state a plausible claim for relief.  *See* Gov't's Mem. at 21–22, 44–45.  These two arguments are addressed in turn below.

### 1.    At Least One Plaintiff Has Standing to Challenge the 2015 Rule

In considering the Federal Defendants' arguments urging a finding that the plaintiffs lack standing to challenge the 2015 Rule, *see* Gov't's Mem. at 21–22, the D.C. Circuit's holding in *Mendoza* presents a high hurdle.  The *Mendoza* Court found that four American plaintiffs, who were each former sheepherders, had constitutional standing under the competitor standing doctrine to bring a procedural APA claim against DOL challenging the 2011 TEGLs, where the plaintiffs averred that they "[we]re interested in working as herders and herding [wa]s their

preferred occupation," that they had "continue[d] to monitor the herder job market with the intention of applying for work in the industry if conditions improve," and, in fact, would have worked as herders again if "wages and working conditions improve[d]." 754 F.3d at 1013–14. Based on these averments, the D.C. Circuit found that even though the American plaintiffs had left the herding profession prior to the effective date of the 2011 TELGs and were no longer working as herders, they "are not removed from the herder labor market," and, thus, continue to be direct competitors to H-2A sheepherders. *Id.* at 1014.

Moreover, the *Mendoza* Court found that the American former sheepherder plaintiffs, as American workers, fell within the "zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: [the Immigration and Nationality Act ('INA')]." *Id.* at 1016. Noting that the INA provision authorizing the challenged 2011 TEGLs, 8 U.S.C. § 1188(a)(1), had "[t]he clear intent . . . to protect American workers from the deleterious effects the employment of foreign labor might have on domestic wages and working conditions," *Mendoza*, 754 F.3d at 1017, the D.C. Circuit found that the plaintiffs were among the "workers displaced by lax visa policies from jobs they otherwise would hold" and therefore "fall within the zone of interests of the INA and have a legislatively conferred cause of action to raise their claim regarding the Department of Labor's administration of the H-2A program as it regards herders," *id*. at 1018.

Applying this binding guidance, the Court finds that, although the foreign H-2A sheepherder plaintiffs and HAP members would suffer the direct adverse impacts from allegedly illegally low wages, they lack standing for failure to satisfy the zone-of-interests test. As explained in further detail below, they are simply not American workers whom the INA was designed to protect from "the deleterious effects the employment of foreign labor might have on

domestic wages and working conditions." *Mendoza*, 754 F.3d at 1017.   Nonetheless, only one

plaintiff needs to have standing to invoke the jurisdiction of the Court to review the plaintiffs'

claims. *See Mass. v. EPA*, 549 U.S. 497, 518 (2007); *U.S. Telecomm. Ass'n v. FCC*, 825 F.3d

674, 740 (D.C. Cir. 2016).   The Court finds that the plaintiff Mr. Llacua, an American former

sheepherder, has demonstrated standing to bring all Rule 2015 Claims against the Federal

Defendants.   Consequently, this Court may exercise jurisdiction over Counts Five through

Seven.

### a.      *Foreign Sheepherder Plaintiffs*

"In addition to constitutional standing, a plaintiff must have a valid cause of action for the

court to proceed to the merits of its claim" and such "a statutory cause of action extends only to

plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) (quoting *Lexmark Int'l,

Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014)).   To determine whether

the plaintiffs fall within the zone of interests, the court uses "traditional tools of statutory

interpretation" to answer the question "whether a legislatively conferred cause of action

encompasses a particular plaintiff's claim." *Lexmark Int'l Inc.,* at 1387.   Though previously

categorized as a "prudential standing" issue, the *Lexmark* Court clarified that the zone-of-

interests test is a statutory one, going directly to the heart of the plaintiffs' claims to determine

whether "'this particular class of persons ha[s] a right to sue under this substantive statute.'" *Id.*

(quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (2013) (Silberman, J.,

concurring)).   The zone-of-interests test, however, unlike the standing requirements of injury-in-

fact, traceability and redressability, is not jurisdictional, and may be waived. *See id.* at 1387 n.4;

*see also Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 319 (D.C. Cir. 2015)

(noting that rather than "a jurisdictional requirement . . . the zone of interest test is now 'a merits issue.'") (quoting *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015)); *Am. Inst. of Certified Pub. Accountants v. IRS.*, 804 F.3d 1193, 1199 (D.C. Cir. 2015) ("The IRS insists its zone of interests argument is jurisdictional, a surprising argument given that in [*Lexmark*,] a case the IRS itself cites, the Supreme Court squarely ruled to the contrary.").

The zone-of-interests test "is not meant to be especially demanding," however, because Congress intended to "make agency action presumptively reviewable" when enacting the APA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Thus, "a plaintiff falls outside the group to whom Congress granted a cause of action only when its interests 'are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Mendoza*, 754 F.3d at 1017 (quoting *Clarke*, 479 U.S. at 399). Despite this low threshold to show statutory authorization to sue, the Federal Defendants, relying on the D.C. Circuit's binding decision in *Mendoza*, argue that the "H-2A nonimmigrants are not within the INA's zone-of-interests." Gov't Mem. at 40. The Court agrees that *Mendoza* dictates that result here.

The *Mendoza* Court unequivocally held that "[t]he clear intent of [the INA's H-2A] provision is to protect *American* workers from the deleterious effects the employment of foreign labor might have on domestic wages and working conditions." *Mendoza*, 754 F.3d at 1017 (emphasis added); *see also Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 805 (D.C. Cir. 1985) ("The legislative history of [the INA] (as initially passed) clearly evinces a congressional purpose to keep American labor stalwart in the face of foreign competition in the United States. . . ."); 20 C.F.R. § 655.0 (providing that the 2015 Rule "shall be

construed to effectuate the purpose of the INA that U.S. workers rather than aliens be employed wherever possible").

Moreover, in analyzing similar provisions of the INA, other Judges on this Court have held that foreign workers do not fall within the zone of interests protected by the statute and thus lack standing to sue.  For example, in *Vemuri v. Napolitano*, 845 F. Supp. 2d 125, 130–32 (D.D.C. 2012), the court held that non-citizen workers fell outside the zone of interests of the INA and therefore lacked standing to challenge the denial of I-140 petitions for permanent employment.  The court reasoned that the plaintiffs' interests were "contrary to the specific purpose of the labor certification process and employment visa requirements, which are designed to protect U.S. workers from the adverse effects of non-citizens emigrating for employment purposes."  *Id.* at 132; *accord Pai v. U.S. Citizenship & Immigration Servs.*, 810 F. Supp. 2d 102, 110–11 (D.D.C. 2011) (concluding that a non-citizen lacked standing to sue under the INA because "the plain language of the[] statutory provisions reflects a concern to protect the interests of workers in the United States," and "nothing in the language or legislative history of [those provisions] reflects a similar concern to protect the interests of non-resident aliens seeking to enter this country to obtain a job").

Messrs. Salcedo and de la Cruz, who are foreign workers present in the United States on sheepherding visas, *see* SAC ¶¶ 6–7, along with Mr. Doe, a foreign sheepherder who formerly worked pursuant to an H-2A visa and intends to do so again, *id.* ¶5; Pls.' Notice Regarding Pl. John Doe, lack standing in this case.  HAP submitted declarations from two members, who aver only that they are "authorized to work in the United States," not that they are American citizens. *See* Pls.' Opp'n, Ex. C ¶ 2, ECF No. 73-3; *id.*, Ex. D ¶ 2, ECF No. 73-4. [8]  Thus, none of these

---

[8]      "An organization has associational standing to bring suit on its members' behalf when: (1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to

foreign plaintiffs is part of the class of American workers subject to the protection of the INA

provision under which the 2015 Rule was promulgated and, consequently, may not seek relief

under the APA.  While the interests of the foreign sheepherders may be aligned with the interests

of American workers who are shut out of the industry due to low wages, this fortuitous

alignment of goals is not enough to bring the foreign sheepherders within the statutory zone of

interests.[9]  *See Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1300 (D.C. Cir. 2015).

### b.       *American Former Sheepherder Plaintiff*

Unlike the foreign sheepherders, the American former sheepherder plaintiff, Mr. Llacua,

is similarly situated to the American former sheepherder plaintiffs in *Mendoza* and, for the

aforementioned reasons, falls well within the zone of interests of the INA.  Mr. Llacua must

nevertheless demonstrate sufficient injury-in-fact, causation, and redressability to establish

standing to bring the 2015 Rule Claims against the Federal Defendants.  Each of these three

constitutional standing elements is discussed below.

---

the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Sierra Club v. FERC*, No. 14-1249, 2016 WL 3525562, at *3 (D.C. Cir. June 28, 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).  In support of its associational standing, HAP submitted a declaration from its director, alleging that HAP "has current members who are H-2A herders and other members who are former herders," Pls.' Opp'n, Ex. A ¶ 5, ECF No. 73-1, without providing the necessary information regarding whether any of its members are American workers.  Thus, HAP has not demonstrated that at least one of its members would have standing to sue in his or her own right.

[9]        The plaintiffs argue that the foreign sheepherders fall within the zone of interests of 8 U.S.C. § 1153(b)(3)(iii), which provides that visas "shall be made available to . . . other qualified immigrants who are capable . . . of performing unskilled labor, not of a temporary or seasonal nature, for which qualified workers are not available in the United States."  *See* Pls.' Opp'n at 31–32.  The plaintiffs contend that the foreign sheepherders were harmed because they were misclassified by DHS as H-2A workers when they should have been entitled to § 1153(b)(3) visas.  *Id.* at 31.  The foreign sheepherders may be well within the zone of interests of § 1153(b)(3), but that is not the statute at issue here and, indeed, § 1153(b)(3) is mentioned nowhere in the Second Amended Complaint.  The instant claims against the Federal Defendants challenge the 2015 Rule as a violation of the H-2A program for, *inter alia*, "creat[ing] a program that authorizes the employment of foreigners who serve not as shepherds but as permanent all-purpose sheep-ranch support staff."  SAC ¶ 53.  This challenge falls squarely under the relevant INA provision analyzed by the D.C. Circuit in *Mendoza*.

###### i.      *Injury-In-Fact*

Mr. Llacua has averred all of the elements the *Mendoza* Court found dispositive in

concluding that American former sheepherder plaintiffs adequately alleged a concrete injury. [10]

Mr. Llacua avers that he initially came to the United States as an H-2A sheepherder and left this

job but is "willing and available to return to work as a sheepherder" if "wages were to increase

enough." Pls.' Ex Parte Mot. for TRO and/or Mot. for Prelim. Inj., Ex. K ("First Llacua Decl.")

¶¶ 6, 7, 8, ECF No. 1-11.  Indeed, Mr. Llacua's "preferred job is working on the range with

sheep," something he considers his "specialty because it is what [he has] done [his] whole life."

*Id.* ¶ 8.  He avers that he has been in contact with people who are in the herding industry as well

as employers, and "[found] out about [a] job as a sheepherder in [a] ranch in Utah." *Id.* ¶¶ 9, 11.

He knows, however, that employers "have a policy of paying their workers at or around the

minimum wage allowed," and, consequently, that he would make only $1200 a month, which is

insufficient for him to support his family.  Pls.' Opp'n, Ex. B ("Second Llacua Decl.") ¶¶ 3–4.

ECF No. 73-2. [11]  Instead, he avers that he is willing to return to "a shepherding job for $12 per

hour." *Id.* ¶ 6.

Thus, like the plaintiffs in *Mendoza*, Mr. Llacua has "attested to specific experience that

qualifies [him] to work as [a] herder[]; the particular working condition that led [him] to leave

the industry; the specific wages and conditions [he] would require to accept new employment as

---

[10]      The Federal Defendants argue that the standing analysis utilized in *Mendoza* is inapplicable here because
the plaintiffs in *Mendoza* alleged only procedural injury, whereas the plaintiffs here allege substantive injuries.
Gov't's Mem. at 33.  While the government is correct that "[t]he requirements for standing differ where . . .
plaintiffs seek to enforce procedural (rather than substantive) rights," and "the normal standards for immediacy and
redressability are relaxed," the analysis for determining whether the plaintiffs have alleged a sufficient injury
remains the same.  *See Mendoza*, 754 F.3d at 1010 (stating that the plaintiffs must still "establish the agency action
threatens their concrete interest").
[11]      Consideration of the declarations filed by Mr. Llacua is appropriate since courts may "'undertake an
independent investigation to assure itself of its own subject matter jurisdiction,'" *Settles*, 429 F.3d at 1107–08
(quoting *Haase*, 835 F.2d at 908), and consider facts developed in the record beyond the complaint, *id.*; *Herbert*,
974 F.2d at 197, including materials outside the pleadings, *Jerome Stevens Pharm.*, 402 F.3d at 1253.

[a] worker[]; the manner in which [he has] kept abreast of conditions in the industry; and . . . a specific possible avenue for obtaining reemployment as a herder." *Mendoza*, 754 F.3d at 1014. Therefore, the Court finds that Mr. Llacua has demonstrated sufficiently concrete injury-in-fact under the competitor standing doctrine to invoke this Court's jurisdiction over the plaintiffs' 2015 Rule Claims.[12]

### ii.    *Causation and Redressability*

Since the plaintiffs' 2015 Rule Claims are not based on a procedural injury, as were the plaintiffs' claims in *Mendoza*, the relaxed standard for "immediacy and redressability" in *Mendoza* does not apply here.  *See Mendoza*, 754 F.3d at 1010.  Nonetheless, the plaintiffs have sufficiently demonstrated that Mr. Llacua's injury of not being able to pursue his preferred profession at a decent wage is both caused by DOL's and DHS's actions in approving and issuing H-2A sheepherder visas in accordance with the 2015 Rule and can be redressed by this lawsuit.  Mr. Llacua expressly avers that he would prefer to work as a sheepherder but for the low wages set by the government that the foreign H-2A sheepherders are willing to accept, effectively shutting Mr. Llacua out of his preferred industry.  *See* First Llacua Decl. ¶¶ 6, 8–10.

The plaintiffs posit that if they succeed on the merits, DHS, the agency "responsible for the approval of visa petitions for H-2A workers," SAC ¶ 14, would be enjoined from issuing non-seasonal sheepherder visas under the H-2A visa program, which authorizes visas for

---

[12]        The Federal Defendants contend that Mr. Llacua has not demonstrated any "competitive injury with respect to [the plaintiffs'] claims that the 2015 Rule expands the definition of 'herder' and 'range'" because he does not expressly aver that he has ever worked as a "lamber," someone who works with the sheep on a ranch rather than on the open range, nor does he expressly aver that he has ever looked, or would look, for a job as a lamber.  Gov't's Reply Supp. Mot. Dismiss ("Gov't's Reply") at 12, 14, ECF No. 76.  The Federal Defendants' precise delineation between shepherds and lambers is strained.  Former shepherds like Mr. Llacua likely have a versatile set of skills such that they can and have worked with sheep on and off the range.  In any case, the crux of the plaintiffs' claims is that the 2015 Rule unlawfully depresses the wage for all sheepherders—whether they are out on the range or on a ranch.  Mr. Llacua, someone who has worked with sheep for over ten years, certainly qualifies as someone in that labor market with a direct competitor interest.

"temporary or seasonal" work only.  Pls.' Opp'n at 29–30; SAC ¶ 128.  By so enjoining the issuance of H-2A visas to sheepherders, which tie the H-2A worker to the employer who petitions for the H-2A visa, the plaintiffs contend that foreign sheepherders would be able to bargain for higher pay, leading to higher wages, such that American sheepherders can once again enter the sheepherding industry.  Pls.' Opp'n at 34–36.  At the same time, should the plaintiffs succeed, DOL would be ordered to "promptly issue a rule" that will more accurately capture the number of hours worked per week by open range herders, and redefine the terms herder and range, effectively raising the prevailing wage rates for all sheepherders, on and off the range.  *See id.* at 42–45; SAC ¶ 128.

The Federal Defendants do not seriously contend that Mr. Llacua fails adequately to demonstrate causation and redressability other than to baldly state that "Llacua and Plaintiffs provide no [such] allegations."  Gov't's Mem. at 36.  The Federal Defendants' stubborn refusal to acknowledge the link between long-term underpaid foreign workers and depressed wages for American workers in the same industry defies common sense.  *See id.* at 36, 39; Gov't's Reply at 13.  The law does not require the plaintiffs to allege with absolute certainty the sequence of events that will lead to the plaintiff's redress—only that there be "[b]asic economic logic" undergirding the plaintiffs' claims.  *See Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1197–98 (D.C. Cir. 2015).  Based on this common sense logic, the Court finds that Mr. Llacua has established competitor standing for the plaintiffs' Rule 2015 claims against the Federal Defendants.

### 2.    Plaintiffs Have Stated Claims Against the Federal Defendants

The Federal Defendants further argue that even if the plaintiffs have standing, they have failed to state a claim against DHS and DOL.  First, the Federal Defendants contend that the

plaintiffs did not sufficiently allege that "DOL failed to articulate a reasonable explanation for its policy choices," because "the final version of the rule provides, among other things: (1) a lengthy explanation of the purpose and need for the rule and the special procedures, (2) discussion of the more than 500 comments received during rulemaking, (3) a thorough analysis of the 2011 special procedure's ineffective wage methodology and other proposed wage methodologies, including the regular AEWR used under the H-2A program, (4) a requirement that [] employers adjust the herder AEWR if the AEWR increased, including for existing labor certifications, and (5) an explanation for why the normal H-2A AEWR could not be used and comments to the contrary." Gov't's Mem. at 45.  The Court disagrees.

Upon a motion to dismiss for failure to state a claim, the factual allegations in the complaint are accepted as true.  *Twombly* at 555; *Sissel*, 760 F.3d at 4.  Here, the plaintiffs have made three allegations that, accepted as true, state plausible APA claims against DOL: (1) the 2015 Rule "creates a program that authorizes the employment of foreigners who serve not as shepherds but as permanent all-purpose sheep-ranch support staff," that are neither temporary nor seasonal in nature, in direct violation of the congressional mandate set out in 8 U.S.C. § 1101(a)(15)(H)(ii)(a), SAC ¶ 53; (2) the 2015 Rule determines the prevailing wage rates based on "an unaudited review" of "employer-provided data" that herders work on average only 48 hours per week, constituting "irrational and arbitrary" agency action, "especially in light of similar problems with data-collection from employers DOL has had in administering the H-2A shepherd program in the past," *id.* ¶ 54; and (3) the 2015 Rule expands the definition of herder and range such that it "will have an adverse effect on [American ranch] workers' wages," in violation of the statutory mandate, *id.* ¶ 56.  While DOL may be well able to defend its positions

in the final analysis, after it has lodged its administrative record, a motion to dismiss is not the appropriate stage to argue that it has sufficiently done its job.

Second, the Federal Defendants argue that, in any event, the plaintiffs "fail to plead a plausible claim for relief against DHS." Gov't's Reply at 14.  According to the Federal Defendants, "the crux of [the plaintiffs'] grievance is with the 2015 Rule," which was promulgated by DOL, and they have not made "any allegation[s] concerning DHS's role in the H-2A herding program, *i.e.* any allegation concerning 8 C.F.R. § 214.2(h) generally or section 214.2(h)(5) specifically," *id.* at 16, which are DHS regulations barring DHS from issuing H-2A visas even where DOL has approved a labor certification, if "there is substantial evidence that the employment is not temporary or seasonal." *id.* at 16 (quoting 8 C.F.R. § 214.2(h)(5)(iv)(B)). The Federal Defendants' argument is unavailing.

The plaintiffs expressly allege in the Second Amended Complaint that DHS has a policy of issuing H-2A sheepherder visas for "indefinite periods," in direct contravention of the statutory mandate set out in 8 U.S.C. § 1101(a)(15)(H)(ii)(a) that H-2A visas are authorized for foreign workers who "perform only 'temporary or seasonal' agricultural work."  SAC ¶¶ 51, 53. This allegation sufficiently puts the Federal Defendants on notice as to the nature of the plaintiffs' claim against DHS, even if DHS's own implementing regulation, echoing the language of the statute, is not expressly mentioned in the complaint.

Furthermore, to the extent that DHS wishes to evade responsibility for the issuance of the H-2A sheepherder visas because DOL promulgated the 2015 Rule, the Tenth Circuit has recently, persuasively, rejected that argument, finding that while DHS may seek the advice of DOL "in the form of the grant or denial of a certification" as "a pre-condition to DHS's decision on the matter," "DHS always [has] the final decision about admitting temporary workers

irrespective of DOL's 'advice.'" *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 Fed. Appx. 205, 207 (10th Cir. 2015). Indeed, "while DHS's decision whether to admit H-2B workers hinges in part on DOL's issuance of a certification, DHS still has to decide whether the other criteria for admission of H-2B workers has been satisfied, for example, whether the alien intends to remain in the United States on a temporary basis." *Id.* at 211 (citing *La. Forestry Ass'n v. Sec'y of U.S. Dep't of Labor*, 745 F.3d 653, 672–73 (3d Cir. 2014). Thus, the plaintiffs may bring claims against DHS for allegedly rubber-stamping DOL's labor certifications under the 2015 Rule in a manner that creates a class of "all-purpose sheep-ranch support staff."[13]  SAC ¶ 53.

Accordingly, the Federal Defendants' motion to dismiss plaintiffs' 2015 Rule Claims set out in Counts Five, Six, and Seven of the Second Amended Complaint is denied.

### C.      Counts Eight and Nine: The Back Pay Claims

Lastly, the individual current H-2A sheepherder plaintiffs, on their own behalf and on behalf of classes of "all persons who entered into contracts as H-2A shepherds with the WRA [or the MPAS] during any time which H-2A shepherd minimum wages were established by DOL using the H-2A Special Procedures within the relevant statute of limitations," SAC ¶¶ 78, 91, assert back pay claims against the Association Defendants under quasi-contract and alternative theories, including "unjust enrichment and *quantum meruit*," *id.* ¶¶ 120–21, 125–26. The Association Defendants move to dismiss these claims against them under Federal Rule of Civil Procedure 12(b)(1) and (6), to strike any reference in the Second Amended Complaint to MPAS or WRA as an employer, to sever and transfer the back pay claims to the United States District Court for the District of Colorado, and to reconsider the order permitting plaintiff John Doe to proceed under a pseudonym. Ass'n Defs.' Mot. at 1–2. The Court grants the Association

---

[13]      The Federal Defendants' argument that the statute of limitation has run on any APA challenge to 8 C.F.R. § 214.2(h)(5) is unavailing for the simple reason that the plaintiffs make no such claim.

Defendants' motions to sever and transfer venue, and, consequently, denies the motions to dismiss, to strike, and to reconsider, without prejudice.

Federal Rule of Civil Procedure 20(a)(2) permits defendants to be joined if "(a) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (b) any question of law or fact common to all defendants will arise in the action."  Here, the back pay claims against the Association Defendants are not asserted "jointly, severally, or in the alternative with respect to" the plaintiffs' remaining 2015 Rule Claims against the Federal Defendants.  Instead, Counts Eight and Nine for back pay based on the misapplication of the 2011 TEGLs and the invalidity of the 2015 Rule are stand-alone claims against the Association Defendants and are entirely separate from the declaratory relief and APA claims against the Federal Defendants.

"Misjoinder of parties is not a ground for dismissing an action," but "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21.  "The Court may also sever any claim against a party."  *Id.*; *see also Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968) (noting that Rule 21 "authorizes the severance of any claim, even without a finding of improper joinder, where there are sufficient other reasons for ordering a severance"); *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 (5th Cir. 1995) (holding that Rule 21 gives the court "discretion to sever an action if it . . . might otherwise cause delay or prejudice"); *Aiello v. Kingston*, 947 F.2d 834, 835 (7th Cir. 1991) (observing that "[Rule] 21 allows a court to sever claims that are logically distinct"); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985) ("'Rule 21 gives the court discretion to sever any claim and proceed with it separately if doing so will increase judicial economy and avoid

prejudice to the litigants.'" (quoting 6 Wright & Miller, Federal Practice and Procedure § 1591 (3d ed. 2016))); 4 James Wm. Moore et al., Moore's Federal Practice § 21.05 (3d ed. 2013) (stating that "the courts agree that Rule 21 may apply even in the absence of misjoinder or nonjoinder" and "[t]he trial court thus has great discretion to restructure an action to promote the efficient administration of justice").

The plaintiffs oppose severance only on the ground that the plaintiffs' back pay claims are related to the plaintiffs' challenges to the 2011 TEGLs and 2015 Rule.  *See* Pls.' Opp'n at 54–55.  Notwithstanding this obvious relationship of the subject matter among the claims, significant differences in the nature of the claims, the named defendants, and the evidentiary support persuade the Court that severance is appropriate.  The back pay claims are predicated on state common law, rather than federal questions, and are brought solely against private parties rather than agency defendants.  Finally, the evidentiary support for the APA claims will rest on an extensive administrative record that has little bearing on the claims for back pay.  Thus, the Court will sever Counts Eight and Nine against the Association Defendants in the interest of efficiency and judicial economy.

Having severed the back pay claims, the Association Defendants' motion to transfer venue, under 28 U.S.C. § 1404, is considered next.  The Association Defendants seek transfer to the United States District Court for the District of Colorado, where some of the same plaintiffs have asserted claims against the Association Defendants and other rancher defendants, alleging that the defendants "have engaged in illegal, concerted conduct to fix the wages that all member sheep ranches offer to domestic and foreign shepherds at precisely the government-set minimum wage." Pls.' Opp'n at 54.

A case may be transferred to any district where venue is also proper "[f]or the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *see also Atl. Marine Constr. Co. v. U.S. Dist. Court*, 134 S. Ct. 568, 579 (2013) ("[Section] 1404(a) does not condition transfer on the initial form's being 'wrong.' . . . [I]t permits transfer to any district where venue is also proper (*i.e.*, 'where [the case] might have been brought') or to any other district to which the parties have agreed by contract or stipulation."). The Supreme Court has explained that "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). Thus, "transfer in derogation of properly laid venue" in the District of Columbia "must . . . be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in that statute." *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974). The movant bears the burden of persuasion that transfer of an action is proper. *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978); *Niagara Pres., Coalition, Inc. v. FERC*, 956 F. Supp. 2d 99, 102–03 (D.D.C. 2013); *Hooker v. NASA*, 961 F. Supp. 2d 295, 297 (D.D.C. 2013).

The first step in resolving a motion for transfer of venue under § 1404(a) is to determine whether the proposed transferee district is one where the action "might have been brought." 28 U.S.C. § 1404(a); *see also Atl. Marine Constr. Co.*, 134 S. Ct. at 579. The claims asserted in Counts Eight and Nine by HAP, individual foreign sheepherders residing in Colorado, on their own behalf and on behalf of a putative class, against the private Association Defendants based in California and Wyoming pose no federal question. Instead, the quasi-contract claims are brought before this court under diversity jurisdiction for class actions, 28 U.S.C. § 1332(d), because the

matter in controversy exceeds the value of $5,000,000, and all the named plaintiffs reside in a state different from the defendants.  *See* SAC ¶ 2.

In diversity jurisdiction actions, such as the instant matter, venue is generally proper in any judicial district where (1) "any defendant resides, if all defendants are residents of the State in which the district is located;" (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;" or (3) "any defendant is subject to the court's personal jurisdiction with respect to such action," if neither of the other prongs apply.  28 U.S.C. § 1391(b).  Here, the parties do not dispute that "a substantial part of the events or omissions giving rise to the claim occurred" in Colorado, where the individual plaintiffs live and work, or that the defendants would be subject to that court's personal jurisdiction.  *See* Ass'n Defs.' Mem. at 32; Pls.' Opp'n at 54 (noting that the same defendants are named in a separate action regarding H-2A sheepherder wages); SAC ¶¶ 5–6. The Court therefore turns to consideration of which forum, the District of Columbia or the District of Colorado, best serves the convenience of the parties and witnesses, and interest of justice, as required by § 1404(a).

In resolving motions to transfer venue under Section 1404(a), courts have not limited their consideration to the express statutory factors of "convenience of parties and witnesses," 28 U.S.C. § 1404(a),  but have also considered other private and public interest factors, which elucidate the concerns implicated by the phrase "in the interest of justice."  *See, e.g.*, *Stewart Org.*, 487 U.S. at 29; *Foote v. Chu*, 858 F. Supp. 2d 116, 120–21 (D.D.C. 2012); *Barham v. UBS Fin. Servs.*, 496 F. Supp.2d 174, 176 (D.D.C. 2007); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).  The private interest factors are addressed first, followed by the public interest factors.

### 1.      Analysis of Private Interest Factors

Courts generally look to six private interest factors in evaluating transfer motions: (1) "[t]he plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants;" (2) "the defendants' choice of forum;" (3) "whether the claim arose elsewhere;" (4) "the convenience of the parties;" (5) "the convenience of the witnesses of the plaintiff[s] and defendant[s], but only to the extent that the witnesses may actually be unavailable for trial in one of the fora;" and (6) "the ease of access to sources of proof." *Trout Unlimited*, 944 F. Supp. at 16; *see also Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32–33 (D.D.C. 2008). These factors weigh significantly in favor of transfer. The Court will address each factor *seriatim*.

First, with respect the plaintiffs' choice of forum, notably, the plaintiffs initially brought this lawsuit in the District of Colorado. *See Hispanic Affairs Project*, 141 F. Supp. 3d at 65. The plaintiffs consented to transfer of the case to this Court after the District Court for the District of Colorado "denied the plaintiffs' *ex parte* motion for a temporary restraining order and set a briefing schedule for the plaintiffs' motion for a preliminary injunction." *Id.* Plainly, at least initially, the District of Colorado was the plaintiffs' preferred venue to hear this case. Even if the plaintiffs ultimately agreed to transfer this case to the District of Columbia, because none of the plaintiffs reside in the District of Columbia, the deference typically awarded to the plaintiffs' choice of forum is minimized. *See Sallyport Glob. Servs., Ltd. v. Arkel Int'l, LLC*, 78 F. Supp. 3d 369, 373 (D.D.C. 2015); *Ctr. for Envtl. Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 357 (D.D.C. 2014); *Pac. Mar. Ass'n v. NLRB*, 905 F. Supp. 2d 55, 60 (D.D.C. 2012). Accordingly, this factor is at least neutral, if not slightly in favor of transfer.

Second, the Association Defendants' choice of forum in the District of Colorado, while "'not ordinarily entitled to deference,'" *Renchard v. Prince William Marine Sales, Inc.*, 28 F.

Supp. 3d 1, 11 (D.D.C. 2014) (quoting *Weiner v. Novartis Pharms. Corp.*, 991 F. Supp. 2d 217, 220–21 (D.D.C. 2013)), carries some weight favoring transfer.

The third factor, whether the claim arose elsewhere, weighs in favor of transfer as well. Any employment contract and performance of such contract was performed, by the individual plaintiffs, in Colorado.  SAC ¶¶ 5–6.  Unsurprisingly, none of the sheepherders work or reside in the District of Columbia.  Part of the plaintiffs' claims, however, hinge on the finding that DOL improperly determined the prevailing wage rates, in contravention of its own 2011 TEGLs, and that the 2015 Rule is substantively invalid.  While some policy decisions likely occurred in the District of Columbia, where the agency is headquartered, much of the prevailing wage rate determinations depend on regional surveys, conducted in and around Colorado.  *See* SAC ¶¶ 45– 47.  Consequently, this factor favors transfer to Colorado.

The remaining three factors regarding the convenience of the parties, the convenience of the witnesses, and the ease of access to sources of proof all weigh in favor of the transferring to Colorado.  All the parties live in or around Colorado, and all are far away from the District of Columbia.  *See* SAC ¶¶ 5–6, 16–17.  Witnesses—such as sheepherders, ranch owners—likely live in or around Colorado as well.  The only witnesses that may reside in the District of Columbia are agency headquarters employees, to the extent any are necessary at all in resolving the back pay claims.  Lastly, evidence relating to these back pay claims are likely to be from the regions where sheepherding occurs—in and around Colorado.

Overall, all of the private interest factors weigh in favor of transfer.

### 2.    Analysis of Public Interest Factors

Courts typically look to three factors in evaluating the public interest: "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum;

(2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Foote*, 858 F. Supp. 2d at 123 (citing *Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 56 (D.D.C. 2011)).  The second factor is easily dispensed since neither party addressed the relative congestion of the courts.  The first and third factors weigh heavily in favor of transferring to Colorado.

The plaintiffs' back pay claims arise under quasi-contract or analogous equitable theories, and, therefore, state common law applies.  Since the sheepherders live and work in Colorado, it is likely that Colorado state law applies.  In any event, in no scenario would District of Columbia law apply since none of the parties to these back pay claims resides here and none of the events occurred here.  The Supreme Court has acknowledged the advantages in diversity actions of having federal judges who are the most familiar with the governing state law deciding legal disputes subject to state law.  *See Van Dusen*, 376 U.S. at 645 ("[I]t has long been recognized that: 'There is an appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.'" (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947))).  Consequently, district courts often transfer cases to the forum most familiar with the state laws applicable to the parties' dispute.  *See, e.g.*, *Estate of Matthews v. Novartis Pharm. Corp.*, 77 F. Supp. 3d 1, 8 (D.D.C. 2014) (transferring a diversity case to the Southern District of Georgia "[s]ince Georgia products liability law will likely govern" and "the Southern District of Georgia's experience interpreting Georgia products-liability law strongly favors transfer"); *Taylor v. Shinseki*, 13 F. Supp. 3d 81, 91 (D.D.C.2014) (finding that Louisiana's familiarity with substantive state tort law weighed in favor of transferring the case to Louisiana); *Trout Unlimited*, 944 F. Supp. at 19 (transferring a case to

Colorado where the case may have required interpretation of Colorado law because "[t]he district court in Colorado is more familiar than this court with the application of Colorado law"); *Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 324 (D.D.C. 1991) ("Another factor strongly warranting transfer is the familiarity of the Ohio District Court with the Ohio law which must be applied in this case.").

Finally, the third factor also weighs in favor of transferring the back pay claims to Colorado.  The District of Colorado has more of an interest in resolving issues that affect the lives of Colorado residents more than this Court would.  *See Pearson v. Rodriguez*, No. 15-617, 2016 WL 1275588, at *3 (D.D.C. Mar. 31, 2016) (finding that the Eastern District of Virginia had a more significant interest in the adjudication of the United States Citizenship and Immigration Services' denial of a petition filed by a Virginian resident); *Jimenez v. R&D Masonry, Inc.*, No. 15-1255, 2015 WL 7428533, at *4 (D.D.C. Nov. 20, 2015) (concluding that Maryland had a greater interest in resolving the controversy where "the vast majority" of the parties' activities occurred in Maryland).

Thus, the balance of the factors demonstrate that a transfer to the District of Colorado is warranted and would be in the interest of justice.  This is particularly true in light of the lawsuit brought by some of the same plaintiffs here, and litigated by the same attorneys, against the same defendants in the District of Colorado.  Though the plaintiffs point out that the crux of that lawsuit lies in antitrust and whether the Association Defendants "engaged in illegal, concerted conduct to fix [] wages . . . at precisely the government-set minimum wage," Pls.' Opp'n at 54, that lawsuit similarly seeks relief in the form of back pay wages.  *See* Am. Compl. at 42 (Prayer for Relief), ECF No. 32, 15-cv-01889-REB-CBS (D. Colo.) (filed Oct. 28, 2015).  Therefore, even though the back pay claims at issue here are different in nature and involve different

questions of law, they would come to the same conclusion—whether, and how much, the plaintiffs are entitled to damages to compensate for lost wages due to allegedly unlawful activity on the part of the Association Defendants or invalid administrative rules issued by DOL. Consequently, the administration of justice is best served by transferring these back pay claims against the Association Defendants to the District of Colorado so that they may be adjudicated at the same time as the plaintiffs' pending antitrust claims.

Finally, because the back pay claims will be transferred to another court, this Court will not attempt to address the merits of the Association Defendants' motions to dismiss, strike, and to reconsider the Order permitting John Doe to proceed pseudonymously, which should more appropriately be resolved by the transferee court. Accordingly, the Association Defendants' motions to sever and transfer are granted; and these defendants' motions to dismiss, strike, and to reconsider are denied without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Federal Defendants' motion to dismiss is denied in part and granted in part. Specifically, this motion is granted as to the plaintiffs' 2011 TEGLs Claims set out in Counts One, Two, Three, and Four, and denied as to the plaintiffs' 2015 Rule Claims set out in Counts Five, Six and Seven. The Federal Defendants and the plaintiffs are directed to submit jointly, by October 10, 2016, a Meet and Confer Report, along with a proposed scheduling order to govern further proceedings to resolve the remaining claims in Counts Five, Six, and Seven. *See* Standing Order ¶ 3(a), (b)(i), ECF No. 26.

The Association Defendants' motions to sever Counts Eight and Nine and to transfer those claims to the District Court in Colorado are granted; their motions to dismiss, strike, and to

reconsider are denied, without prejudice.  The plaintiffs' motion for leave to file a sur-reply is

denied.

An appropriate Order accompanies this Memorandum Opinion.

Date:  September 9, 2016

_____
BERYL A. HOWELL
Chief Judge