## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HISPANIC AFFAIRS PROJECT, et al.,  )<br><br>Plaintiffs )<br><br>v. )<br>)<br>EDWARD HUGLER, et al.,  )<br><br>Defendants ) | Civil Action No. 15-1562-BAH |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

EREZ REUVENI
Senior Litigation Counsel

B: s/ Heather Sokolower
HEATHER SOKOLOWER
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC  20044
Tel:  (202) 532-4329 / Fax (202) 305-7000
Email:  heather.sokolower@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND .............................................2

      A.       The H-2A Program .............................................................................2

      B.       Rules Governing Occupations Involving Herding & Range Production of
             Livestock........................................................................................3

            1.      Adverse Effect Wage Rate (AEWR) in the 2015 Rule...............................6

            2.      Scope and location of work that may be performed by H-2A Herders .....12

STANDARD OF REVIEW ............................................................................................18

ARGUMENT....................................................................................................................21

I.      Plaintiffs' challenge to DOL's and DHS's "authorization of permanent herder jobs
       that are not temporary or seasonal" is not properly before this Court and, in any
       event, is without merit ..............................................................................21

II.     The AEWR required by 2015 Rule is within DOL's statutory authority and is
       neither arbitrary nor capricious..................................................................27

      A.       The wage methodology that DOL adopted in the 2015 Rule is consistent with
             DOL's mandate to assess adverse effect and DOL articulated a reasoned basis in
             support of its decision to adopt this methodology ................................27

      B.       DOL was not required to rely on an FLS-based AEWR, and it provided a
             reasoned explanation as to why it chose not to do so ...........................31

      C.       DOL provided a reasoned explanation as to why it relied on an estimate of
             48 hours per week to calculate the monthly AEWR ...........................36

III.    The 2015 Rule does not "illegally" expand the definition of "range" or the work that
       may be performed by H-2A herders ........................................................38

IV.   The Court should withhold consideration of the appropriate remedy until after
       resolving the merits of Plaintiffs' claims and further briefing, should any remedy be
       warranted..................................................................................................43

CONCLUSION ...............................................................................................................45

CERTIFICATE OF SERVICE ...................................................................................46

## CASE LAW

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*
  429 F.3d 1136 (D.C. Cir. 2005) ............................................................................ 25

*AFL-CIO v. Brock ,*
  835 F.2d 912 (D.C. Cir. 1987) ................................................................ 6, 7, 28, 31

*AFL-CIO v. Dole*,
  923 F.2d 182 (D.C. Cir. 1991) ........................................................................ 31, 34

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................ 44

*Am. Farm Bureau v. U.S. E.P.A.*,
  121 F. Supp. 2d 84 (D.D.C. 2000) ...................................................................... 22

*Am. Fed'n of Gov't Employees, AFL-CIO, Local 446 v. Nicholson*,
  475 F.3d 341 (D.C. Cir. 2007) ............................................................................ 28

*Am. Pub. Commc'ns Council v. F.C.C.*,
  215 F.3d 51 (D.C. Cir. 2000) .............................................................................. 37

*Animal Legal Def. Fund, Inc. v. Glickman*,
  204 F.3d 229 (D.C. Cir. 2000) ............................................................................ 28

*Appalachian Power Co. v. E.P.A.*,
  251 F.3d 1026 (D.C. Cir. 2001) .......................................................................... 25

*Arent v. Shalala*,
  70 F.3d 610 (D.C. Cir. 1995) .............................................................................. 28

*Banner Health v. Burwell*,
  126 F. Supp. 3d 28 (D.D.C. 2015) ...................................................................... 21

*Bayou Lawn & Landscape Servs. v. Johnson*,
  173 F. Supp. 3d 1271 (N.D. Fla. 2016) ............................................................... 29

*BellSouth Corp. v. F.C.C.*,
  162 F.3d 1215 (D.C.Cir.1999) ............................................................................ 38

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ...................................................................................... 19, 36

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................ 20

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ................................................................................. 22

*Coburn v. McHugh*,
   679 F.3d 924 (D.C. Cir. 2012) ................................................................................... 24

*Comité De Apoyo A Los Trabajadores Agricolas v. Perez*,
   774 F.3d 173 (3d Cir. 2014) ...................................................................................... 35

*Covad Communications Co., v. F.C.C.*,
   450 F.3d 528 (D.C. Cir. 2006) ................................................................................... 28

*Ctr. for Food Safety v. Salazar*,
   898 F. Supp. 2d 130 (D.D.C. 2012) ........................................................................... 19

*Del Monte Fresh Produce N.A. v. United States*,
   706 F. Supp. 2d 116 (D.D.C. 2010) ........................................................................... 22

*Fox Television Stations, Inc. v. F.C.C.*,
   280 F.3d 1027 (D.C. Cir. 2002) ................................................................................. 44

*Huls America v. Browner*,
   83 F.3d 445 (D.C. Cir. 1996) ..................................................................................... 43

*Louisiana Forestry Ass'n, Inc. v. Solis*,
   814 F. Supp. 2d 655 (W.D. La. 2011) ........................................................................ 34

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................................ 21, 22

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................................................... 19

*Mendoza et al. v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ............................................................................. 5, 45

*Mendoza v. Perez*,
   72 F.Supp.3d 168 (D.D.C. 2014) ............................................................................... 45

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................................... 19

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*,
   545 U.S. 967 (2005) ................................................................................................... 19

*Nat'l Min. Ass'n v. Dep't of Labor*,
   292 F.3d 849 (D.C.Cir.2002) ............................................................................ 25

*Nat'l Mining Ass'n v. Kempthorne*,
   512 F.3d 702 (D.C. Cir. 2008) .......................................................................... 28

*Nat'l Wildlife Fed'n v. E.P.A.*,
   286 F.3d 554 (D.C.Cir.2002) ............................................................................ 25

*New York v. U.S. E.P.A.*,
   413 F.3d 3 (D.C. Cir 2005) ............................................................................... 38

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...................................................................................... 21, 22

*Nuclear Energy Inst. v. E.P.A.*,
   373 F.3d 1251 (D.C. Cir. 2004) ........................................................................ 24

*Orengo Caraballo v. Reich*,
   11 F.3d 186 (D.C.Cir. 1993) ............................................................................. 34

*PDK Labs. Inc. v. U.S. D.E.A.*,
   362 F.3d 786 (D.C. Cir. 2004) .......................................................................... 20

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) .......................................................................................... 28

*Richards v. I.N.S.*,
   554 F.2d 1173 (D.C. Cir. 1977) ........................................................................ 18

*Rural Cellular Ass'n v. F.C.C.*,
   588 F.3d 1095 (D.C. Cir. 2009) ........................................................................ 19

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*
   841 F. Supp. 2d 349 (2012) ............................................................................... 45

*Teva Pharmaceuticals USA, Inc. v. Food & Drug Admin.*,
   441 F.3d 1 (D.C. Cir. 2006) .............................................................................. 19

*Tex Tin Corp. v. E.P.A.*,
   935 F.2d 1321 (D.C.Cir.1991) .......................................................................... 25

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C.Cir.2010) .............................................................................. 2

iv

*Vermont Pub. Serv. Bd. v. F.C.C.*,
   661 F.3d 54 (D.C. Cir. 2011) ........................................................................ 38

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
   749 F.2d 788 (D.C. Cir. 1984) ..................................................................... 20

## FEDERAL STATUTES

Pub. L. No. 107-296 ................................................................................................. 3

5 U.S.C. 551 ............................................................................................................. 1

5 U.S.C. § 706(2)(A) ............................................................................................. 18

5 U.S.C. § 706(2)(D) ............................................................................................. 18

6 U.S.C. § 202 ......................................................................................................... 3

6 U.S.C. § 271(b) .................................................................................................... 3

8 U.S.C. § 1101 ....................................................................................................... 1

8 U.S.C. § 1101(a)(15)(F)(i). ................................................................................ 20

8 U.S.C. § 1101(a)(15)(H). .................................................................................... 20

8 U.S.C. § 1101(a)(15)(H)(i)(B). ........................................................................... 20

8 U.S.C. § 1101(a)(15)(H)(ii)(a). ..................................................................... 2, 21

8 U.S.C. § 1101(a)(15)(L). .................................................................................... 20

8 U.S.C. § 1182(a) ................................................................................................... 3

8 U.S.C. § 1184(c) ........................................................................................ 2, 3, 26

8 U.S.C. § 1184(c)(2)(D) ...................................................................................... 20

8 U.S.C. § 1184(g)(4) ........................................................................................... 20

8 U.S.C. § 1188(a)(1) ........................................................................................... 2, 6

8 U.S.C. § 1201(a)(1)(B) ....................................................................................... 23

8 U.S.C. § 1221(h) ................................................................................................... 3

v

8 U.S.C. § 1225 ............................................................................................................... 3

8 U.S.C. § 1182(a) .......................................................................................................... 3

8 U.S.C. § 1153(b)(3) .................................................................................................... 44

29 U.S.C. 213(a)(6)(E) ........................................................................................ 7, 33, 35, 44

## FEDERAL REGULATONS

8 C.F.R. § 214.2(f)(5) ..................................................................................................... 20

8 C.F.R. § 214.2(h) ........................................................................................................ 23

8 C.F.R. § 214.2(h)(13) .................................................................................................. 20

8 C.F.R. § 214.2(h)(5)(iv) .............................................................................................. 23

8 C.F.R. § 214.2(l)(11) ................................................................................................... 20

20 C.F.R. § 655 ............................................................................................................... 3

20 C.F.R. § 655.103(d) .................................................................................................. 26

20 C.F.R. § 655.120(a) .................................................................................................... 7

20 C.F.R. § 655.200 ....................................................................................................... 43

20 C.F.R. § 655.200(b)(2) .............................................................................................. 39

20 C.F.R. § 655.200(b)(1) .............................................................................................. 48

20 C.F.R. § 655.201 .............................................................................................. 16, 41, 43

20 C.F.R. § 655.210 ....................................................................................................... 43

20 C.F.R. § 655.211 ....................................................................................................... 43

20 C.F.R. § 655.215(b)(1) .............................................................................................. 41

20 C.F.R. § 655.215(b)(2) .......................................................................................... 24, 39

22 C.F.R. § 41.103 ......................................................................................................... 23

22 C.F.R. § 41.111 ......................................................................................................... 23

29 C.F.R. § 516.33 .................................................................................................................... 7

29 C.F.R. § 780.323 –.329 ....................................................................................................... 7

29 C.F.R. § 780.326(a) ............................................................................................................ 14

29 C.F.R. § 780.325(b) ............................................................................................................ 16

29 C.F.R. § 780.327 ................................................................................................................. 16

29 C.F.R. § 780.329(b) ....................................................................................................... 14, 18

29 C.F.R. § 780.329(c) ............................................................................................................. 16

## FEDERAL REGISTER

52 Fed. Reg. 20,496 ................................................................................................................. 7

52 Fed. Reg. 20,502 ................................................................................................................. 7

75 Fed. Reg. 6,884 ................................................................................................................7, 26

75 Fed. Reg. 6,890 ....................................................................................................................26

75 Fed. Reg. 6,891-93 ................................................................................................................7

76 Fed. Reg. 47, 256 ................................................................................................................. 5

76 Fed. Reg. 47, 243 ................................................................................................................. 5

80 Fed. Reg. 20,301–20,302 ..................................................................................................... 4

80 Fed. Reg. 62,958 ............................................................................................................... 1, 4

80 Fed. Reg. 62,959 ............................................................................................................... 1, 4

80 Fed. Reg. 62,966-69 ............................................................................................................ 35

## ADMINISTRATIVE MATERIALS

Field Memorandum No. 74-89, (Dep't of Labor), (June 30, 1995) ................................................ 4

Field Memorandum No. 24-01 (Dep't of Labor), (Aug. 1, 2001), ................................................ 4

TEGL No. 15-06, Change 1, ...................................................................................................... 49

**INTRODUCTION**

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment. Plaintiffs, a worker advocate organization and former sheepherder, challenge various aspects of the H-2A agricultural guest worker program that relate to the admission of foreign workers in job opportunities in herding and the range production of sheep and other livestock. Specifically, Plaintiffs allege that the Department of Homeland Security's (DHS) actions in issuing H-2A visas[1] to sheepherders violate the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., and that the Department of Labor's (DOL) regulations regarding the "temporary labor certification" required for these positions are substantively deficient because they are arbitrary, capricious, and adversely affect U.S. workers. Their claim regarding DHS's issuance of visas to these workers is deficient as a matter of law because they do not identify the specific, final agency actions of which they seek review and the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq*., does not provide a cause of action allowing plaintiffs to programmatically challenge DHS's adjudication of all past, present, and future H-2A petitions filed by employers seeking to employ herders and range livestock workers. Their claims regarding DOL's regulation, *Temporary Agricultural Employment of H-2A Foreign Workers in Herding or Production of Livestock on the Range in the United States*, 80 Fed. Reg. 62,958, 62,959 (Oct. 15, 2015) (2015 Rule), AR4526 - AR4639, are deficient as a matter of law because they fail to establish that, in issuing these regulations, DOL acted outside of the authority delegated to it by Congress under the INA, or that any of the regulatory provisions they challenge are arbitrary, capricious, or otherwise contrary to law.

---

[1]  As Defendants explain in detail below, DHS does not issue visas; the State Department does. *See* INA §§ 221, 222.

The Court should therefore grant Defendants' Motion for Summary Judgment, deny Plaintiffs' Motion for Summary Judgment, and enter judgment in favor of Defendants' on all remaining claims.[2]

### STATUTORY AND REGULATORY BACKGROUND

#### A.    The H-2A Program

The INA, as amended by the Immigration Reform and Control Act of 1986 (IRCA), defines an "H-2A" nonimmigrant as "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). The admission of foreign workers pursuant to this category involves a multi-step process before three different Federal agencies: (1) DOL; (2) DHS; and (3) the Department of State (DOS). First, an employer seeking to employ H-2A foreign workers must apply to DOL for a certification that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1); *see also id.* at § 1184(c). Second, upon receiving this certification—known

---

[2]  Defendants also separately move to strike the extra-record exhibits Plaintiffs attach to their motion. *See* ECF 100. Because Plaintiffs bring their claims pursuant to the APA, the Court's review is limited to the administrative record. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C.Cir.2010). Defendants filed a certified index of the Administrative Record (AR) on November 20, 2015, ECF No. 50, and Plaintiffs never moved to supplement the record. Accordingly, Defendants do not respond to this evidence and the arguments this evidence allegedly supports in their response. Should the Court deny Defendants motion to strike in full or in part, Defendants seek leave to file supplemental briefing to address this extra-record evidence and the legal arguments inserted in their extra-record exhibits.

as a "temporary labor certification"—the employer must file an I-129 Petition to Import a Nonimmigrant Worker (I-129 Petition) with the United States Citizenship and Immigration Service (USCIS), a component of DHS. 8 U.S.C. § 1184(c).[3] Finally, if USCIS approves the I-129 Petition, then the foreign workers whom the employer seeks to bring to the United States may apply for a nonimmigrant visa at a DOS consulate abroad. *Id.* If the visa is issued, the alien must appear at a U.S. port-of-entry and be inspected and admitted in H-2A status by an immigration officer. *See* 8 U.S.C. § 1225; *see also* 8 U.S.C. §§ 1182(a), 1221(h).

DOL has promulgated regulations, through notice and comment rulemaking, that govern the process by which an employer may apply for and receive the "temporary labor certification" required by section 1188. *See* 20 C.F.R. § 655, Subpart B. In this action, Plaintiffs challenge certain provisions of the regulations that DOL implements, via a rule it adopted through notice-and-comment rulemaking, which establishes standards and procedures for employers seeking to hire foreign temporary agricultural workers for job opportunities in herding and the production of livestock on the range.[4]

### B.    Rules Governing Occupations Involving Herding & Range Production of Livestock

Historically, employers in a number of states (primarily but not exclusively in the West) have used the H-2A program (and its predecessor H-2 program) to bring foreign workers into the country to work as animal herders and range livestock workers. *See* Notice of Proposed

---

[3]  Under section 1517 of title XV of the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135, reference to the Attorney General's or other Department of Justice Official's responsibilities under section 1184(c) have been expressly transferred to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 202, 271(b).

[4]  DOL has traditionally referred to the production of cattle separately from sheep- or goat-herding, as the ''production of livestock" on the range.  For simplicity, references here to "herders" or "herding" encompass sheep-and goat-herding, as well as range cattle production.

3

Rulemaking (NPRM); *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States*, 80 Fed. Reg. 20,300–01 (Apr. 15, 2015), Administrative Record (AR)0216–AR0260. Sheep and goat herders attend to herds of sheep or goats, and oversee the herd as it moves from one area to another. *Id*. This work takes place on the range, which requires the herders to live with the herd, monitoring and attending to the herd's needs on an on-call basis up to 24 hours per day, seven days per week, as the herd moves across remote range lands and isolated and often mountainous terrain. *Id*. Herders may also assist in lambing, docking, and shearing, and employers may require that the herd be brought to the main ranch or farm location for short periods, for the care or sorting of the animals. A herder's time at the ranch is limited, however, as the limited purpose of the work is to attend to the herd as it grazes on the range. *Id*. The range production of cattle also involves duties and occupational characteristics similar to those of herding, including the requirement to spend extended periods of time herding animals across remote range lands and being on call up to 24 hours a day, 7 days a week to protect and care for the animals. *Id*. at 20,302.

DOL has long recognized the unique occupational characteristics of these positions, which include spending extended periods of time herding animals across remote range lands and being on call to protect and maintain herds for up to 24 hours a day, seven days a week. Because these unique occupational characteristics rendered certain provisions of DOL's standard H-2A regulations not readily applicable to certification of herder work, they were the basis for DOL's early establishment of guidelines particular to that work. *See* 80 Fed. Reg. at 20,301–20,302; 80 Fed. Reg. 62958–59; Field Memorandum No. 74-89, (Dep't of Labor) (June 30, 1995), AR 3772–3795; Field Memorandum No. 24-01 (Dep't of Labor) (Aug. 1, 2001), AR 3796–3798. Until 2015, the rules governing the certification of these positions were set forth in a series of sub-regulatory

guidance memoranda called Training and Guidance Employment Letters (TEGLs) and Field Memoranda, the last of which DOL issued in 2011. *See* TEGL No. 32-10, 76 Fed. Reg. 47,256 (Dep't of Labor) (Aug. 4, 2011) (sheepherding and goatherding), AR3801–AR3803; TEGL No. 15-06, Change 1, 76 Fed. Reg. 47,243 (Dep't of Labor) (Aug. 4, 2011) (open range production of livestock), AR3854–AR3863.[5]

After the D.C. Circuit's decision in *Mendoza et al. v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), DOL set about codifying the rules applicable to these positions in regulations promulgated through notice and comment rulemaking. On April 15, 2015, DOL issued a Notice of Proposed Rulemaking (NPRM) in the Federal Register in which it proposed to create a single set of procedures applicable to the certification of positions involving the herding or production of livestock on the open range in order to "create administrative efficiencies for the Department, promote greater consistency in the review of H-2A applications, provide foreign workers and workers similarly employed in the United States with the same benefits and guarantees, and provide greater clarity for employers with respect to program requirements." 80 Fed. Reg. at 20,303. As relevant here, the NPRM: (1) sought comments about whether sheep and goat herding involve distinct temporary positions at different times of the year that require more than one certification to reflect distinct temporary and/or seasonal needs under the INA; (2) proposed specific definitions for "herding," "open range," and "production of livestock," and proposed other criteria to clarify the positions that are properly subject to the rule; and (3) proposed changing the method by which it calculated the minimum required wage rate for these positions.

On October 15, 2015, after reviewing the comments it received in response to the NPRM,

---

[5] DOL's now-superseded policy directives and advisories for the H–2A program, including TEGLs related to herding and livestock production on the open range, are available at on the OFLC Web site at http://www.foreignlaborcert.doleta.gov/reg.cfm.

5

DOL published a Final Rule in the Federal Register that established a single set of standards and procedures applicable to occupations involving herding or the range production of livestock. *See* 80 Fed. Reg. 62,958.  This rule implemented some, but not all, of the changes that were proposed in the NPRM.  As relevant here, after considering all of the comments it received in response to the NPRM, DOL declined to adopt a ten month limitation for positions involving sheep or goat herders, 80 Fed. Reg. at 62999; made some modifications to the definitions of terms and qualifying job criteria that it proposed in the NPRM, *id.* at 62,962–73; and changed the methodology by which it proposed to calculate the minimum required wage rate for herding positions, *id*. at 62,986–96. Because Plaintiffs' claims challenge the regulatory provisions resulting from this process, a review of the factors that DOL considered in issuing these regulations is set forth below.

**1.    Adverse Effect Wage Rate (AEWR) in the 2015 Rule**

The INA requires that employers file an application with DOL requesting certification that there are no able, willing, qualified, and available U.S. workers to fill the position in which they seek to employ H-2A workers, and that the employment of H-2A nonimmigrants will not adversely affect the wages and working conditions of similarly situated U.S. workers. *See* 8 U.S.C. § 1188(a)(1). The INA does not define "adverse effect" or specify how adverse effect is to be measured. *See AFL-CIO v. Brock*, 835 F.2d 912, 914 (D.C. Cir. 1987). One of the ways that DOL fulfills this mandate is by requiring prospective H-2A employers to pay, at a minimum, the applicable Adverse Effect Wage Rate (AEWR) for the position(s) in which they seek to employ H-2A workers.[6] "[C]alculating AEWRs has been left entirely to the Department's discretion."

---

[6] The AEWR is the rate at which DOL requires H-2A workers to be paid before it will certify that the employment of such workers will not have an adverse effect on the wages of U.S. workers similarly employed. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States, 52 Fed. Reg. 20,496, 20,502 (June 1, 1987);

6

*Brock*, 835 F.2d at 914.

As a general rule under the H-2A program, employers seeking H-2A certification are required to pay the higher of the hourly AEWR based on the Department of Agriculture's (USDA) Farm Labor Survey (FLS), the prevailing wage, or the legal minimum wage. 20 C.F.R. § 655.120(a). However, given the unique occupational characteristics of herding—including spending extended periods in isolated areas and being on call up to twenty-four hours a day, seven days a week—DOL has historically exempted positions involving herding from the standard hourly AEWR applicable to other H-2A occupations. *See* 76 Fed. Reg. at 47,256. Instead, DOL historically based the AEWR for these positions on a monthly wage rate derived from prevailing wage surveys conducted by State Workforce Agencies (SWAs) in states where these positions were typically found. 76 Fed. Reg. at 47,244-45; 47,257-58; *see also* 80 Fed. Reg. at 20,306–07.

The Fair Labor Standards Act (FLSA) contains a similar exemption from its minimum wage and overtime requirements for any employee employed in agriculture if they are principally engaged in the range production of livestock. 29 U.S.C. 213(a)(6)(E); *see also* 29 C.F.R. § 780.323 –.329. These employees are also generally exempt from the FLSA's recordkeeping requirements. 29 C.F.R. 516.33. The FLSA exemption is based on the remoteness of range livestock production occupations and the difficulty of tracking hours worked.  *See* 80 Fed. Reg. at 62,994.

To conduct a prevailing wage survey, the SWAs had to obtain information from employers, voluntarily, about the wages that they paid to U.S. workers in herding and range livestock positions; the survey results were then used to set the AEWR in a given State. 80 Fed. Reg. at 20,307. Due to the small numbers of U.S. workers employed in these positions and the voluntary

---

Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6,884, 6,891-93 (Feb. 12, 2010).

7

nature of the reporting, many SWAs did not report any survey results or provided DOL with surveys that did not return statistically valid results. *Id*. As a result, DOL was often unable to determine a valid prevailing wage rate for these workers in each state where one was needed.  As a result, the OFLC Administrator found it necessary to set the AEWR for herding positions based on survey results from other areas or states, or based upon survey results from a prior year. *Id*. Almost every state experienced years in which there was no statistically verifiable data, and DOL concluded that the lack of such data likely contributed to wage stagnation in the herding industry over the past 20 years. *Id*. at 20,307–09.

In the NPRM, DOL notified the public that the SWA surveys had become increasingly unreliable and that it sought to change the method by which it calculated the AEWR for herding positions. 80 Fed. Reg. at 20,307–09. Specifically, DOL proposed changing the method by which it calculated the AEWR to a monthly wage rate based on a base wage rate derived from the FLS survey for field and livestock workers. *Id*. at 20,308. DOL intended to continue to rely on a monthly rate for workers certified under this rule (as opposed to the hourly FLS-based AEWR that is generally applicable to H-2A workers) given the remote location of herding work and the sporadic and unpredictable nature of the duty hours on any given day, which made it difficult to track and pay an hourly wage rate to these workers. 80 Fed. Reg. at 62,987. To create a monthly wage, DOL proposed multiplying the hourly FLS-based rate by a 44-hour workweek, which resulted in a wage rate that was less than that suggested by the pre-NPRM submissions of an attorney representing worker interests, but more than that suggested by the three primary employer associations. *Id*. [7] One of the documents included in the docket for public comment was a comment

---

[7] Specifically, the industry associations proposed relying on a 40-hour work week, which they based on the legal settlement in *Zapata v. Western Range Association*, Civ. N. 92–10–25, 244L (Ore. 1994), and the workers' advocates, through their counsel Edward Tuddenham, proposed

submitted by several employer associations before publication of the NPRM that recommended using the current Federal minimum wage to set a monthly AEWR for these occupations.  AR275-AR289.

DOL received hundreds of comments objecting to the FLS-based AEWR. *See* 80 Fed. Reg. at 62,988–90. These comments—which were submitted by individual herding employers, industry associations, state and local government officials, others from western states with a business interest in the sheep industry, and the Small Business Association's Office of Advocacy (SBA Advocacy)—alleged that the revised methodology DOL proposed in the NPRM would triple the current AEWR in many states and jeopardize the entire herding industry. *Id*. DOL received only a few comments in support of the FLS-based wage. *See* 80 Fed. Reg. at 62,990. The most supportive comments were from individual commenters and worker advocates. *Id*. The worker advocates characterized DOL's proposal to use a monthly, FLS-based AEWR as a "practical and commonsense approach," but objected to the 44-hour calculation on which DOL proposed to base the monthly wage rate.   *Id*. at 62,995. The commenters supporting the FLS-based AEWR acknowledged "a monthly AEWR based on average hourly totals will never be completely accurate," but argued that DOL's decision to base this calculation only on employer-submitted data would be arbitrary and inconsistent with DOL's obligation to protect against adverse effect. *Id*. at 62,995. In their view, DOL should directly survey workers or, if that was not feasible, include data from existing worker surveys in its estimate. However, they cited only one survey that met this criteria: *Overworked and Underpaid: H-2A Herders in Colorado* (Colorado Survey). *Id*. This

---

relying on a 48-hour work week, which they offered as a "conservative" estimate based on data employers provided to DOL in connection with their applications for temporary labor certification. *Id*. at 20,309.

study, conducted by Colorado Legal Services, surveyed 90 H-2A Colorado sheep herders about their pay and hours and found that 62 percent of herders actively worked at least 81 hours per week. *Id*. Two individual employers expressly disputed the methodology in this survey, stating it was not a reliable source and was based on biased questions from interviewers. *Id*.

After reviewing all of the comments it received in response to the NPRM, DOL determined that borrowing the current Federal Minimum Wage of $7.25/hour multiplied by 48 hours per week, with an annual adjustment beginning in 2017 based on the increase in the Employment Cost Index (ECI), would be a more reasonable basis on which to set the monthly AEWR. *Id*. at 62,991. It arrived at this conclusion after determining that an FLS-based AEWR, as it proposed in the NPRM, was "likely to result in adverse effect on U.S. workers by causing a substantial number of herding employers to close or significantly downsize their operations—leaving fewer herding jobs available to U.S. workers." 80 Fed. Reg. at 62,990. In reaching this conclusion, DOL did not rely on any single comment or set of comments, but rather, "on the record as a whole, including data from budget documents submitted, reports from individual employers and associations, and historic pricing data." *Id*.

Based on the comments it received, DOL decided to increase the number of hours per week by which it would multiply an hourly wage rate from 44 to 48. *See* 80 Fed. Reg. at 62,995–96. DOL agreed with the worker advocates that (1) any estimate of hours worked would necessarily be imprecise, given that employers of herders are generally exempt from FLSA and H-2A recordkeeping requirements, and (2) the hourly projection should not be based in any part (as it was in the NPRM) on the 40-hour estimate from the *Zapata* settlement. *Id*. at 62,995. In support of its decision to multiply the base wage rate by 48 hours per week, DOL relied on an estimate that it received from an attorney representing worker interests, Edward Tuddenham, prior to the

10

issuance of the NPRM (which was referenced in the NPRM). *Id*. at 62,996. This estimate was based on data that employers of H-2A herders provided on Applications for Temporary Employment Certification across numerous states. *Id*. DOL agreed with Edward Tuddenham that, given the lack of other reliable data, this data was the most comprehensive and detailed source from which to establish an hourly calculation on which to base a monthly AEWR. *Id.* DOL disagreed with the worker advocates that employers were likely to under-report hours on these forms in order to make their jobs appear more attractive, given that regardless of the number of hours they reported on these forms, they still had to advertise that the position required workers to be available up to 24 hours per day, seven days per week. *Id*. Moreover, DOL declined to base the hours-per-week calculation in the AEWR on the Colorado Survey cited by the worker advocates because, although it found this survey "informative," it also found it to be "very limited" and not representative of the industry as a whole. *Id*. DOL also declined the worker advocates' invitation to collect its own data on the average number of hours worked by H-2A herders because, given the challenges associated with surveying persons in this occupation, it would be very difficult and resource-intensive to do so. *Id*.

Finally, DOL acknowledged that although the wage increase required by the 2015 Rule was less than it would have been under the FLS-based AEWR proposed in the NPRM, it was nevertheless significant, as it approximately doubled the current required wage rate for sheep herders in a number of states. 80 Fed. Reg. at 62,997. In light of the scope of this increase and the economic data provided by the commenters, DOL concluded that a limited transition period to implement the new AEWR was necessary. *Id.* at 62,998. In reaching this conclusion, DOL considered the data and comments submitted by the worker advocates but determined that this data did not require immediate implementation of the new wage rate. *Id*. at 62,997. Nevertheless, DOL

11

acknowledged that the transition period should not be extended longer than necessary in order to prevent adverse effect. *Id*. at 62,998. Accordingly, the 2015 Rule requires that employers pay H-2A herders at 80 percent of the newly formulated AEWR in year one, at ninety percent in year two, and in full by year three, rather than full implementation in year five as proposed. *Id*.

### 2.    Scope and location of work that may be performed by H-2A Herders

In the NPRM, DOL proposed to create a single set of procedures for employers engaged in the herding or production of livestock on the range that would, in part, provide greater clarity for employers with respect to program requirements. 80 Fed. Reg. at 20,303. Accordingly, in the NPRM, DOL proposed limiting the applicability of the regulation to those occupations involving "the herding or production of livestock on the open range, on an on-call basis, up to 24 hours per day and 7 days a week, and in locations requiring the use of mobile housing for at least 50 percent of the workdays included in the work contract period." *Id.* The purpose of this provision was to establish a sufficient threshold to confirm the unique, remote characteristics of these occupations while allowing a realistic and workable amount of time off the range, because DOL enforcement investigations revealed that some employers were using H-2A herders and range livestock workers to work on the ranch for extended periods of time. 80 Fed. Reg. at 62,964. Still, DOL recognized that employers may require workers to bring the animals to the ranch for periods of time to assist with work involving the animals that constitutes the production of livestock (*e.g.*, lambing or calving, shearing, tending to a sick animal, branding, culling, or splitting livestock from the herd for sale or transfer). 80 Fed. Reg. at 20,303. DOL therefore proposed allowing these workers to perform minor, sporadic, and incidental work closely and directly related to the herding and production of livestock during such periods on the ranch, so long as such ranch duties were included in the job order and occurred on no more than 20 percent of the workdays that the worker

12

is at the ranch during the contract period. *Id*. DOL also proposed definitions specific to the herding or production of livestock on the open range—including terms for "herding," "production of livestock," and "open range"—that were not previously defined in the TEGLs and were intended to assist employers in understanding the type of work that qualifies for coverage under the rules. *Id*.

DOL sought comments on the qualifying job criteria and all the definitions.  In particular, DOL sought comments on the time periods and the locations of duties typically performed by workers in these occupations, including duties performed on the range versus off the range, and whether the definition of open range should include a minimum acreage of land on which the animals roam and whether (and under what circumstances), the regulation may take into account barriers, fences or other enclosures on this same land. 80 Fed. Reg. at 20,304.

DOL received many comments—including comments from employers, industry advocates, and worker advocate groups[8]—about these provisions. *See* 80 Fed. Reg. at 62,962–73 (discussing in detail the comments it received, responding to these comments, and explaining why the Department adopted the job criteria and definitions that it did). With respect to the 50 percent rule, commenters primarily raised concerns with the combined effect of the 50 percent range requirement in connection with the proposed definition of "open range," which included the absence of fencing as an indicator of open range. *See id.* at 62,963-64. Several employers also provided detailed information regarding time typically spent on and off the range, demonstrating

---

[8] DOL received two joint comments from worker advocate groups that supported the need for rulemaking: (1) a relatively brief worker advocate joint submission applauded the proposed rules, asserting that the revisions will "greatly benefit both temporary foreign workers and U.S. workers alike, including long-overdue wage increases and other proposed provisions that seek to address the poor working conditions," AR 1696–1701; and (2) a more comprehensive worker advocate joint comment submitted the same day, which included many of the same signatories as the other worker advocate joint comment, AR 1988–3459.

13

that herding and range production cycles vary greatly among operations and that a certain amount of flexibility is required. *Id*. at 62,964. The worker advocates also expressed concern with the 50 percent threshold, asserting that the provision allowed too much time off the range, creating a loophole that allows employers to pay the herding and range livestock wage rate for up to six months of work at the ranch, and suggested that the range threshold be increased to 70 percent of the work contract period. *Id*. In response to the proposed definitions, both industry and worker advocates suggested using the regulatory definitions that applied to the FLSA's exemption for the "range production of livestock" in some form for purposes of the H-2A rule, some suggesting adopting them in full and some emphasizing different aspects of those provisions. *Id*. at 62,971.

After reviewing all of the comments, DOL decided to (1) eliminate the 50 percent mobile housing requirement proposed in the NPRM; (2) require that H-2A herders spend more than 50 percent of their workdays on the range (not "at least 50 percent", as proposed in the NPRM); (3) retain the definition of "herding" as proposed in the NPRM; (4) modify the definition of "production of livestock" proposed in the NPRM to include duties that are closely and directly related to herding or the production of livestock; (5) eliminate the proposed 20 percent cap on such closely and directly related duties and provide examples of what does, and does not, qualify as closely and directly related; (6) revise the definition of "open range" in the NPRM to "range"; (7) remove the suggestion that the presence of fencing is an indicator of whether land is "range"; and (8) adopt a multi-factor test in determining whether land is "range." *Id*. at 62,963–73.

With respect to the 50 percent rule, after considering all of the comments, DOL explained that it viewed the more than 50 percent threshold for workdays on the range as a reasonable requirement because it (1) required workers to be primarily on the range; (2) was consistent with the FLSA range production of livestock exemption; and (3) allowed for flexibility in the cases of

14

emergencies and changing circumstances. *Id*. at 62,964. In DOL's view, "[t]he record demonstrate[d] that a rule requiring a majority of the workdays under the contract to be spent on the range is appropriate and necessary to confirm that occupations under the herding and range livestock regulations, earning the required wage rate, are indeed uniquely remote and thus distinguishable from other H-2A occupations." *Id*. DOL concluded that allowing employers to pay the herding and range livestock wage to workers who were spending more time on the ranch than on the range would have an adverse effect on U.S. workers. *Id.* At the same time, DOL declined to increase the threshold of time required on the range to 70 percent, as suggested by worker advocates, because it determined that a majority range requirement was sufficient to confirm the unique, remote nature of herding occupations and distinguish herders from other H-2A occupations, such as ranch hands, while still allowing for the necessary flexibility in modern herding to allow for changing circumstances on the range. *Id*.

After considering all of the comments in response to the NPRM's proposed definitions of "herding," "the production of livestock," and "minor, sporadic, and incidental work," DOL decided to revise the definition of "production of livestock" to include work that is closely and directly related to such work, and to remove the 20 percent limitation on minor, sporadic and incidental work, based on its determination that such work was inextricably linked with those primary herding tasks. 80 Fed. Reg. at 62,968. At the same time, DOL continued to conclude that it would be inappropriate to provide employers with the unlimited latitude that many of the commenters requested by allowing employers to require workers employed under the regulation to perform any ranch duties that are necessary to meet the day-to-day needs that arise in ranch operations. Accordingly, DOL declined to adopted the revised "Grazing Livestock Management System" definition recommended by a number of employers and their representatives, because it

15

found this definition was overly broad and vague, noting it would allow ranchers "virtually unfettered discretion" to assign H-2A herders any duties, unrelated to herding and the production of livestock. *Id*. For similar reasons, DOL also declined to adopt the FLSA's regulatory definition, which allows a tolerance for non-herding work so long as it is less than 50 percent of the work hours, as some commenters suggested. In DOL's view, such a tolerance would be too broad to qualify for the exception from the standard H-2A wage requirements. *Id*. at 62,969.

To fulfill DOL's original purpose of providing that workers employed pursuant to the herding and range livestock regulations are not working as general ranch hands, and to provide the requested guidance and clarity to both workers and the regulated community, DOL included several additional examples of duties that do and do not qualify as directly and closely related to the production of livestock. *Id*. (explaining regulation codified at 20 C.F.R. § 655.201). Several of these examples were taken from the FLSA regulations implementing the exemption for the range production of livestock, which, as noted above, a number of commenters identified as a model for the rule. *See* 29 C.F.R. §§ 780.325(b), 780.327, 780.329(c).  Further, several of the examples were in line with those suggested by the worker advocates, including permitting the repairing of fences or corrals used to contain the herd. *See* 80 Fed. Reg. at 62,968-69; AR1998.

With respect to the proposed definition of "open range," in reviewing the comments it received, DOL noted that herding practices have evolved significantly over the last 50 years and that the proposed definition of "open range" in the NPRM did not reflect these changes. 80 Fed. Reg. 62,972. Accordingly, in the 2015 Rule, DOL decided to modify the definition of range that it proposed and instead adopt a multi-factor test. *Id*. The revised definition allows ranchers more flexibility than the rule proposed in the NPRM, but offers more guidance than the TEGLs, which did not define "open range" or "pasture." DOL chose this multi-factor test because it maintains a

16

nexus to the longstanding purpose of the herder rules, *i.e.* to provide that herders can be available to tend to the flock in remote locations 24 hours a day, 7 days a week, while maintaining some flexibility. *Id*. In adopting this definition, DOL considered a number of factors. First, it determined that the definition of "open range" in state law had limited applicability and that the use of "open range" in its rules could cause unnecessary confusion in "open range" states. *Id*. Second, it decided not to include a minimum number of acres in the definition of range, but it nevertheless found the amount of acreage to be a relevant factor in determining whether the area is considered "range." *Id*. Third, it noted concerns raised by commenters regarding the use of fencing as a proxy for "open range," and concluded these comments demonstrated that the definition proposed in the NPRM was untenable for many ranchers due to the extensive presence of fencing across many of the lands that are used for grazing. *Id*. at 62,972–73.

DOL found the FLSA regulatory definition of "range" to be a useful starting point, as suggested by many commenters, but it did not fully adopt that definition in three key respects. First, range housing is typically necessary to qualify for the special procedures in the 2015 Rule, but it is not required to qualify for the exemption under the FLSA. 80 Fed. Reg. at 62,973. DOL explained that it generally viewed range housing as an essential element in determining whether work was taking place on the "range"—because workers must be on call 24 hours a day, 7 days a week to tend to the needs of the animals, and "range" work cannot take place near the headquarters—but because it did not intend to provide employers with an incentive to use range housing when it was not appropriate (a concern raised by the worker advocates), DOL decided this should be a factor in considering whether land qualified as "range," but not an inflexible requirement. *Id*. Second, DOL sought to modify the FLSA definition in order to allow grazing on crop residue, because areas where sheep graze on crop residue may not always qualify as "range"

under the FLSA. *Id*. DOL made this modification to accommodate the commenters who observed that many sheep were feeding on crop residue during certain months of the year, often on leased lands at a distance from the rancher's property as the herd trailed to or from land controlled by the Bureau of Land Management or the Forest Service. *Id*. However, DOL noted that this was not a significant modification from the FLSA definition, as even the FLSA definition provides that range is "generally" not cultivated and "typically" not suitable for cultivation. *Id.*   Third, DOL intentionally omitted the sentence in the FLSA regulation stating that "[t]he balance of the 'headquarters ranch' would be the 'range,'" *id*. (citing 29 C.F.R. § 780.329(b)), because it thought the balance of the ranch that is away from headquarters, and thus considered "range," should not automatically qualify as work conducted on the "range," and that this assessment should instead be made under the more exacting multi-factor test for "range" in the 2015 Rule. *Id*.

## STANDARD OF REVIEW

Where, as here, a party challenges an agency's regulation under the APA, the standard set forth in Rule 56 does not apply, and summary judgment serves as "the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id*. (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)). As relevant here, the APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C), or "without observance of procedure required by law," *id*. § 706(2)(D). In determining whether a particular action is "arbitrary or capricious," the court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear

18

error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Agencies must "examine the relevant data and articulate a satisfactory explanation for [their] action[s] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This is a "narrow" standard of review, "as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Where the agency decisions under review are primarily predictive, "[t]he 'arbitrary or capricious' standard is particularly deferential," and the reviewing court's "role is limited . . . requir[ing] only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

When courts consider an agency's interpretation of a statute that it is charged with enforcing, they must first ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see also National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 980 (2005). Where the statute is silent or ambiguous regarding the question at issue, the court asks "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Congressional silence or a statutory ambiguity means that Congress has left a gap for the agency to fill, *see Teva Pharmaceuticals USA, Inc. v. Food & Drug Admin.*, 441 F.3d 1, 4 (D.C. Cir. 2006), and the court does not choose between competing meanings, but rather, defers to an agency's reasonable resolution of that ambiguity, *see PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004).[9]

---

[9] Plaintiffs incorrectly contend that, in reviewing their claims, the Court must narrowly construe DHS or DOL's interpretation of the INA's nonimmigrant provision authorizing the admission of H-2A nonimmigrant workers. *See* Pls. Mem. at 13. The two cases on which plaintiffs rely stand

Finally, it is beyond dispute that the court must evaluate the 2015 Rule on the basis of the administrative record that was before DOL at the time of the rulemaking. *See, e.g., Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) (court "should have before it neither more nor less information than did the agency when it made its decision"). Thus, "[i]n evaluating each rulemaking, the Court must exclude all information that pertains to events after that rulemaking, including information in the administrative records for subsequent rulemakings." *Banner Health v. Burwell*, 126 F. Supp. 3d 28, 70 (D.D.C. 2015) (Kollar-Kotelly, J.); *see also id*. at 86 (court uses "the judicial time machine" to focus on the record that was before the agency at the time of the rulemaking).

---

for the unremarkable proposition that exceptions to a general rule are to be read narrowly. However, plaintiffs fail to cite any case in which the statutory structure allowing for the admission of nonimmigrant H-2A workers must be considered as an exception to a more general rule set out in the INA.  Nor do plaintiffs' cases support any deviation from *Chevron's* deferential review of the agencies' interpretation, and Defendants are not aware of any court that has applied such a theory to limit the authority of either DOL or DHS to resolve ambiguities in the H-2A provisions of the INA. Moreover, notwithstanding Plaintiffs' contentions to the contrary, the INA does *not* define "temporary." It defines "permanent," and the term "temporary" is interpreted differently with respect to various categories of nonimmigrant visas. For instance, section § 1101(a)(15)(H) includes several types of "temporary workers," including H-1B workers (section 101(a)(15)(H)(i)(B)) and H-2B workers (section 101(a)(15)(H)(ii)(b)), in addition to the H-2A workers at issue.  These temporary periods are defined alternatively by statute and in DHS regulations as a maximum of 6 or 10 years (in 3 or 5 year increments) for H-1B nonimmigrants and 3 years for H-2B nonimmigrants. *See* 8 U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13). In addition, L-1 intracompany transferee nonimmigrants, defined in 8 U.S.C. § 1101(a)(15)(L), are admitted "temporarily" for up to either 5 years (L-1B specialized knowledge individuals) or 7 years (L-1A managers and executives), for initial periods of up to 3 years and extended periods of up to 2 years. *See* 8 U.S.C. § 1184(c)(2)(D); 8 C.F.R. § 214.2(l)(11) and (15). Moreover, F-1 nonimmigrant academic students, defined in 8 U.S.C. § 1101(a)(15)(F)(i), must be seeking to enter temporarily, such period being defined in DHS regulations as the duration of status, i.e., "the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the Service for attendance . . . or engaging in authorized practical training following completion of studies." *See* 8 C.F.R. 214.2(f)(5).

## ARGUMENT

**I.     Plaintiffs' challenge to DOL's and DHS's "authorization of permanent herder jobs that are not temporary or seasonal" is not properly before this Court and, in any event, is without merit**

Plaintiffs allege DOL and DHS have "violated the Administrative Procedure Act" by "adhering to policies outlined in the 2015 Rule that allow shepherds in the United States on Temporary Agricultural Visas (also known as H-2A visas) to . . . conduct work on a permanent basis." Pls. Mot., ECF 93, at 1. In particular, Plaintiffs contend the agencies' alleged "policy" of "issuing" visa petitions "for indefinite periods" violates 8 U.S.C. § 1101(a)(15)(H)(ii)(a), which provides for the admission of foreign workers "coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature." *See* SAC ¶ ¶ 51,53.

To the extent this claim challenges DHS's alleged "policy" of "issuing" visa petitions "for indefinite periods," it is not properly before the Court because it does not challenge any discrete, identifiable action on the part of DHS (or its component USCIS). It is well-established that the APA does not provide a cause of action to challenge an alleged generalized "policy" in the absence of a discrete, final agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990) (noting that the APA does not entitle a plaintiff to "demand a general judicial review of the [agency's] day-to-day operations," simply by claiming that those operations are characterized by "failures" to abide by statutes or regulations"); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004) ("*SUWA*") ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA"). Instead, a plaintiff asserting an APA claim "must direct its attack against some particular 'agency action' that causes it harm." *Lujan*, 497 U.S. at 891; *see also Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure is reviewable, an on-going program

or policy is not, in itself, a 'final agency action' under the APA"); *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 102 (D.D.C. 2000) ("[C]ourts have repeatedly refused to entertain the type of programmatic attack on the general day-to-day operations of the agency that the plaintiffs are waging here") (citation omitted). "Such broad review of agency operations is just the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is inappropriate." *Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116, 119 (D.D.C. 2010); *accord SUWA*, 542 U.S. at 66-67 (explaining that the limitation of final agency action in the APA is intended to: (1) "protect agencies from undue judicial interference" and (2) "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve").

Any claim Plaintiffs raise against DHS must fail because their Amended Complaint does not identify any discrete "final agency action" undertaken by DHS.  Indeed, because Plaintiffs do not provide the Court with any particular action to review, it is not clear how the Court could even go about evaluating Plaintiffs' claims against DHS, as there is no administrative record on which to evaluate Plaintiffs' allegations or DHS's actions. The Court cannot examine DHS's alleged "policies" in a vacuum, and Plaintiffs may not bring an action under the APA to obtain the broad, programmatic relief that they seek. As the Supreme Court noted in *Lujan*, plaintiffs "cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." 497 U.S. at 891.

Moreover, Defendants are unable to effectively respond to Plaintiffs' contention that "issuing H-2A visas to shepherds under the 2015 Rule is illegal because their work is neither temporary nor seasonal," Pls. Mem. at 15, because it misconstrues the process whereby H-2A nonimmigrant visas are authorized and issued. As an initial matter, neither DOL nor DHS are

22

tasked with issuing visas to H-2A sheepherders; this is done by DOS, *see* 8 U.S.C. § 1201(a)(1)(B); 22 C.F.R. §§ 41.103, 41.111, which is not a party to this case. More importantly, the 2015 Rule merely prescribes the procedures and standards by which DOL makes the certification required by section 1188 for positions that involve sheepherding or production of livestock on the range. No visas are ever issued to shepherds "under the 2015 Rule," and DHS does not "approve" I-129 nonimmigrant petitions "under the 2015 Rule." Rather, USCIS (a component of DHS) adjudicates I-129 petitions filed by employers seeking to hire H-2A workers in accordance with its own regulations at 8 C.F.R. § 214.2(h). Because the 2015 Rule does not dictate DHS's adjudication of H-2A petitions or prescribe how DHS may determine, based on the facts of each case presented, whether a sheepherding employer's need is "temporary in nature" (or, for that matter, DOS's issuance of H-2A visas), the relief that Plaintiffs seek against DHS—*i.e.,* an order enjoining DHS from approving any H-2A visa petitions in accordance with the 2015 Rule—is meaningless and the relief Plaintiffs seek cannot be redressed through this action.[10]

Further, to the extent Plaintiffs' seek to facially challenge the DHS regulation that defines "of a temporary or seasonal nature," 8 C.F.R. § 214.2(h)(5)(iv), which authorizes USCIS to approve H-2A petitions for shepherds (and other agricultural workers) for periods of up to one year at a time, they fail to plead this claim in their amended complaint and such a challenge is clearly precluded by the statute of limitations. *See* ECF No. 76 at 17 (explaining why the statute of limitations for APA challenges to DHS's regulations governing the H-2A petition process lapsed, at the latest, on December 18, 2014, six years after DHS's revisions to the regulations governing the H-2A petition process).

---

[10] DHS may, consistent with its existing regulations, determine that an employer's need is not temporary in nature based on a pattern of requests by the employer to fill that same or similar need for a second or subsequent 364-day period.

23

Finally, because DOL does not issue H-2A visas to shepherds, under the 2015 Rule or otherwise, the precise nature of Plaintiffs' claim against DOL is unclear.[11] The only provision of the 2015 Rule that is even possibly relevant to this claim is 20 C.F.R. § 655.215(b)(2), which permits herding employers to request certification for a period of up to 364 days. To the extent Plaintiffs challenge this provision as arbitrary, capricious, or contrary to law because DOL's certification of sheepherding positions for 364 days leads to the issuance of H-2A visas for positions that are not actually "of a temporary or seasonal nature," they are precluded from raising this claim because neither they, nor any other party, raised it in the rulemaking proceeding before DOL.[12]

The D.C. Circuit has consistently held that courts "are bound to adhere to the 'hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.'" *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (quoting *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (per curiam)). Indeed, "[a]bsent special circumstances, a party must initially present its comments

---

[11]  To the extent Plaintiffs tie this claim to a general "policy" and not to a specific agency action (*i.e.,* a particular provision of the 2015 Rule), it suffers from the same defect as the claim Plaintiffs raise against DHS.

[12]  The NPRM sought comment specifically on the issue of the temporary and seasonal nature of herder work, including the length of time spent on the range during the year. 80 Fed. Reg. at 20311 (NPRM); 80 Fed. Reg. at 62999 (final rule). None of the comments DOL received in response to the NPRM alleged that DOL's certification of shepherding positions for periods of up to 364 days caused H-2A visas to be issued to nonimmigrant workers who filled permanent sheepherding positions in violation of the INA. A comment submitted by worker advocates included a brief statement suggesting that DOL should require two separate certifications for the range production of sheep and goats over the course of one year: one application for "open range season," which the worker advocates suggested should be limited to nine months a year, and one for a "birthing season," which the worker advocates suggested should be limited to 3 months a year. AR 1996. Therefore, on this record, the primary comment by worker advocates declined to contest as a whole the cumulative nature of the certification periods for sheep- and goat-herders.

24

to the agency *during the rulemaking* in order for the court to consider the issue." *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C.Cir.1991) (emphasis added). As the D.C. Circuit has explained:

> [A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration. There are two reasons for this. First, the courts are not authorized to second-guess agency rulemaking decisions; rather, the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking. Therefore, it is unsurprising that parties rarely are allowed to seek "review" of a substantive claim that has never even been presented to the agency for its consideration. Second, as noted above, "[s]imple fairness ... requires as a general rule that courts should not topple over administrative decisions unless the administrative body . . . has erred against objection made at the time appropriate under its practice."

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) (internal citations omitted); *see also Appalachian Power Co. v. E.P.A.*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (finding plaintiffs waived ability to present argument in action challenging agency rule when they failed to cite comments in the relevant rulemaking docket that raised the issue); *National Wildlife Federation v. EPA*, 286 F.3d 554, 562 (D.C.Cir.2002) (per curiam) (rejecting challenge to regulation that "neither [petitioner] nor any other party before the agency raised . . . during the administrative phase of the rulemaking process."); *National Mining Ass'n v. Department of Labor*, 292 F.3d 849 (D.C.Cir.2002) (declining to consider a challenge to the Department of Labor's regulations under the Black Lung Benefit Act, because the petitioner "failed to raise it during the notice-and-comment period"). Because Plaintiffs' arguments regarding the alleged effect of DOL's rule on the issuance of H-2A visas for permanent positions were not raised by any commenter during the notice-and-comment period, DOL never had the opportunity to react to them, and Plaintiffs' arguments are barred in this forum. The Court should therefore decline to address this issue.

25

Even if the Court were to review this claim, it would nevertheless fail. Plaintiffs do not explain how a DOL regulation that permits employers of sheepherders to seek a temporary labor certification for a period of up to 364 days violates the statute. For the purposes of the H-2A labor certification program, DOL defines "temporary" work as employment that will, "except in extraordinary circumstances, last no longer than 1 year." 20 C.F.R. §655.103(d). In establishing this provision, DOL adopted DHS's basic definition of "temporary" set out in its H-2A regulations. *See Temporary Agricultural Employment of H-2A Aliens in the United States: Final Rule,* 75 Fed. Reg. 6884, 6890 (2010). In any event, as Plaintiffs themselves acknowledge, Pls. Mem. at 20-21, the INA tasks DHS—not DOL—as the ultimate arbiter of whether a petitioner meets the requirements for the H-2A classification, including whether the position described in the petition is "of a temporary or seasonal nature." *See* 8 U.S.C. § 1184(c) (leaving the question of whether an alien may work in the United States pursuant to §1101(a)(15)(H)(ii)(a) in any specific case or cases to the Secretary of Homeland Security, upon petition of the importing employer). Ultimately, neither the statute nor either agencies' regulations proscribe the 364-day certification period, and DOL's decision to continue its longstanding practice of certifying sheepherder positions for periods of up to 364-days was neither arbitrary nor capricious. In reviewing the comments it received in response to the NPRM, which specifically sought comment on the 364-day certification period, DOL learned that both ranchers and the herders they employ were accustomed to obtaining temporary labor certifications for periods of up to 364 days and that changing its longstanding practice would be disruptive to the livelihoods of both employers and employees. *See* 80 Fed. Reg. at 62,999-63,000.

Accordingly, Plaintiffs' claim that DOL and DHS authorize permanent herder jobs has no merit and it is not properly before this Court.

**II.    The AEWR required by 2015 Rule is within DOL's statutory authority and is neither arbitrary nor capricious**

Even though the AEWR that DOL adopted in the 2015 Rule approximately *doubled* the wage that employers must offer and pay to H-2A sheepherders in a number of states, 80 Fed. Reg. 62997, Plaintiffs allege that it "establishes an illegal subminimum wage policy that, contrary to Congressional intent, 'will . . . adversely affect the wages and working conditions of workers in the United States similarly employed.'" Pls. Mem. at 26. By seeking to have it "set aside" under the APA plaintiffs are clearly attempting to substitute their judgment about a policy determination for that of DOL, which is the agency that has the responsibility to make that determination.

Plaintiffs' claims must fail because, in adopting this wage methodology, DOL made a statutorily permissible policy choice and the administrative record demonstrates that DOL considered the relevant factors and provided a detailed, reasoned explanation as to (1) why it selected the wage methodology that it did, and (2) why it did not adopt the methodology proposed in the NPRM or other methodologies presented in response to the NPRM. *See* 80 Fed. Reg. at 62986–96 (providing a thorough explanation of the Department's decision making process with respect to the AEWR that was implemented in the 2015 Rule). While Plaintiffs may disagree with DOL's conclusions or policy choices, neither they nor this Court may substitute their judgment for that of DOL. Because the administrative record establishes that DOL examined the various alternatives presented to it and articulated a reasoned basis for its decision, Plaintiffs claims fail as a matter of law and the Court should award judgment in favor of the Defendants.

**A.    The wage methodology that DOL adopted in the 2015 Rule is consistent with DOL's mandate to assess adverse effect and DOL articulated a reasoned basis in support of its decision to adopt this methodology**

Plaintiffs cursorily allege that the 2015 Rule establishes an "illegal subminimum wage policy," Pls. Mem. at 26, but they fail to raise a colorable argument that the AEWR adopted in this

27

rule falls outside of the broad authority that Congress delegated to DOL to assess whether the admission of foreign workers will cause an "adverse effect" on the wages of U.S. workers similarly employed. *See AFL-CIO v. Brock,* 835 F.2d 912, 914-17 (D.C. Cir. 1987). Notably, the INA does not define "adverse effect" or specify how adverse effect is to be measured, and the D.C. Circuit has found that Congress entrusted DOL with these tasks and "calculating AEWRs has been left entirely to the Department's discretion." *Id. at* 914.

Where, as here, Congress delegates to an agency the authority to interpret broad statutory goals, a reviewing court's role is limited to assessing whether the agency's construction of the statute is reasonable. *See National Mining Association v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008) ("All we ask of the agency is a reasonable interpretation"). In such a situation, the court's inquiry under *Chevron* "step two" overlaps with the narrow and deferential inquiry under the APA's arbitrary and capricious standard of review. *See American Federation of Government Employees v. Nicholson*, 475 F.3d 341, 346 (D.C. Cir. 2007); *see also Covad Communications Co., v. FCC*, 450 F.3d 528, 537 (D.C. Cir. 2006); *Animal Legal Defense Fund v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000) ("The explanation that renders the Secretary's interpretation of the statute reasonable also serves to establish that the final rule was not arbitrary and capricious"). This overlap limits the court's inquiry to whether the agency has considered relevant factors in adopting its interpretation of the statute, *see Arent v. Shalala*, 70 F.3d 610, 620 (D.C. Cir. 1995) (Wald, J., concurring), and a consideration of "relevant factors" is confined to the policies specific to the agency's organic statute, *see Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 646-47 (1990).

Here, the monthly AEWR that DOL adopted in the 2015 Rule falls well within its broad discretion to assess "adverse effect," and DOL's detailed and thorough explanation in the preamble

28

belies any argument that its adoption of this wage rate was arbitrary and capricious. *See* 80 Fed. Reg. at 62,986–96. Specifically, after reviewing all of the comments it received in response to the NPRM, DOL concluded that using an FLS-based AEWR, as it proposed in the NPRM, was "likely to result in adverse effect on U.S. workers by causing a substantial number of herding employers to close or significantly downsize their operations—leaving fewer herding jobs available to U.S. workers." 80 Fed. Reg. at 62990. In reaching this conclusion, DOL did not rely on a single comment or set of comments, but rather, "on the record as a whole, including data from budget documents submitted, reports from individual employers and associations, and historic pricing data." *Id*. DOL recognized limitations on the data provided by employers, their associations, and their other supporters, but considering "the size of the proposed increase and the data provided," it determined that "the record provide[d] a reasonable basis to conclude that the proposed wage increase [was] too great to be borne by the industry, and thus [would] result in adverse effect on U.S. workers because fewer herding jobs [would] be available." *Id*. at 62,990-91; *cf. Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1291-92 (N.D. Fla. 2016) (finding implementation of adverse effect requirement in H-2B program reasonable).

DOL determined that borrowing the current Federal minimum wage of $7.25 (adjusted annually based on ECI), and multiplying it by 48 hours per week, provided a more reasonable basis on which to set the monthly AEWR for H-2A herders. 80 Fed. Reg. at 62,994–95. DOL agreed with employers' associations that a single national AEWR was appropriate for H-2A herders (unless a higher state wage applies), given that they often travel across state lines and their employers are required to provide most living expenses free of charge. *Id*. at 62,994. But DOL also agreed with the worker advocates that the persistent lack of U.S. workers in herding occupations was likely due to the fact that U.S. workers could earn at least the Federal minimum

wage elsewhere and that the DOL's inadequate wage methodology for these occupations under the TEGLs contributed to herder wage stagnation. *Id.* at 62,994.[13] Accordingly, DOL viewed the current hourly federal minimum wage as the logical, non-arbitrary starting point on which to base the AEWR for H-2A herders. *Id.* To prevent future wage stagnation, DOL linked the AEWR with the ECI for wages and salaries. *Id.* at 62,995. DOL chose the ECI instead of the consumer-price index because the 2015 Rule required employers of H-2A herders to provide food and lodging, making the cost of consumer goods less relevant to setting the required wage rate than circumstances in which workers are paying these costs themselves. *Id.*

Although Plaintiffs do not clearly articulate why they believe the monthly AEWR DOL adopted in the 2015 Rule falls outside DOL's broad discretion to assess "adverse effect," their objections are twofold: (1) the base wage is not as high as it would have been under FLS-based AEWR that DOL proposed adopting in the NPRM, which in Plaintiffs' view, is a more appropriate source on which to base the AEWR; and (2) the average number of hours per week on which the AEWR is based, *i.e.* 48, is too low.[14] As explained in detail below, neither of these complaints is

_____

[13]  In addition, DOL recognized that three of the four *Mendoza* plaintiffs, all U.S. workers, stated that they would return to herding if offered either the wage that results from our methodology or the minimum wage rate (although one qualified that he was seeking the minimum wage for all hours worked and others sought additional non-wage benefits). *Id.* at 62,994.

[14] Defendants dispute Plaintiffs' generalized assertion that, in adopting this AEWR, DOL arbitrarily endorsed "industry-derived figures" for the base wage rate and the average hours worked. *See* Pls. Mem. at 27. The AEWR that DOL ultimately adopted represents a reasoned determination based on all of the comments that DOL received, including those from employers, their associations and/or supporters, on the one hand, and from worker advocates, on the other. Specifically, nearly all of the comments that DOL received from employers, their associations, and supporters opposed using the FLS-based AEWR and many commenters suggested that DOL retain the wage methodology in the TEGLs or not set any minimum wage at all. 80 Fed. Reg. at 62992. While two ranching associations did alternatively recommend that DOL set a monthly AEWR based on either (a) an inflation-adjusted value from the 1994 sheep TEGL wages or (b) the current FLSA minimum wage multiplied by a set estimate of hours, neither suggested that DOL base this wage on a 48-hour work week. *Id.* In contrast to these comments, the worker advocates generally endorsed the FLS-based AEWR. *Id.* at 62,990. Based on all of the comments received,

sufficient to demonstrate that the AEWR in the 2015 Rule falls outside the scope of authority that Congress delegated to DOL under section 1188, or that DOL's adoption of this wage methodology was in any way arbitrary or capricious.

### B.       DOL was not required to rely on an FLS-based AEWR, and it provided a reasoned explanation as to why it chose not to do so

Plaintiffs spend a significant portion of their brief arguing that DOL should have adopted the FLS-based AEWR that it proposed in the NPRM.  *See* Pls. Mem. at 32–36. But DOL was not required to do so, and Plaintiffs' arguments are premised on the mistaken assumption that the INA required DOL to implement the FLS-based AEWR to compensate for past wage stagnation. It does not. *See Brock*, 835 F.2d at 917 (holding that the INA neither "explicitly [n]or implicitly mandates the Department's AEWR policy.... [N]either the Department's former policy of offsetting for past depression nor its present policy of ignoring this adverse effect, is statutorily required"); *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991) (holding the INA permits, but does not require, DOL to upwardly adjust the AEWR to account for past wage depression). Where, as here, DOL provided a thorough and reasoned explanation as to why the AEWR it adopted was superior to the FLS-based AEWR that it proposed in the NPRM, its decision must be upheld. *See AFL-CIO v. Dole,* 923 F.2d at 185-87.

Most of Plaintiffs' arguments opposing the AEWR in the 2015 Rule suffer from the same defect: they fail to recognize that Congress delegated to DOL—and not Plaintiffs or the Court—

---

DOL reasonably concluded that use of the FLS-based AEWR to set the monthly herder AEWR would cause a substantial number of herding employers to close or significantly downsize their operations and result in an adverse effect on U.S. workers due to fewer available jobs. And the 48-hour per week estimate that DOL ultimately adopted was initially proposed by an attorney representing worker interests and is based on DOL's own certification data, which DOL appropriately determined to be the most comprehensive and detailed data source available for these occupations. *Id*. at 62,995.

31

the authority to make policy choices regarding how to guard against "adverse effect." The D.C. Circuit's decision in *AFL-CIO v. Dole,* is particularly instructive on this point. There, the court upheld DOL's decision to change the methodology by which it calculated the AEWR, even though this change resulted in a lower wage rate, because DOL had examined the various alternatives presented by the public and provided sufficient reasons for rejecting them. *Id*. at 186. Significantly, the court refused to second-guess DOL's judgment in selecting among the various alternatives because, it noted, Congress had delegated that responsibility to DOL:

> The government's choice of methodology is really a policy decision taken within the bounds of a rather broad congressional delegation. The Department is obliged to balance the competing goals of the statute-providing an adequate labor supply and protecting the jobs of domestic workers. Striking that balance is a judgment call which Congress entrusted to the Department of Labor.

*Id*. at 187. Here, the preamble to the 2015 Rule demonstrates that, in the face of imprecise and inconclusive data, DOL made just such a policy when it decided to use the current Federal minimum wage of $7.25 as a starting point in setting the AEWR for H-2A herders. *See* 80 Fed. Reg. at 62,994.[15]

Specifically, in the preamble to the 2015 Rule DOL explained that it decided not to adopt the FLS-based AEWR because, after considering all of the comments and data submitted in response to the NPRM, it concluded that the herding industry could not absorb the nearly three-fold wage increase that the FLS-based AEWR would require, and that if it adopted this as the AEWR, it was likely that a substantial number of herding employers would either close their

---

[15]  If the explanation that DOL provided in *AFL-CIO v. Dole* was sufficient to uphold a new wage methodology that resulted in a *lower* wage than had been previously required, then surely the extensive explanation in the preamble to the 2015 Rule is sufficient to justify DOL's decision to adopt an AEWR that *increases* the required wage rate (albeit to a lesser extent than Plaintiffs would have preferred) by nearly two-fold in most states. *See* 80 Fed. Reg. at 62997 ("the final wage rate approximately doubles the current required wage rate for sheep herders in a number of states.").

business or significantly downsize their operations, which would adversely affect U.S. workers by decreasing the number of positions available to them. 80 Fed. Reg. at 62,990. DOL reviewed the alternative methodologies suggested by commenters and determined that the Federal minimum wage of $7.25 an hour was a reasonable starting point on which to base the monthly AEWR. *Id*. at 62,994. Further, in order to prevent future wage stagnation from occurring, it decided to link the AEWR with the ECI for wages and salaries. *Id*. at 62,995.[16] The wage methodology that DOL ultimately adopted therefore addressed (1) comments submitted by worker advocates who were concerned about wage stagnation in the herding industry; (2) comments submitted by employers and herding associations demonstrating that the increased costs of the FLS-based AEWR would lead herding employers to either close their business or significantly downsize their operations; and (3) DOL's concern that the AEWR attempt to correct for previous wage stagnation not be so high as to have an adverse effect on U.S. workers due to reduced availability of herding jobs.

DOL's thorough and reasoned explanation as to why it did not rely on the FLS-based AEWR refutes Plaintiffs' allegation that it "arbitrarily" rejected this methodology, and none of the arguments that Plaintiffs' advance to the contrary are sufficient to sustain their claim. For instance, Plaintiffs contend that, in rejecting the FLS-based AEWR, DOL impermissibly considered the

---

[16] Plaintiffs assert that the AEWR fails to prevent future wage stagnation, Pls. Mem. at 36 n.28, but this argument is belied by the fact that the AEWR is increased annually based on inflation. They also contend that in relying on the federal minimum wage to borrow the hourly rate as a component of the monthly AEWR calculation, DOL arbitrarily overlooked the "hours worked" requirement in the FLSA. *Id*.  However, plaintiffs fail to recognize that although DOL used the FLSA wage rate as a starting point in setting the monthly AEWR, these workers are generally exempt from the FLSA. 29 U.S.C. 213(a)(6)(E). Further, DOL reasonably explained in the preamble: "Although $7.25 for each hour worked is generally a floor, using the $7.25 wage rate multiplied by 48 hours is reasonable in this circumstance because of the necessity of setting a monthly wage and because employers must provide housing and food without charge to workers in these occupations. Thus it is a reasonable exercise of DOL [sic] discretion and consistent with DOL's obligation to protect against adverse effect to set the wage as $7.25 times 48 hours." 80 Fed. Reg. 62,994.

effect that this wage rate would have on employers, Pls. Mem. at 33. As the Final Rule makes clear, DOL based its decision not to use the FLS-based AEWR on the adverse effect that this rate would have on the job opportunities available to U.S. workers. 80 Fed. Reg. at 62,990.[17]

Plaintiffs also erroneously argue that, in adopting the AEWR in the 2015 Rule, DOL impermissibly disregarded data indicating that "many sheep ranchers already paid domestic shepherds an hourly rate similar to the AEWR required for other H-2A positions." Pls. Mem. at 32–33.  DOL did consider, and specifically respond to, this data, and reasonably concluded that this data did not support Plaintiffs' assertions, did not reflect work that was primarily performed on the range, and/or was of such a small sample size that it was unreportable under the TEGLs. *See* 80 Fed. Reg. at 62,991. Indeed, DOL thoroughly reviewed all of the comments submitted by worker advocates and provided a detailed response as to why it disagreed with their assertion that setting the AEWR based on anything other than the FLS would be inconsistent with the obligation to protect against adverse effect. *Id*. at 62,990-91.[18]

---

[17]  Moreover, the H-2A program is "designed to balance two competing interests: to assure employers an adequate labor force on the one hand and to protect the jobs of citizens on the other." *Orengo Caraballo v. Reich*, 11 F.3d 186, 190 (D.C.Cir. 1993) (internal quotations removed).

[18]  Specifically, to the extent that worker advocates cited other range jobs in Texas or practices in sheep production in states without large herder populations to argue that employers currently using the special procedures could absorb an increase of the scope proposed, DOL did not find their arguments persuasive because (a) the data on which they relied either did not support their assertions or was of such a small sample size to be unreportable under existing guidelines, and (b) the fact that *some* individual employers voluntarily provided higher wage rates was not persuasive evidence that *most* employers could absorb wage increases on the scale proposed in the NPRM. 80 Fed. Reg. at 62,991. DOL agreed that California sheep herding wage rates proved that *some* employers could viably pay a higher wage rate, but determined that this fact, standing alone, did not support using an FLS-based AEWR to set minimum wage rates for all employers across the United States. *Id*. Moreover, contrary to the assertions of the worker advocates, DOL did not believe an FLS-based AEWR was necessary to protect against adverse effect to workers employed in other ranch jobs, because "those occupations d[id] not appear to be primarily engaged in range work," as is required for workers employed pursuant to the 2015 Rule. *Id.* Likewise, even though the AEWR required by the 2015 Rule was lower than the FLS-based AEWR required for ranch hands, DOL concluded that payment of herders at the AEWR in the 2015 Rule would not have an

34

Plaintiffs' reliance on the Third Circuit's decision in *Comité De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173 (3d Cir. 2014) ["*CATA*"], is similarly flawed. There, the court objected to a rule that authorized different prevailing wage rates under the H-2B program for the *same positions, in the same market, at the same time of year*. *Id*. at 190. This is not the case here, where the 2015 Rule created a uniform minimum wage rate applicable to a specific and narrowly defined subset of positions involving livestock. Plaintiffs attempt to confuse the argument by conflating this small subset with positions involving general agricultural or livestock work; however, the herding positions subject to 2015 Rule are distinguishable from general ranch or agricultural positions, and the detailed definitions in the 2015 Rule prohibit employers from using workers certified under this rule to engage in work that is not closely and directly related to herding and/or the production of livestock. *See* 80 Fed. Reg. 62,966-69.[19]

---

adverse effect on ranch hands because the rule further defines what work may be performed by herders while they are at the ranch, and herders were not permitted to perform a number of duties performed by general ranch hands. *Id*. Because the 2015 Rule further clarified the duties that may be performed by range workers while they are working at the ranch, *see id*. at 62,962–66, DOL declined to require payment of the FLS-based AEWR for all hours that herders work on the ranch, noting this practice is consistent with the FLSA exemption for employees primarily engaged in the range production of livestock. *Id*. at 62,991 (citing 29 U.S.C. § 213(a)(6)(E)).

[19] Plaintiffs also contend that DOL's decision to set the AEWR for workers engaged in the range herding or production of livestock using the current Federal minimum wage rate as a component of the monthly AEWR calculation was arbitrary because this wage "has never applied to this group of workers." Pls. Mem. at 32. To the extent that this objection is based on the general exemption of these workers from the FLSA minimum wage requirement, DOL expressly provided a reasoned explanation of its decision to use the $7.25 calculation as a component of its AEWR formula notwithstanding the exemption. 80 Fed. Reg. at 62,994-95. If this is an objection about setting the wage rate for herding occupations based on a data source that had not previously been used to set H-2A wages for these occupations, the same would be true of every wage source other than the TEGL methodology, and use of the TEGL methodology would result in a significantly lower wage than the one to which plaintiffs object. Such an argument also presumes that DOL may not change its position or interpretation with respect to determining the AEWR, which of course is not the case. *See Chevron*, 467 U.S. at 863 ("[a]n initial agency interpretation is not instantly carved in stone.").

35

In sum, although Plaintiffs would have preferred that DOL adopt the FLS-based AEWR, DOL was not required to do so, and it provided an adequate explanation as to why it did not. *See* 80 Fed. Reg. at 62,986–97. Accordingly, the Court should decline Plaintiff's invitation to second guess the Department's judgment.

**C.      DOL provided a reasoned explanation as to why it relied on an estimate of 48 hours per week to calculate the monthly AEWR**

Plaintiffs contend that the monthly AEWR is "arbitrary" because it underestimates the average number of hours that shepherds work. The arguments that Plaintiffs advance in support of this assertion suffer from the same defect as the arguments that they raise in opposition to the base wage rate: they overstate the significance of data submitted by the worker advocates, mischaracterize DOL's responses to this data, and neglect to recognize the deference afforded to DOL in selecting among permissible alternatives.

In formulating the monthly AEWR, DOL decided to multiply a base wage rate by 48 hours per week, and 4.333 weeks per month. In setting this rate, DOL acknowledged that "any estimate of hours worked will necessarily be imprecise," because employees engaged in the range production of livestock are generally exempt from the FLSA and H-2A record keeping requirements. *See* 80 Fed. Reg. at 62995-96. Notwithstanding the scarcity of reliable data, DOL determined that it needed to identify an estimate of H-2A herders' hours to calculate a monthly wage rate. *Id*. Plaintiffs do not challenge the necessity of making this determination, but rather, the number of hours that DOL ultimately selected. *See* Pls. Mem. at 27–31. Specifically, they contend that, in adopting the 48-hour estimate, DOL "arbitrarily reject[ed]" the data from the Colorado Survey indicating shepherds worked an average of 80 hours per week. Pls. Mem. at 28. But DOL considered this data and found it was "very limited" because it was "from a single State

36

and thus not representative of the industry as a whole." 80 Fed. Reg. at 62,996.[20] In the end, DOL decided that the 48-hour estimate from DOL's own certification data recommended as a source by an attorney representing worker interests was the most comprehensive and detailed data from which to establish an hourly calculation. *See id.* Notably, this estimate is four hours higher than the 44-hour estimate that DOL originally proposed using in the NPRM. In addition, the estimate of 48 hours per week is also significantly higher than the equivalent hourly calculations used for the two states, California and Oregon, which set a monthly minimum wage for herding positions. Oregon's minimum monthly wage for herders is the state hourly minimum wage multiplied by a set number of hours equivalent to approximately 40 hours per week, and the California monthly sheepherder wage is the equivalent of approximately 41 hours per week based on the California hourly minimum wage. *Id.* at 62,994-95.

DOL's decision to rely on the 48-hour estimate derived from its own labor certification data was reasonable given the limited information before it at the time that it formulated the rule. *See American Public Communications Council v. F.C.C.*, 215 F.3d 51, 56 (D.C. Cir. 2000) ("[W]e cannot require an agency to enter precise predictive judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty."). Although Plaintiffs would have preferred that DOL base this estimate on the Colorado Survey or commission its own survey, DOL provided a rational explanation as to why it believed the Colorado Survey was less reliable than the 48-hour estimate, 80 Fed. Reg. at 62,996, and DOL was not required to conduct its own

---

[20] Although DOL's determination not to rely on this limited data set in establishing a nationally applicable wage rate was hardly irrational, Defendants complain that DOL's rejection of this data "contradicts longstanding DOL practice" because DOL had historically linked shepherd working conditions in one state to those in another. Pls. Mem. at 29. But this argument fails to recognize that this was precisely the practice that DOL sought remedy in setting a nationwide AEWR. See 80 Fed. Reg. at 20307–09.

survey. *Cf. Vermont Pub. Serv. Bd. v. F.C.C.*, 661 F.3d 54, 64 (D.C. Cir. 2011) (finding that, "absent a clear congressional directive that [an agency] itself engage in fact-finding, the agency "acted well within its discretion" in requiring interested parties to submit data); *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir 2005) ("Incomplete data does not necessarily render an agency decision arbitrary and capricious, for "[i]t is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."); *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C.Cir.1999) ("When ... an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive.").

### III.    The 2015 Rule does not "illegally" expand the definition of "range" or the work that may be performed by H-2A herders

Plaintiffs' final objection to the 2015 Rule is that it creates "an illegally expansive definition of 'range.'" Pls. Mem. at 37–40. Specifically, Plaintiffs contend that the 2015 Rule arbitrarily "expands the geographical scope and nature of shepherd work to encroach on tasks for which there is ample supply of non-H-2A workers" and that it "does so in a manner at odds with the purported basis for creating separate H-2A shepherd rules in the first place." Pls. Mem. at 11. However, Plaintiffs neglect to identify the baseline from which DOL allegedly "illegally expanded" the geographical scope and nature of shepherd work, or for that matter, explain why any of the terms defined in the 2015 Rule were "illegal," other than generally alleging that DOL has "ignore[d] [the] longstanding focus on remoteness" and that the terms in the 2015 Rule would have an "adverse effect." *Id.* at 12, 37-40.

Plaintiffs' claim appears to be at least partially based on their complaint that the 2015 Rule permits shepherds to "work half of their contracts on the ranch," Pls. Mem. at 12 (citing 20 C.F.R.

38

§ 655.200(b)(2)), and "perform unrestricted ranch-hand work to give ranchers 'flexibility in dividing tasks among their H-2A workers,'" *id*. (citing 80 Fed. Reg. at 69,968). Both of these complaints mischaracterize the limits that the 2015 Rule placed on job opportunities under the regulation.  First, the 2015 Rule requires that H-2A workers spend *more than* (not "at least") fifty percent of their workdays on the range. 80 Fed. Reg. 63,066 (codified at 20 C.F.R. § 655.200(b)(2)). In adopting the 50 percent rule, DOL sought to identify a sufficient threshold to confirm the unique, remote characteristics of the positions that were certified under this rule, while allowing for a realistic and workable amount of time at the ranch.  *See id*. at 62,964. DOL concluded that some such delineation was necessary because it had found in its investigations under the TEGLs that some workers were spending extended amounts of time at the ranch while being paid the wage rate intended for range workers. *Id.*

DOL carefully considered the comments that it received and provided a thorough response to the concerns raised by commenters. *See id*. at 62,963–66 (summarizing and addressing comments related to the more than 50 percent requirement); *see also* Sec. B.2., *supra*. After considering and addressing the concerns raised by worker advocates, employers, and industry associations, DOL explained its view that some delineation with respect to ranch versus range was necessary. It viewed the more than 50 percent threshold as a reasonable requirement because (1) it required workers to be primarily on the range; (2) it was consistent with the exemption in the Fair Labor Standards Act (FLSA) for range production of livestock; and (3) it allowed for flexibility in the cases of emergencies and changing circumstances. *Id*. at 62,964.

Notably, not even the comments submitted by worker advocates suggested that DOL should entirely preclude H-2A herders from spending any part of their work contract at the ranch; they merely recommended that DOL revise the rule to require that 70 percent of the work contract

39

period be spent on the range. AR1995. DOL acknowledged this recommendation, but declined to adopt it because, in its view, a majority range requirement was sufficient to confirm the unique, remote nature of herding occupations and distinguish herders from other H-2A occupations, such as ranch hands, while still permitting herding employers the necessary flexibility to allow for changing circumstances on the range. 80 Fed. Reg. at 62,965. Plaintiffs provide no basis on which to conclude that this determination was not a permissible exercise of DOL's discretion.

Plaintiffs' complaints as they relate to permissible duties are similarly unfounded. DOL requested and received numerous comments on the types of duties typically performed on and off the range and considered and addressed these comments in detail when explaining its decisions to revise the proposed definition of "production of livestock" and eliminate the 20 percent cap on "minor, sporadic, and incidental" work. *See* 80 Fed. Reg. 62,966-69; *see also* Section B.2, *supra*. Contrary to Plaintiffs' argument that DOL "failed to consider . . . an alternative, simpler solution . . . for ranchers to hire ranch hands to perform this ranch work," *see* Pls. Mem. at 38-39, DOL specifically considered the appropriate delineation of duties between workers under the 2015 Rule and those of general ranch hands. *See* 80 Fed. Reg. 62,966-69; *see also* Section B.2, *supra*. DOL declined to adopt definitions of these terms, as proposed by employers and industry advocates, that would allow range workers to perform unrestricted duties while at the ranch, based on its conclusion that allowing such general ranch hand work to be performed by herding and range livestock workers would have an adverse effect. 80 Fed. Reg. at 62,968-69. Instead, the 2015 Rule requires that all work performed by H-2A herders and range livestock workers be "closely and directly related to herding or the production of livestock," *id*. (codified at 20 C.F.R. § 655.200(b)(1)), which includes certain duties such as repairing fences used to contain the herd (a job duty to which Plaintiffs object, *see* Pls. Mem. at 38, but was specifically suggested as

40

appropriate in the worker advocates' comment, *see* AR1998). The definition of "production of livestock" also explicitly excludes many tasks performed by general ranch hands, none of which were explicitly excluded in the TEGLs. *See* 80 Fed. Reg. at 62,968-69 (codified at 20 C.F.R. § 655.201) (specifically prohibiting H-2A herders from engaging in the following activities: working at feedlots; planting, irrigating and harvesting crops; operating or repairing heavy equipment; constructing wells or dams; digging irrigation ditches; applying weed control; cutting trees or chopping wood; constructing or repairing the bunkhouse or other ranch buildings; and delivering supplies from the ranch to the herders on the range).

Plaintiffs additionally complain that the 2015 Rule "redefines" the term "range" to include readily accessible areas, such as urban cropland grazed by sheep. Pls. Mem. at 12. This argument, however, first ignores that the TEGLs did not define "range," "open range," or "pasture." *See* TEGL No. 32-10, AR3801–AR3803 (sheepherding and goatherding); TEGL No. 15-06, Change 1, AR 3854–AR3863 (open range production of livestock). This argument also disregards the fact that the 2015 Rule does consider whether land is cultivated as a factor in determining whether it qualifies as "range," as well as whether the land is located in a remote, isolated area; it just does not inflexibly exclude cultivated land under all circumstances. *See* 80 Fed. Reg. at 63,066 (codified at 20 C.F.R. 655.201). Plaintiffs contend that this rule—which *potentially* allows herding on cultivated land to qualify as work on the "range"—is arbitrary because DOL failed to consider whether the more appropriate solution was to certify H-2A workers who work on this land as general ranch hands subject to the standard H-2A wage requires. Pls. Mem. at 37. DOL *did* consider whether it was appropriate to include herding on cultivated cropland in the rule and it decided that "allowing for *some* work on cultivated land, depending on the other factors, is consistent with the purpose of this variance (that the work is unique because it is remote and

41

requires 24/7 availability, which makes the hours difficult to calculate) from the standard H-2A rules." 80 Fed. Reg. at 62,973 (emphasis added). DOL has never indicated that in adopting or implementing the rule, it intends to certify herder work performed solely on cultivated land.

Plaintiffs do not explain why the INA's mandate to prevent "adverse effect" precludes DOL from certifying a position under the herder rule if the herding takes place on cultivated cropland. Nor do they attempt to rebut DOL's conclusion that herding on cultivated cropland could, under some circumstances, meet the purposes of the rule. It was reasonable for DOL to conclude that following the herd as it grazes on crop residue away from the ranch headquarters should not necessarily preclude that work from coverage under the rule. Indeed, under such circumstances, a herder's hours may be just as difficult to track as they are when he is following the herd as it grazes on remote, mountainous terrain.

In sum, Plaintiffs provide no basis on which to conclude that DOL's determinations with respect to the geographical scope and nature of work under the 2015 Rule were not a permissible exercise of DOL's discretion. Given the detail with which DOL addressed the concerns raised by commenters regarding these parameters and the thorough explanations it provided as to why it adopted the job criteria and definitions that it did, any allegation that the resulting scope and nature of the work is arbitrary or capricious lack credulity. Further, this claim fails for the same reasons as Plaintiffs' claim challenging the 2015 Rule's AEWR: DOL considered whether the scope of the regulation in the 2015 Rule would adversely affect U.S. workers—whom worker advocates alleged would be adversely affected if employers were able to rely on H-2A herders, who earn wages below the hourly wage generally required for H-2A workers, to perform general ranch hand work—and reasonably determined that it would not because U.S. workers who are ranch hands perform a much broader array of duties than the workers certified under this rule are permitted to

perform. *See* 80 Fed. Reg. at 62,991 (explaining that "use a lower wage rate than is required for ranch hands . . . will not have an adverse effect for U.S. workers similarly employed" because "the rule has "further defined what work may be performed at the ranch under this Final Rule to prevent herders from being used to perform general ranch hand work."). The Department's conclusion was rational and permissible under the broad discretion Congress delegated to it to assess "adverse effect." Accordingly, it must be upheld. *See e.g., Huls America v. Browner*, 83 F.3d 445 (D.C. Cir. 1996) (upholding an agency's judgment that was statutorily permissible and adequately explained).

For the reasons stated above, the 2015 Rule's definition of "range" and description of the work that may be performed by H-2A herders are reasonable interpretations of the statute.

**IV.    The Court should withhold consideration of the appropriate remedy until after resolving the merits of Plaintiffs' claims and further briefing, should any remedy be warranted**

Plaintiffs contend that, if they succeed on the merits, the Court should set aside and vacate those portions of the 2015 Rule that allow for the "policies" they challenge, specifically 20 C.F.R. §§ 655.200, 655.201, 655.210, 655.211. They further maintain that the vacatur they request "will have the effect of enjoining both DOL and DHS from authorizing H-2A visas to shepherds," Pls. Mem. at 40, and that the "unchallenged portions can function independently of the visa-authorization portions to the extent this separate regulatory framework remains in place for those shepherds currently in the United States on H-2A visas." Pls. Mem. at 40, n. 32. However, even assuming Plaintiffs could prevail on any of their APA claims, it is not at all clear that vacatur (or partial vacatur) would be the appropriate remedy, or even if it were, that it would have the effect

43

Plaintiffs assert.[21] As the Court of Appeals explained in *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002), "vacatur is not necessarily indicated even if an agency acts arbitrarily and capriciously in promulgating a rule." (citation omitted). Rather, in this Circuit, a two-part test is used. *See Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Specifically, the Court examines the "seriousness" of the agency's errors and the "disruptive consequences" of vacatur. *Id.*

Here, the determination of whether vacatur is warranted, and what, if any, effect vacatur would have on the herding industry and the H-2A workers subject to this rule are questions that should be carefully considered by the Court. *See Mendoza v. Perez*, 754 F.3d 1002, 1025 (D.C. Cir. 2014). Because Plaintiffs raise numerous challenges to multiple regulations, it is difficult to address the appropriateness of vacatur, and how vacatur of each, some, or all of the challenged

---

[21] For instance, although Plaintiffs claim employers could simply receive herders through petitioning for immigrant visas, Pls. Mem. at 42, that outcome is unlikely. Herders would be characterized as "unskilled" workers, and that category is capped at 10,000 visas per year for employment-based visas in all unskilled occupations. 8 USC 1153(b)(3). Furthermore, Plaintiffs' suggestion that, if they receive the vacatur order they seek, the unchallenged portions of the 2015 Rule would preserve the regulatory framework with respect to "those shepherds currently in the United States on H-2A visas," Pls. Mem. at 40, n. 32, oversimplifies a complex issue. Among the definitions Plaintiffs seek to vacate is the definition of "range," which delimits the applicability of the standards and procedures in the 2015 Rule. Pls. Mem. at 42. Without an answer to the threshold question of which workers fall within the regulation, the regulation's other provisions, including range housing and sanitation requirements would be inapplicable, and employers would be obligated to meet all requirements for fixed site housing under the standard H-2A regulations, which generally cannot be met in remote locations where herders work. Further, although Plaintiffs contend that the regular hourly AEWR would apply in the event the Court vacates the regulation setting the AEWR in the 2015 Rule, Pls. Mem. at 42 n. 34, they fail to acknowledge that an hourly wage has never been required for these occupations, and do not consider whether the hourly AEWR wage for other H-2A occupations could be required of employers with existing certifications under the 2015 Rule in the absence of APA-required notice and comment. Indeed, due to the general exemption from FLSA minimum wage and recordkeeping requirements for workers "principally engaged in the range production of livestock," 29 U.S.C. § 213(a)(6)(E), employers may not have systems in place to track work hours on the range, and in fact, in enacting the FLSA exemption, Congress found that it would be difficult for employers to track such hours given the remoteness of range livestock production occupations. *See* 80 Fed. Reg. at 62,994.

regulations would affect the existing regulatory framework, without the benefit of the Court's ruling on the merits of Plaintiffs' claims. Accordingly, the Court should reject Plaintiffs' premature request for vacatur and, if the Court finds any legal violation, provide the parties with an opportunity to submit supplemental briefing on the appropriate remedy. *See Sierra Club v. U.S. Dept. of Agriculture, Rural Utilities Service*, 841 F. Supp. 2d 349, 352 (2012) (providing supplemental briefing on remedies issues); *Mendoza v. Perez*, 72 F.Supp.3d 168 (D.D.C. 2014) (considering parties' supplemental briefing on the appropriate remedy and whether vacatur was appropriate). Proceeding in this fashion has the additional benefit of providing the parties the opportunity to negotiate amongst themselves on an appropriate remedy, should the Court find any violations, before asking the Court to weigh in.

## CONCLUSION

Based on the arguments and points of authorities set forth above, Defendants respectfully request that Plaintiffs' motion for summary judgment (ECF No. 93) be denied and that the Court grant summary judgment in favor of Defendants on all remaining counts.

45