# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HISPANIC AFFAIRS PROJECT, *et al.*,

Plaintiffs,

v.

ALEXANDER ACOSTA, in his official
capacity as Secretary of U.S. Department of
Labor, *et al.*,[1]

Defendants.

Civil Action No. 15-cv-01562 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The Immigration and Nationality Act authorizes the issuance of temporary work visas, also known as H–2A visas, to foreign agricultural laborers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). This case concerns the special procedures and conditions under which American employers bring temporary foreign laborers into the United States to perform shepherding work. The plaintiffs, Rodolfo Llacua, a U.S. citizen originally from Peru, who labored as a shepherd in the United States on an H–2A visa from 1999 through 2011, and Hispanic Affairs Project ("HAP"), brought this lawsuit against the United States Department of Labor ("DOL"); the Secretary of Labor in his official capacity; DOL's Assistant Secretary, Employment and Training Administration, in her official capacity; the United States Department of Homeland Security ("DHS"); and the Secretary of DHS in his official capacity (collectively, "the government"); as well as the Western Range Association and the Mountain Plains Agricultural Service, which employ shepherds

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the Secretary of Labor, Alexander Acosta, for former Acting Secretary of Labor, Edward Hugler, who was previously substituted for former Secretary Thomas Perez. Likewise, Acting Assistant Secretary, Employment and Training Administration Byron Zuidema is substituted for Portia Wu, and Secretary of Homeland Security John F. Kelly is substituted for Jeh Charles Johnson.

(collectively, "the association defendants").[2] The plaintiffs' claims against the government arising out of invalid Training and Employment Guidance Letters ("TEGLs") were previously dismissed, and the claims for back pay against the association defendants, predicated on the invalid TEGLs, were severed and transferred to the District of Colorado. *See generally* Order, ECF No. 82; Mem. Op., ECF No. 83.[3] Counts V, VI, and VII now remain, each of which challenges aspects of DOL's 2015 Rule, *Temporary Agricultural Employment of H–2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States* ("Final Rule"), 80 Fed. Reg. 62,958 (Oct. 16, 2015) (codified at 20 C.F.R. §§ 655.200–655.235), which supplanted the 2011 TEGLs. To be precise, the plaintiffs contend that the 2015 Rule "allows [H–2A] shepherds . . . to: (1) conduct work on a permanent basis, (2) for a wage that falls to as low as $3 per hour, and (3) in accord with definitions contained in the Rule for 'range' and the type of work shepherds can perform that are illegally broad." Pls.' Mot. Summ. J. at 1, ECF No. 93. Each remaining Count challenges these same three aspects of the 2015 Rule under a different APA subsection. Count V asserts three claims under § 706(2)(A) of the APA, which prohibits arbitrary and capricious agency action. Compl. ¶¶ 111–12. Count VI asserts three claims under § 706(2)(C), which proscribes agency action in excess of the agency's statutory authority. *Id.* ¶¶ 113–14. Finally, Count VII alleges three claims under § 706(2)(D), which

---

[2]     The plaintiffs' operative complaint was brought by HAP and four shepherds, including both H–2A shepherds as well as a shepherd who is a U.S. citizen. *See* Second Amended Compl. ("Compl.") ¶¶ 4–8, ECF No. 58. The Court previously held that foreign sheepherders do not fall within the zone of interests protected by the Immigration and Nationality Act ("INA") and thus dismissed those plaintiffs from the case. *See* Mem. Op. at 28– 29, ECF No. 83; *see also* Mem. Op. at 8, ECF No. 90 (holding that HAP falls within the zone of interests protected by the INA because at least two of its members are lawful permanent residents of the United States). The plaintiffs now challenge this holding that foreign shepherds are not within the statute's zone of interests but correctly observe that "[t]he Court need not address this matter, as the U.S. shepherds [in this case have] . . . standing." Pls.' Mem. Supp. Mot. Summ. J. at 14 n.11, ECF No. 93.

[3]     Thereafter, the association defendants filed an uncontested motion to intervene, *see generally* Joint Mot. Intervene, ECF No. 98, which motion was granted, *see* Minute Order (dated Apr. 3, 2017).

prohibits agency action taken "without observance of procedure required by law." *Id.* ¶¶ 115–16.[4]

Pending before the Court are four motions, which became ripe on May 19, 2017, with the filing of the parties' Joint Appendix:[5] (1) the plaintiffs, the government defendants, and the association defendants have each moved for summary judgment, *see generally* Pls.' Mot. Summ. J.; Defs.' Opp'n Pls.' Mot. Summ. J. & Cross-Mot. Summ. J. ("Gov't's Cross-Mot. Summ. J."), ECF No. 101; Ass'n Defs.' Cross-Mot. Summ. J., ECF No. 99, and (2) the government has moved to strike the exhibits attached to the plaintiffs' summary judgment motion, citing the long-standing principle that judicial review of agency action under the APA must be limited to the administrative record. *See generally* Defs.' Mot. Strike Extra-Record Materials ("Gov't's Mot. Strike"), ECF No. 100. For the reasons set out below, the government's Motion to Strike is granted in part and denied in part; the plaintiffs' Motion for Summary Judgment is denied in full; and the government's and intervenors' Cross-Motions for Summary Judgment are granted in full.

## I.   BACKGROUND

Much of the factual and regulatory background has been set out in prior opinions in this and related cases. *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1007–10 (D.C. Cir. 2014);

---

[4]   The plaintiffs acknowledge that "[t]he types of APA violations established here are appropriately classified as substantive violations of 5 U.S.C. § 706(2)(A)," addressing arbitrary and capricious agency action. Pls.' Mem. Supp. Mot. Summ. J. at 13 n.10. Nevertheless, the plaintiffs also assert their three challenges to the 2015 Rule under § 706(2)(D) because, according to the plaintiffs, "some of the types of problems with DOL reasoning have been considered procedural violations under [that section]." *Id.* (citing *Comité de Apoyo a los Trabajadores Agricolas v. Perez* ("*CATA*"), 774 F.3d 173, 188 (3d. Cir. 2013)). The plaintiffs do not reference § 706(2)(D) anywhere else in their briefing.

[5]   The Administrative Record ("AR") contains the regulatory precursors to the Final Rule, the Notice of Proposed Rulemaking, studies and letters from various stakeholders DOL received prior to the Notice of Proposed Rulemaking, more than 500 comments submitted during the rulemaking period, and the Final Rule. *See generally* Certification of Index to Administrative Record, ECF No. 50. The parties' Joint Appendix, consisting of "those documents in the certified administrative record that are explicitly cited by the parties in their briefs," Joint Notice of Filing of App'x Pursuant to Rule 7(n) at 1, ECF No. 114, is over 2,000 pages. *See generally* App'x Vol. I, ECF No. 114-1, App'x Vol. II, ECF No. 114-2; App'x Vol. III, ECF No. 114-3; App'x Vol. IV, ECF No. 114-4; App'x Vol. V, ECF No. 114-5; App'x Vol. VI, ECF No. 114-6; App'x Vol. VII, ECF No. 114-7; App'x Vol. VIII, ECF No. 114-8.

*Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 354–57 (D.D.C. 2016); *Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 63–66 (D.D.C. 2015).  Thus, only a brief overview of the particular challenges at issue is necessary here.

The H–2A visa program, established by the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.*, and amended by the Immigration Reform and Control Act of 1986, Pub. L. 99–603, sec. 301, 100 Stat. 3359 (1986), allows employers to hire "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature."  8 U.S.C. § 1101(a)(15)(H)(ii)(a).  As the government explains, "the admission of foreign workers pursuant to [the H–2A visa program] involves a multi-step process before three [f]ederal agencies."  Defs.' Mem. Supp. Opp'n Pls.' Mot. Summ. J. & Cross-Mot. Summ. J. ("Gov't's Mem. Supp. Cross-Mot. Summ. J.") at 2, ECF No. 101-1.  An employer seeking to hire H–2A workers must first obtain a "certification from [DOL] that (1) there are not sufficient qualified and willing U.S. workers to fill open positions and (2) hiring foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. workers." *Mendoza*, 754 F.3d at 1007 (citing 8 U.S.C. § 1188(a)(1)).  After securing the DOL certification, the employer must file an I-129 Petition to Import a Nonimmigrant Worker ("I-129 Petition") with the United States Citizenship and Immigration Services ("USCIS"), a component of DHS. *See* 8 U.S.C. § 1184(c)(1); *see also United States v. Ramirez*, 420 F.3d 134, 137 (2d Cir. 2005) (explaining that after engaging with DOL, an employer "then files with [DHS] a Form I-129 Petition").[6]  Upon approval of an I-129 Petition, the foreign worker identified in that petition

---

[6]      Section 1184(c) provides that the Attorney General is responsible for issuing such petitions, but that responsibility was statutorily transferred to DHS and then delegated to USCIS. *See* 6 U.S.C. §§ 202, 271(b).

may apply for and obtain a visa at a Department of State consulate overseas. *See id.* §§ 1184(c), 1225, 1182(a), 1221(h).[7]

## A.    The *Mendoza* Litigation

The H–2A visa program applies to a wide range of foreign agricultural workers hired for temporary work in the United States. Recognizing "[t]he unique occupational characteristics" of herders, who "spend[] extended periods of time with grazing herds of sheep in isolated mountainous terrain [and] being on call to protect flocks from predators 24 hours a day, 7 days a week," DOL has long prescribed special rules for this class of agricultural workers. *Training and Employment Guidance Letter No. 32-10: Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H–2A Program* ("2011 TEGL"), 76 Fed. Reg. 47,256, 47,256–57 (Aug. 4, 2011); *see also Temporary Agricultural Employment of H–2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States* ("NPRM"), 80 Fed. Reg. 20,300, 20,301 (proposed Apr. 15, 2015) (20 C.F.R. pt. 655). For many years, the special rules governing H–2A visas for herders were set out in Field Memoranda and Training and Guidance Employment Letters ("TEGLs"). *See* 2011 TEGL, 76 Fed. Reg. at 47,257; NPRM, 80 Fed. Reg. at 20,300, 20,302. In a 2014 case challenging the procedural validity of the 2011 TEGLs, however, the D.C. Circuit held that "the Department of Labor violated the Administrative Procedure Act by promulgating [the TEGLs— one for sheep and goat herders and the other for open range production of other types of livestock] without providing public notice and an opportunity for comment." *Mendoza*, 754 F.3d

---

[7]     In this case, the plaintiffs "seek an injunction against DHS for the authorization of visa petitions *or* DOL for the authorization of labor certifications" because, according to the plaintiffs, an injunction against either DHS or DOL "would have the effect of precluding the issuance of actual visas." Pls.' Reply Supp. Mot. Summ. J. at 5 n.4 (emphasis added). The plaintiffs "do not seek to enjoin the Department of State's issuance of the actual visas, as [the State Department] has no duty to review an authorized visa petition to ensure compliance with [statutory] requirement[s]." *Id.*

at 1025.  The D.C. Circuit remanded the case to this Court "to craft a remedy to the APA violation."  *Id.*  On remand, this Court ordered the government to publish a Notice of Proposed Rulemaking by March 1, 2014, and a final rule by November 1, 2015, and set the new rule's effective date as "30 days after the rule's publication or December 1, 2015, whichever is earlier." *Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014).  The 2011 TEGLs were ordered vacated as of the effective date of the new rule.  *Id.*

###### B.   The 2015 Final Rule

In accordance with a Court authorized extension, *see* Memorandum and Order at 5, *Mendoza v. Perez*, Civ. No. 11-1790 (BAH), ECF No. 61, on April 15, 2015, DOL issued a Notice of Proposed Rulemaking ("NPRM") in the Federal Register "proposing to amend its regulations governing certification of the employment of nonimmigrant workers in temporary or seasonal agricultural employment under the H–2A program to codify certain procedures for employers seeking to hire foreign temporary agricultural workers for job opportunities in sheepherding, goat herding and production of livestock on the open range." NPRM, 80 Fed. Reg. at 20,300.  After a comment period, DOL published the challenged Final Rule on October 16, 2015.  *See* Final Rule, 80 Fed. Reg. at 62,958.

The plaintiffs advance three challenges to the Final Rule.  First, the plaintiffs contend that the Final Rule effectively allows herders to work on a permanent basis because it does not restrict "the timing or frequency of renewals."  Pls.' Mem. Supp. Mot. Summ. J. at 6, ECF No. 93.  Second, the plaintiffs assert that the Final Rule prescribes herder wages "that fall[] as low as $3 per hour," Pls.' Mot. Summ. J. at 1, since the Final Rule, 20 C.F.R. § 655.211(c)(1), specifies that the minimum wage applicable to H–2A shepherds, phased in over a two-year period, will be $7.25 per hour, multiplied by 48 hours per week, multiplied by 4.333 weeks per month, *see* Pls.'

Mem. Supp. Mot. Summ. J. at 2, 26–36. Finally, the plaintiffs argue that the Final Rule "create[s] an illegally expansive definition of 'range' . . . and has illegally broadened the scope of shepherd work, which now includes ever-more ranch-based work." *Id.* at 37. The plaintiffs maintain that these three aspects of the Final Rule violate the APA, 5 U.S.C. §§ 706(2)(A) (proscribing agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), 706(2)(C) (proscribing agency action that is "in excess of statutory . . . authority"), and 706(2)(D) (proscribing agency action that is "without observance of procedure required by law").

As relief, the plaintiffs seek a "declaratory judgment that DOL and DHS have violated the APA by adhering to the permanent work-visa, the subminimum wage, and shepherd-as-ranch-hand policies," and "ask the Court to set aside and vacate the portions of the 2015 Rule that allow for these policies, which will have the effect of enjoining both DOL and DHS from authorizing H–2A visas to shepherds." Pls.' Mem. Supp. Mot. Summ. J. at 40.[8]

## II.     LEGAL STANDARD

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases). Thus, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C. Cir. 2013) (noting, in an APA case, that

---

[8]     In particular, the plaintiffs seek *vacatur* of "portions of 29 [sic] C.F.R. §§ 655.200, 655.201, 655.210, 655.211." *Id.* at 40 n.32.

"determining the facts is generally the agency's responsibility, not ours"). As a general rule, judicial review is limited to the administrative record, since "[i]t is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in original); *see also* 5 U.S.C. § 706 ("[T]he Court shall review the whole record or those parts of it cited by a party. . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (noting, when applying the arbitrary and capricious standard under the APA, that "'[t]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120–21 (D.C. Cir. 2014) (citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or capricious provision, under subsection 706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs" of the APA. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

To pass arbitrary and capricious muster, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins.*

*Co.* (*"State Farm"*), 463 U.S. 29, 43 (1983) (internal quotation marks omitted).   As the D.C.

Circuit has explained, a party challenging agency action as arbitrary and capricious "must show

the agency action is not a product of reasoned decisionmaking."   *Van Hollen, Jr. v. FEC*, 811

F.3d 486, 495 (D.C. Cir. 2016). "This is 'a heavy burden,' since *State Farm* entails a 'very

deferential scope of review' that forbids a court from 'substitut[ing] its judgment for that of the

agency.'"   *Id.* (citing *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C.

Cir. 2000)); *see also Judulang v. Holder*, 565 U.S. 42, 52–53 (2011) (same); *Fogo De Chao*

*(Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same);

*Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same).   When "an agency has

acted in an area in which it has 'special expertise,' the court must be particularly deferential to

[the agency's] determinations."   *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 512 F. Supp. 2d

32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock*, 838 F.2d 1258,

1266 (D.C. Cir. 1988)).   That said, "courts retain a role, and an important one, in ensuring that

agencies have engaged in reasoned decisionmaking."   *Judulang*, 565 U.S. at 53.   Simply put,

"the agency must explain why it decided to act as it did."   *Butte Cty. v. Hogen*, 613 F.3d 190, 194

(D.C. Cir. 2010).

       The D.C. Circuit has summarized the circumstances under which an agency action would

normally be "arbitrary and capricious" to include "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."   *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir.

2015).   Thus, when an agency "'fail[s] to provide a reasoned explanation, or where the record

belies the agency's conclusion, [the court] must undo its action.'" *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is [ ] glaring [ ] we can declare with confidence that the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994))); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)).  "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in original).

## III.   DISCUSSION

The parties' cross-motions for summary judgment are addressed after considering the government's motion to strike exhibits appended to the plaintiffs' motion.

### A.   The Government's Motion to Strike

The plaintiffs attached eighteen exhibits to their motion for summary judgment, *see generally* Pls.' Mot. Summ. J., Exs. A–R, ECF Nos. 93-1 to 93-18, sixteen of which were not submitted to, or otherwise considered by, DOL during its notice-and-comment rulemaking and are consequently not part of the administrative record. The government seeks to strike those sixteen exhibits,[9] arguing that "judicial review of agency action, except in rare circumstances

---

[9]     The government "do[es] not seek to strike Exhibit A, a DOL Field Memorandum, as it is included in the Administrative Record at 3796–98." *Id.* at 3 n.2.  Likewise, the government does not move "to strike Exhibit O, a U.S. House of Representatives Subcommittee Report, as this document was referenced in the agency's rulemaking proceeding." *Id.*

. . . , is limited to the administrative record." Gov't Mot. Strike at 3; *see also id.* at 6 (arguing that "the problem of which [the plaintiffs] complain is . . . one of their own making" because they did not present these exhibits to DOL during the rulemaking process). The government points out that the plaintiffs "file[d] extra-record materials contemporaneously with their summary judgment brief," without first seeking leave of court. *Id.* at 4. This, in turn, "places the burden on [the government] to move to strike, . . . [and] leaves some uncertainty about the documents and arguments to which [the government] must respond." *Id.* at 4. The government's points are well taken, since, as another Judge on this Court has observed, "[a]sking the Court for permission to consider additional materials on the very day on which the dispositive motions are filed is simply too late. Doing so meant that Plaintiffs precluded Defendant from effectively objecting to the inclusion of these materials before Plaintiffs relied on them in their briefing." *Banner Health v. Burwell*, 126 F. Supp. 3d 28, 60 (D.D.C. 2015). Due to this awkward procedural posture, the government requests an opportunity to file supplemental briefing in the event that any of the plaintiffs' exhibits are accepted for review. *See* Gov't Mot. Strike at 7. The plaintiffs, on the other hand, maintain that "[their] submission of these [exhibits] should not delay a decision in this case." Pls.' Opp'n Mot. Strike at 10, ECF No. 108. Thus, a determination as to whether the exhibits attached to the plaintiffs' motion for summary judgment is necessary. *See CTS Corp.*, 759 F.3d at 64 (observing that the plaintiff "did not even move to supplement the record" and instead "simply attached . . . new evidence to its brief" but nevertheless addressing whether supplementation would be appropriate).

### 1.    Standards Governing Supplementation and Extra-Record Evidence

Under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *accord, e.g.*, *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should

have before it neither more nor less information than did the agency when it made its decision.'"

(quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). "The

administrative record includes all materials compiled by the agency . . . that were before the

agency at the time the decision was made." *James Madison Ltd. by Hecht*, 82 F.3d at 1095

(internal quotation marks and citations omitted). Otherwise, the reviewing court would

consider *de novo* material not included in the agency record and "reach its own conclusions

based on such an inquiry," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), which is

inconsistent with APA standards of review, under which "the focal point for judicial review

should be the administrative record already in existence, not some new record made initially in

the reviewing court," *Camp*, 411 U.S. at 142.

Supplementation of the administrative record is appropriate only in exceptional or

"unusual" circumstances. *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010)

("[W]e do not allow parties to supplement the record 'unless they can demonstrate unusual

circumstances justifying a departure from this general rule.'" (quoting *Tex. Rural Legal Aid v.

Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991))). The D.C. Circuit has recognized three

narrow instances in which supplementation of an administrative record may be appropriate

before reaching the merits of an APA challenge to agency action: "(1) if the agency 'deliberately

or negligently excluded documents that may have been adverse to its decision,' (2) if background

information was needed 'to determine whether the agency considered all the relevant factors,' or

(3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *City

of Dania Beach*, 628 F.3d at 590 (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002

(D.C. Cir. 2008)). Underlying these exceptions, however, is the "strong presumption" that an

agency has properly compiled the entire record of materials that it considered, either directly or

indirectly, in making its decision. *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013) (quoting *Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)), *affirmed sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015); *accord United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("In the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties."); *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity.").

"In addition to supplementing administrative records with material that an agency considered but failed to include, courts have in certain circumstances departed from the general rule of limiting judicial review to the administrative record and permitted the introduction of extra-record information." *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 5 (D.D.C. 2015). In a case involving a "serious question" about "the procedural validity" of the challenged agency action, the D.C. Circuit identified eight circumstances in which consideration of extra-record evidence may be appropriate. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).[10] More recently, however, the D.C. Circuit has cautioned that the exceptions announced in *Esch* are "narrow" and that, "at most [*Esch*] may be invoked to challenge gross procedural deficiencies—such as where the administrative record itself is so deficient as to preclude effective review." *Hill Dermaceuticals, Inc.*, 709 F.3d at 47 (citing *Theodore Roosevelt Conservation P'ship v.*

---

[10]     The D.C. Circuit identified the following eight circumstances in *Esch*, 876 F.2d at 991 (quoting Steven Stark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action*, 36 ADMIN. L. REV. 333, 345 (1984)): "(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage."

*Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) ("The APA limits judicial review to the administrative record except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.") (internal quotations omitted))); *see also Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1380–81 (Fed. Cir. 2009) (rejecting *Esch* because (1) the *Esch* exceptions originated in a law review article that predated the Supreme Court's decision in *Florida Power & Light Company*, (2) the *Esch* exceptions "are so broadly-worded as to risk being incompatible with the limited nature of arbitrary and capricious review, particularly if construed to allow the introduction of new evidence or theories not presented to the deciding agency," and (3) "*Esch*'s vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence" (internal quotation marks and citations omitted)).

Here, the plaintiffs do not take issue with the general proposition that a court reviewing an agency's action under § 706 of the APA is limited to the administrative record. Instead, the plaintiffs respond that "most of the materials in question are offered not to supplement the record but rather for a different, permissible purpose—namely: (1) to establish standing [Exhibits B, C, J, K, and L], (2) as records subject to judicial notice offered for demonstrative purposes [Exhibits G, H, Q, and R], (3) as quasi-judicial authorities binding on DHS [Exhibits M and N], and (4) as a streamlined compendium of materials actually in the administrative record [Exhibit E]." Pls.' Opp'n Mot. Strike at 1. The plaintiffs concede that four exhibits were submitted as extra-record material—Exhibits D, F, I, and P—but that supplementation is "permissible . . . because of the [g]overnment's failure to consider issues that it was duty-bound to consider in the 2015 Rule."

*Id.* Each group of exhibits and the associated justification asserted by the plaintiffs is addressed in turn.

### 2.    Exhibits B, C, J, K, and L

Exhibits B, C, J, K, and L are offered to help establish the plaintiffs' standing. Those exhibits are, respectively, declarations by (1) Ricardo Perez, the Executive Director of HAP; (2) former plaintiff John Doe; (3) plaintiff Rodolfo Llacua; (4) Magdaleno Diaz, a member of HAP; and (5) Fidel Medina, also a HAP member. *See generally* Pls.' Mot. Summ. J., Ex. B, Decl. of Ricardo Perez, ECF No. 93-2; *id.*, Ex. C, Decl. of John Doe, ECF No. 93-3; *id.*, Ex. J, Decl. of Rodolfo Llacua, ECF No. 93-10; *id.*, Ex. K, Decl. of Magdaleno Diaz, ECF No. 93-11; *id.*, Ex. L, Decl. of Fidel Medina, ECF No. 93-12. The plaintiffs are correct to point out that they may introduce extra-record evidence to establish their standing, and that the Court may rely on that evidence in evaluating whether standing exists. *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (citing *Amfac Resorts, LLC v. Dep't of Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002) ("[The petitioners] are not confined to the administrative record. . . . Beyond the pleading stage, they must support their claim of injury with evidence.")); *accord, e.g.*, *Mass. v. EPA*, 415 F.3d 50, 55 (D.C. Cir. 2005) ("[T]o establish standing, a petitioner challenging agency action has the same burden of production as a plaintiff moving for summary judgment in the district court: it must support each element of its claim to standing by affidavit or other evidence." (internal quotation marks omitted)), *rev'd on other grounds*, 549 U.S. 497 (2007); *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 217 (D.D.C. 2015) ("Although judicial review of agency action is typically confined to the administrative record, where there is not sufficient evidence of standing in the record because the question was not before the agency, plaintiffs may submit extra-record evidence to establish standing."); *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 57 (D.D.C. 2015) ("[E]ven if [the

plaintiff's] standing in this matter was not evident from the administrative record, [the plaintiff] has clearly cured any evidence-related deficiency by submitting a declaration . . . .").

Critically, however, the topics addressed in the relevant declarations here exceed the scope of any standing inquiry, *see, e.g.*, Perez Decl. ¶ 9 (explaining that HAP members have communicated to HAP that they "are generally paid the monthly salary of $1206.33 per month and that they work on a permanent basis in this country pursuant to continually renewed H–2A contracts that last around three years"), and the plaintiffs' summary judgment brief cites those declarations principally for purposes other than establishing standing, *see, e.g.*, Pls.' Mem. Supp. Mot. Summ. J. at 5 n.4, 6 n.5, 23, 40. The plaintiffs may not smuggle in extra-record evidence relevant to the merits of this APA action by contending that the evidence pertains to standing, particularly where standing was previously addressed in detail at the motion to dismiss stage and is no longer at issue.[11] Accordingly, the Court will disregard Exhibits B, C, J, K, and L, as well as the arguments predicated on those exhibits.

### 3.    Exhibits G, H, Q, and R

The plaintiffs next argue that the Court may take judicial notice of Exhibits G, H, Q, and R, which are "labor certifications accessible through the Department of Labor's website." Pls.' Opp'n Mot. Strike at 3. More precisely, Exhibit G is an H–2A application for DOL certification for harvesters, and Exhibits H, Q, and R are similar applications for shepherds. The plaintiffs cite Exhibits G and H in their summary judgment brief to argue that "[t]he lack of a temporary or seasonal need for H–2A shepherds stands in striking contrast to typical H–2A workers." Pls.'

---

[11]    Were the Court to revisit its conclusion that foreign shepherds do not come within the INA's zone of interests and therefore lack standing, portions of these exhibits might be relevant. As explained *supra* n.2, however, the Court declines the plaintiffs' invitation to reconsider its earlier conclusion, which in any event has no practical consequence in this case, since other plaintiffs come within the statute's zone of interests and therefore have standing.

Mem. Supp. Mot. Summ. J. at 8. The plaintiffs use Exhibits Q and R (H–2A applications for shepherds in Hawaii and on the border of Alabama and Florida, respectively) to contend that "the broader new definitions of 'range' and 'shepherd' now employed by DOL allow for a race to the bottom for all workers that could be classified as 'shepherds' and be paid the H–2A shepherd minimum of $3 per hour." *Id.* at 35.

The plaintiffs' position that the Court may take judicial notice of documents on an agency's website does not find support in the caselaw. To the contrary, to take judicial notice in a § 706 APA case, the materials must still come within one of the judicially delineated exceptions to the rule against supplementation and consideration of extra-record documents. *See Riffin v. Surface Transp. Bd.*, Civ. No. 16-1147, 2016 WL 6915552, *1 (D.C. Cir. Oct. 6, 2016) (unpublished) (summarily rejecting a plaintiff's effort to supplement the administrative record via judicial notice, with an application filed with the agency, explaining that none of the three exceptions to the rule against supplementation obtained); *Banner Health*, 126 F. Supp. 3d at 61 ("Insofar as Plaintiffs seek to base their challenge upon these extra-record materials, even those available to the public of which the Court could take judicial notice, the Court concludes that it is necessary to apply the standard for considering extra-record evidence."); *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 32 n.14 (D.D.C. 2013) ("[T]aking judicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action. . . . [A] court may only consider an adjudicative fact subject to judicial notice that is *not* part of the administrative record if it qualifies for supplementation as extra-record evidence under *Esch*." (emphasis in original)), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015); *Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 172 (D.D.C.

2014) (same).[12] The plaintiffs here make no effort to argue that evaluation of Exhibits G, H, Q, and R is proper under the narrow exceptions to the general rule forbidding supplementation of the administrative record or extra-record review of materials. Accordingly, the Court will not take judicial notice of those exhibits and will not consider them in evaluating the plaintiffs' motion for summary judgment.

###    4.    Exhibits M and N

The plaintiffs argue that Exhibits M and N may properly be considered as "quasi-judicial authorities" because they are memoranda prepared by the Office of Legal Counsel ("OLC") within the Department of Justice. Pls.' Opp'n Mot. Strike at 1.[13] Exhibit M is an OLC memorandum entitled "Meaning of 'Temporary' Work Under 8 U.S.C. § 1101(a)(15)(H)(ii)(b) [*i.e.*, the H-2B visa provision[14]]" and was prepared in 2008 for the acting general counsel of DHS. Pls.' Mot. Summ. J., Ex. M at 1, ECF No. 93-13. This 2008 OLC memorandum discussed USCIS's proposed rule that "employment is of a temporary nature" for purposes of H-2B visas "when the employer needs a worker for a limited period of time," generally one year or less, but not to exceed three years, and concluded the proposed rule is "based on a permissible reading of the statute." *Id.* at 1–2. Exhibit N is an OLC memorandum entitled "Temporary Workers Under § 301 of the Immigration Reform and Control Act," which was prepared over 20 years earlier than Exhibit M, in 1987, for the Commissioner of the Immigration and

---

[12]    The plaintiffs rely on *Pharm. Research. & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014), in opposing the government's motion to strike Exhibits G, H, Q, and R. As the government points out, while the Court in that case "did take judicial notice of information on a government website, it did so based on an uncontested motion for judicial notice" and did not analyze whether consideration of that information would be properly considered under one of the narrow exceptions to the baseline rule that APA challenges are limited to the administrative record. Gov't's Reply Supp. Mot. Strike at 6–7, ECF No. 112.

[13]    Such advice from the OLC is expressly contemplated by statute. *See* 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating to the Office of Legal Counsel the Attorney General's statutory authority to render legal advice);

[14]    H-2B visas are temporary visas awarded to non-agricultural workers where labor shortages exist in the United States. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

Naturalization Service. Pls.' Mot. Summ. J., Ex. N at 1, ECF No. 93-14.  This 1987 OLC memorandum concluded that "temporary work refers to any job where the employer's need for the employee is temporary, regardless of whether the underlying job can be described as permanent or temporary," *id.*, and that "the basic rule for H2 petitions is that a 'temporary' job means one for a year or less," *id.* at 3.  The plaintiffs argue that the two OLC memoranda were pertinent to the DOL's rulemaking in this case and maintain that "it is unclear how the OLC opinions to DHS are not the equivalent of judicial authority from this circuit and should not be accorded precedential weight from DHS (and DOJ)."  Pls.' Opp'n Mot. Strike at 4.[15] Essentially, the plaintiffs seek to piggyback on the legal reasoning set out in the OLC memoranda, and would prefer to cite the memoranda as authority rather than claim the legal analysis as their own.  *See* Pls.' Opp'n Mot. Strike at 4 ("Plaintiffs would have been happy to have copied and pasted without attribution the same arguments on 'temporary' into the MSJ, but giving OLC the attribution and paraphrasing good arguments that Defendants are desperate to ignore seemed the more appropriate course.").

The government argues that the Court should not consider the two OLC memoranda because neither was prepared for DOL, and one "discusses 'temporary' for purposes of the H–2B nonimmigrant classification for *non*agricultural labor or services, not the H–2A nonimmigrant classification for agricultural work at issue in this case."  Gov't's Reply Supp. Mot. Strike at 9.  While the government's differentiation between the OLC memoranda and the 2015 rulemaking are correct, these distinctions go to the weight or force of the memoranda rather than whether

---

[15] In advancing this argument, the plaintiffs rely on *Pub. Citizen v. Burke*, 655 F. Supp. 318, 321–22 & n.5 (D.D.C. 1987), in which the court explained that "OLC memoranda are 'binding as a matter of law on those who request [them] until withdrawn by the Attorney General or overruled by the courts.'"  *Id.* at 4 (quoting *Pub. Citizen*, 655 F. Supp. at 321–22).  The government counters that the plaintiffs "conveniently neglect to include the next two sentences of the case they quote, which specify: 'However, this general rule has been held not to apply when the matter is within the proper discretion of a department official . . . . In those circumstances, an opinion would be merely advisory.'"  Gov't's Reply Supp. Mot. Strike at 8–9 (quoting *Pub. Citizen*, 655 F. Supp. at 322).

they should be considered at all.  The plaintiffs are correct to point out that such memoranda are akin to legal authority for an agency engaging in rulemaking on a related subject and therefore may now be considered by the Court, even if the agency elected not to consider such materials. *See Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C 1998) (considering documents not previously considered by the agency "[b]ecause all of these documents were publicly available at the time the [agency] compiled its . . . statistics, and all but two were official records from court proceedings . . . ."). Indeed, the agency's non-consideration of the OLC memoranda—whether deliberate or inadvertent—is all the more reason to consider them in reviewing the agency's action.  A contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices. *See* Arthur H. Garrison, *The Opinions by the Attorney General and the Office of Legal Counsel: How and Why They Are Significant*, 76 ALB. L. REV. 217, 238 (2013) ("The exclusive authority held by the OLC to determine the interpretation of the law for the executive branch is based on the authority historically and statutorily bestowed upon the Attorney General—'because the Attorney General's opinions are treated as final and conclusive they necessarily become the executive branch interpretation of the law.'" (quoting Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 ADMIN. L. REV. 1303, 1321 (2000)).  Accordingly, it would be appropriate for the Court to account for Exhibits M and N in addressing the pending motions for summary judgment.[16]  As explained below, however, the Court ultimately does not reach the merits of the plaintiffs' argument that the 2015 Rule enables

---

[16]     Alternatively, consideration of Exhibits M and N may be appropriate under D.C. Circuit case law addressing extra-record review of documents given that the agency's failure to consider two relevant OLC memoranda may give rise to an inference of "improper behavior," that is, willful blindness to contrary authority. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

H–2A shepherds to work in non-temporary positions, and, thus, Exhibits M and N have no practical effect in this case.

### 5. Exhibit E

The plaintiffs contend that Exhibit E is properly before the Court because it is "mainly a compilation of authorities from the administrative record." Pls.' Opp'n Mot. Strike at 4. Exhibit E is a 39-page document that begins with a 3-page cover memorandum prepared by the plaintiffs' counsel entitled "Additional Authorities," which provides an overview of the materials that follow and explains how they relate to the arguments advanced in the plaintiffs' motion for summary judgment. *See* Pls.' Mot. Summ. J., Ex. E at 2–4, ECF No. 93-5. The cover memorandum states that the balance of Exhibit E "provide[s] additional authorities mainly from a selection of the approximately five-hundred comments submitted as part of the administrative record" during the rulemaking underlying this case. *Id.* at 2. The government does not take issue with judicial consideration of the vast majority of the material comprising Exhibit E but instead notes that "the memorandum and two newspaper articles that it cites" must be ignored. Gov't's Reply Supp. Mot. Strike at 10 (emphasizing that the plaintiffs "cannot rely on evidence or argument that was not before DOL during the rulemaking process"). The Court agrees and will not consider the cover memorandum or the two referenced news articles as evidence but will otherwise consult the materials in Exhibit E, which even the government acknowledges are part of the extant administrative record.

### 6. Exhibits D, F, I, and P

Finally, the government has moved to strike Exhibits D, F, I, and P. Exhibit D is a declaration by Ignacio Alvarado, a HAP member, who worked as a shepherd for 15 years, both in Chile and in Colorado. *See* Pls.' Mot. Summ. J., Ex. D, Decl. of Ignacio Alvarado ("Alvarado Decl.") ¶¶ 1–2, ECF No. 93-4; *see also* Pls.' Opp'n Mot. Strike at 8 (describing Mr. Alvarado as

"an expert on H–2A shepherds").  Mr. Alvarado's declaration addresses the different types of work that shepherds perform during discrete herding seasons and states that "[t]he work of an H–2A shepherd lasts through these different seasons and normally for many years," and that "the custom with the shepherds . . . is that they work for three-year contracts, return home for a brief period of time, and begin another three-year contract."  Alvarado Decl. ¶ 35.  Exhibit F is a notice published on February 12, 2014, on the intervenor-defendant WRA's website.  *See* Pls.' Mot. Summ. J., Ex. F, WRA Membership Notice at 1, ECF No. 93-6.  The notice states that members "should be aware that one of our assurances to the Department of Labor is that travel for each herder, to and from their home country, is provided" and that WRA "purchases these tickets and prorates the cost thereof over 36 months (the maximum time a man could stay)."  *Id.* at 1.  The plaintiffs cite this notice as evidencing a quasi-permanent work policy.  Exhibit I reflects DOL wage data for lambers, which the plaintiffs use to argue that "the new definition of 'shepherd' completely envelopes any separate work performed by a 'lamber.'"  Pls.' Opp'n Mot. Strike at 8.  Finally, Exhibit P is a declaration by the plaintiffs' attorney, which analyzes a 2014 "data set providing information across a number of fields about each H–2A Visa Certification," which he downloaded from DOL's website.  Pls.' Mot. Summ. J., Ex. P, Decl. of Dermot Lynch ¶¶ 2–3, ECF No. 93-16.

The plaintiffs contend that Exhibits D, F, I, and P are offered to "supplement or clarify the record" because DOL and DHS ignored relevant evidence in crafting the Final Rule and in "rubber stamping visa petitions," respectively.  Pls.' Opp'n Mot. Strike at 5 ("[T]he [g]overnment, including in its rulemaking (and in this litigation), takes a stance on some of the problems with the 2015 Rule and in rubber stamping visa petitions that amounts to 'see no evil, hear no evil, speak no evil' about the reality of H–2A shepherd work."); *see also id.* at 6 ("[I]t is

permissible to supplement the record on review of an agency action, 'when the agency failed to consider factors which are relevant to its final decision.'" (quoting *Esch*, 876 F.2d at 991)). Although the plaintiffs use the word "supplement," they seem to argue in substance that the exhibits are properly before the Court as extra-record evidence because the agencies should have, but did not, consider these documents. *See Safari Club Int'l*, 111 F. Supp. 3d at 4 ("Supplementing the administrative record in an APA case means adding material to the volume of documents the agency considered, while admitting extra-record evidence means adding material outside of or in addition to the administrative record that was not necessarily considered by the agency."); *see also Silver State Land, LLC*, 59 F. Supp. 3d at 165, 170 (distinguishing between "supplementation of the administrative record" and "extra-record review"). As such, the plaintiffs must make "a strong showing of bad faith or improper behavior" or show that "the record is so bare that it prevents effective judicial review." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

With respect to Exhibit D, the declaration by Mr. Alvarado, and Exhibit F, the notice issued on WRA's website, there is no basis to conclude that the agency deliberately ignored these documents in engaging in rulemaking—indeed, Mr. Alvarado's declaration was prepared over one year *after* the rulemaking was completed as part of this litigation. Nor do Exhibits D and F add to the extant record in any meaningful way, since record evidence, cited by the plaintiffs, indicates that H–2A shepherds tend to stay as long as an H–2A visa allows, for more than one season, and return many times working for the same rancher for up to twenty years. *See* Pls.' Mem. Supp. Mot. Summ. J. at 7 n.5 (citing Exhibits D and F, as well as the Federal Register, as indicating that the same shepherds are reemployed over time). Accordingly, Exhibits D and F will not be considered. *See Safari Club Int'l*, 111 F. Supp. 3d at 7 ("Plaintiffs

have not met the requirements for admitting the email as extra-record evidence [because] [t]hey do not allege bad faith nor improper behavior by the agency, and the Court finds that this email is not necessary to make judicial review effective in this case."). Regarding Exhibit I, which discloses lamber wages, the plaintiffs present no reason to believe that this document was overlooked in bad faith by the agency. Further, as with Exhibits D and F, Exhibit I does not meaningfully add to the plaintiffs' argument and evidence that DOL's wage determination for H–2A shepherds is unlawful. *See* Pls.' Mot. Summ. J. at 9–11. Thus, Exhibit I will not be considered.

Exhibit P is a declaration by the plaintiffs' attorney, Mr. Lynch, which analyzes data culled from employers' Form ETA-9142A filings, which H–2A employers submit to DOL to obtain a certification allowing them to hire H–2A workers. Lynch Decl. ¶ 2; Final Rule, 80 Fed. Reg. at 62,974. This is the same data set relied on by attorney and commenter Edward Tuddenham to conclude that herders work, on average, 48 hours per week. *See* Oct. 30, 2014 Letter from Edward Tuddenham to DOL Acting Deputy Associate Solicitor, AR at 264–68. DOL "relied upon" the data underlying Mr. Tuddenham's comment "in reasoning that H–2A shepherds work an average of 48 hours per week." Lynch Decl. ¶ 2; *see also* Final Rule, 80 Fed. Reg. at 62,995–96 (citing data submitted by employers in "Form ETA-9142A filings" as justifying the 48-hour work week). In his declaration, Mr. Lynch concludes that defendant-intervenor WRA "always says shepherds work 40 hours a week" in its Form ETA-9142A filings and MPAS "always says that H–2A shepherds work 60 hours a week" in its filings. Lynch Decl. ¶ 8. Particularly because the agency did not set out the data set Mr. Tuddenham relied upon, Mr. Lynch's declaration is helpful to understanding whether reliance on that data set—as opposed to other sources, as urged by some commenters during the rulemaking process—was appropriate.

*Cf. Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 368 (D.C. Cir. 1981) ("Appellants are clearly correct in suggesting that the administrative record must disclose the studies and data used in compiling environmental impact statements."). As such, Mr. Lynch's declaration—and the data set it cites—is properly before the Court. The declaration helps effectuate judicial review in pointing out potential flaws in the data relied upon by the agency, at least indirectly, in setting a 48-hour work week. *Cf. Western Watersheds Project v. U.S. Forest Serv.*, Civ. No. 05-189, 2006 WL 292010 (BLW), *4 (D. Idaho Feb. 7, 2006) (unpublished) (relying on an extra-record declaration analyzing a data set utilized by the agency where the agency did not include the data in the certified administrative record and "d[id] not quarrel" with the analysis set out in the declaration); *Friends of the Earth v. Hall*, 693 F. Supp. 904, 921 (W.D. Wash. 1988) ("[T]he extra-record evidence explains the data and factors on which the Navy and the Corps relied, and thus can be relied upon by the court.").[17]

\*\*\*

In sum, Exhibits A, M, N, O, and P, as well as Exhibit E, except for the cover memo, attached to the plaintiffs' summary judgment motion are properly before the Court. All other exhibits will be disregarded.[18]

---

[17] The plaintiffs also seek to supplement the record with the same declarations used to establish standing, *i.e.*, Exhibits B, C, J, K, L, as well as the newspaper articles cited in Exhibit E, *see* Pls.' Opp'n Mot. Strike at 10, but these exhibits were not in existence at the time of the rulemaking, and, thus, clearly cannot or used to supplement the record. To the extent the plaintiffs seek extra-record review of these exhibits, that request is denied because no "strong showing of bad faith or improper behavior" has been made, and the record is not "so bare" with respect to the matters addressed in the declarations to "prevents effective judicial review." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

[18] As noted, the government requests an opportunity to file supplemental briefing to address the extra-record evidence and related arguments to the extent any are considered. *See* Gov't's Mot. Strike at 7. Ultimately, no such briefing is necessary. The government concedes that Exhibits A and O are properly before the Court and therefore had an opportunity to address those exhibits in its summary judgment briefing. As for Exhibits M and N, those records do not constitute new "evidence" but are instead legal authority, and Exhibit P is simply an independent analysis of data the DOL relied on. The portions of Exhibit E relied upon are already in the administrative record.

## B.        The Cross-Motions for Summary Judgment

The plaintiffs argue that three aspects of the Final Rule violate the APA. These three challenges are taken up *seriatim*.

### 1.        The "Permanent Work-Visa Policy"

The H–2A statute provides that an employer may hire "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a *temporary* or *seasonal* nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a)  (emphasis added). The statute does not define the term "temporary or seasonal." Under the 2015 Rule, however, a goat or sheep herder H–2A visa may be issued for no more than "364 days of need." 20 C.F.R. § 655.215(b)(2).[19]  Notwithstanding this time limit, the plaintiffs contend that the 2015 Rule allows "shepherds [to] labor permanently on three-year work contracts that are indefinitely renewed." Pls.' Resp./Reply Supp. Pls.' Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pls.' Reply Supp. Mot. Summ. J.") at 1, ECF No. 107; *see also* Pls.' Mem. Supp. Mot. Summ. J. at 6 ("A shepherd H–2A visa is for no more than '364 days of need,' 20 C.F.R. § 655.215(b)(2), but with no restrictions on the timing or frequency of renewals, . . . the 2015 Rule creates an annual visa-renewal requirement."). In particular, the plaintiffs assert claims against DOL and DHS alleging that this "permanent work-visa policy" violates (1) § 706(2)(A) of the APA because the time period authorized for shepherd work under the 2015 Rule is neither "temporary" nor "seasonal" as those terms are defined in the H–2A statute; and (2) § 706(2)(C) of the APA because, in

---

[19]       By contrast to the time limitation for range sheep and goat herders, "[t]he period of need identified on the H–2A Application for Temporary Employment Certification and job order for range herding . . . of . . . other domestic hooved livestock," including cattle, "must be for no more than 10 months." 20 C.F.R. § 655.215(b)(2). The NPRM explains that "this distinction between range occupations for the purposes of the period of need was intended to maintain overall consistency with the standard H–2A regulations, at 20 C.F.R. 655.103(d), and at the same time preserve the unique history and experience with range sheep and goat production employees." Final Rule, 80 Fed. Reg. at 62,999.

addition to "conflict[ing] with DOL and DHS definitions of 'temporary' and 'seasonal,' it "ignores the relevant information in the administrative record about the permanent and multi-seasonal nature of shepherd work." *Id*. at 14–15.

The government's response is three-fold. First, the government argues that the plaintiffs' claims against DHS are "deficient as a matter of law" because the plaintiffs do not and cannot challenge long-standing DHS H–2A regulations, nor do the plaintiffs "identify the specific, final agency actions of which they seek review." Gov't's Cross-Mot. Summ. J. at 1; *see also* Gov't's Mem. Supp. Cross-Mot. Summ. J. at 21–23. With regard to the latter point, the government posits that the APA "does not provide a cause of action allowing plaintiffs to programmatically challenge DHS's adjudication of all past, present, and future H–2A petitions filed by employers seeking to employ sheepherders." Gov't's Cross-Mot. Summ. J. at 1. Second, the government contends that "because DOL does not issue H–2A visas to shepherds, under the 2015 Rule or otherwise, the precise nature of [the plaintiffs'] claim against DOL is unclear" given that "[t]he only provision of the 2015 Rule that is even possibly relevant to this claim is 20 C.F.R. § 655.215(b)(2), which permits herding employers to request certification for a period of up to 364 days." Gov't's Mem. Supp. Cross-Mot. Summ. J. at 24; *accord* Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 17, ECF No. 99-1 ("DOL does not issue visas, nor does it renew those visas. Those decisions are handled by USCIS, which . . . has specific rules limiting the renewal of visas to prevent the very scenario that Plaintiffs worry about."). Relatedly, the government argues that this issue was never raised during the rulemaking process and therefore is waived. Gov't's Mem. Supp. Cross-Mot. Summ. J. at 24–25 & n.12. Finally, regarding the merits of the plaintiffs' claims, the government maintains that the 364-day limit passes APA muster because (1) "DOL adopted DHS's basic definition of 'temporary' set out in its H–2A regulations,"

(2) DHS, not DOL, ultimately issues H–2A visas and determines whether the statutory requirements are met, and (3) "neither the [H–2A] statute nor either agencies' [sic] regulations proscribe the 364-day certification period, and DOL's decision to continue its longstanding practice of certifying sheepherder positions for periods of up to 364-days [sic] was neither arbitrary nor capricious." *Id.* at 26. For the reasons set out below, the Court may not reach the merits of the plaintiffs' claim that the 2015 Rule authorizes the issuance of permanent, non-seasonal visas to H–2A shepherds in contravention of the INA.

### a. The Plaintiffs' Claims against DHS.

The government contends that the claims against DHS cannot proceed for several reasons.[20] The starting point in determining whether DHS is properly a defendant in this action is to identify the agency action at issue. This case challenges part of the 2015 Final Rule, promulgated by DOL. *See, e.g.*, Second Am. Compl. at 1 ("DOL has published the 2015 Rule for herders, which became effective November 16, 2015, and which Plaintiffs challenge."); Pls.' Mot. Summ. J. at 1 (arguing that DOL and DHS "violated the Administrative Procedure Act by adhering to policies outlined in the 2015 Rule"). The 2015 Rule addresses, *inter alia*, the circumstances under which DOL may issue a labor certification for H–2A shepherds. *See* Gov't Mem. Supp. Cross-Mot. Summ. J. at 23 ("[T]he 2015 Rule merely prescribes the

---

[20]        The association defendants, for their part, point out that myriad regulatory limitations prohibit issuance of indefinite, uninterrupted H–2A visas to shepherds. First, the DOL H–2A regulations applicable to agricultural workers generally "already limit DOL's ability to grant extensions of labor certifications—short-term extensions of two weeks of [sic] less must be approved by DHS, and long-term extensions 'must be related to weather conditions or other factors beyond the control of the employer (which may include unforeseen changes in market conditions)' and may not extend the total work contract to 12 months or more, 'except in extraordinary circumstances.'" Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 15 (quoting 20 C.F.R. § 655.170(a), (b)). Second, DHS regulations "specifically provide that 'an H–2A petitioner must establish that the employment proposed in the certification is of a temporary or seasonal nature' and that 'employment is of a temporary nature where the employer's need to fill the position with a temporary worker will, except in extraordinary circumstances, last no longer than one year.'" *Id.* (quoting 8 C.F.R. § 214.2(h)(5)(vi)(A)). Finally, the association defendants point to the "touchback" provision in the DHS H–2A regulations, which states that "an individual who has held H–2A status for a total of 3 years may not again be granted H–2A status until such time as he or she remains outside the United States for an uninterrupted period of 3 months." *Id.* at 16 (quoting 8 C.F.R. § 214.2(h)(5)(viii)(C)).

procedures and standards by which DOL makes the certification required by section 1188 for positions that involve sheepherding or production of livestock on the range."). As explained above, such a certification is the first of several steps an employer must take to hire a foreign, non-immigrant shepherd to perform temporary work in the United States. DHS is not involved in the labor certification process. Instead, once an employer obtains a labor certification, the employer then submits a visa petition to DHS, which "must be filed . . . with a single valid temporary agricultural labor certification." 8 C.F.R. § 214.2(h)(5)(i)(A).[21]  Given that this lawsuit targets a DOL rule, and that DHS's role in the H–2A process is distinct from that of DOL, the government questions whether the claims against DHS are proper.[22]  The government points out that the plaintiffs expressly disclaim any challenge to DHS's H–2A regulations, codified at 8 C.F.R. § 214.2(h).  *See* Gov't's Reply Supp. Cross-Mot. Summ. J. at 4 n.1 (citing Pls.'s Reply Supp. Mot. Summ. J. at 18 n.11).  The government's question is well placed.

DHS approves visa petitions *not* pursuant to the 2015 DOL Rule but instead pursuant to its own set of H–2A regulations, codified in pertinent part at 8 C.F.R. § 214.2(h)(5)(iv)–(viii). DHS's H–2A regulations ordain the very "policy" attacked by the plaintiffs in this case. To be precise, the regulations provide that, before a visa may issue, "[a]n H–2A petitioner must

---

[21]     To be precise, "[t]he petition may be filed by either the employer listed on the temporary labor certification, the employer's agent, or the association of United States agricultural producers named as a joint employer on the temporary labor certification." *Id.*

[22]     The parties also dispute whether the challenged "permanent work-visa" for shepherds is a final agency action.  *See* 5 U.S.C. § 704 (limiting APA review to "*final agency action* for which there is no other adequate remedy in a court" (emphasis added)); *see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  The government contends that the plaintiffs "do[] not pinpoint any 'identifiable action or event' that (a) is attributable to DHS and (b) falls within one of the 'circumscribed, discrete agency actions' in 5 U.S.C. § 551(13)."  Gov't's Reply Supp. Cross-Mot. Summ. J. at 3, ECF No. 113 (quoting *Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 891 (1990)).  The plaintiffs disagree.  *See* Pls.' Reply Supp. Mot. Summ. J. at 5–8.  The plaintiffs' claims against DHS fail at the threshold for a related reason, and thus the Court need not resolve this dispute.  Nevertheless, the government is correct to point out that DHS has not been able to compile an administrative record in this case because the plaintiffs have not challenged any particular policy or action by DHS, and that the plaintiffs "have never moved for the production of an administrative record on their claims against DHS."  *See* Gov't's Reply Supp. Mot. Strike at 4.

establish that the employment proposed in the certification is of a temporary or seasonal nature." *Id.* § 214.2(h)(5)(iv)(A).   "[N]ormally," DOL's finding that the employment proposed under a particular H–2A visa application qualifies is "sufficient for the purpose of an H–2A petition," but DHS nevertheless makes a subsequent, independent assessment as to whether employment is temporary or seasonal.  *Id.* § 214.2(h)(5)(iv)(B) ("In temporary agricultural labor certification proceedings the Department of Labor *separately* tests whether employment qualifies as temporary or seasonal." (emphasis added)).  Notwithstanding DOL's issuance of a labor certification, "eligibility will not be found . . . where there is substantial evidence that the employment is not temporary or seasonal." *Id.*  As to whether the proposed employment is temporary or seasonal, DHS regulations provide that employment is temporary "where the employer's need to fill the position with a temporary worker will, except in extraordinary circumstances, last no longer than one year," and employment is seasonal "where it is tied to a certain time of year by an event or pattern, such as a short annual growing cycle or a specific aspect of a longer cycle, and requires labor levels far above those necessary for ongoing operations." *Id.* § 214.2(h)(5)(iv)(A).

"Except as provided in paragraph (h)(5)(viii)(B) of [the DHS H–2A regulations], an alien's stay as an H–2A nonimmigrant is limited by the term of an approved petition." *Id.* § 214.2(h)(5)(viii)(C).  An H–2A worker "may remain longer to engage in other qualifying temporary agricultural employment by obtaining an extension of stay." *Id.*  "However, an individual who has held H–2A status for a total of 3 years may not again be granted H–2A status until such time as he or she remains outside the United States for an uninterrupted period of three months." *Id.*  Thus, the DHS regulations—which the plaintiffs expressly do not challenge—facilitate three-year, multi-seasonal stays, and permit H–2A workers to return to the United

States under the H–2A statute after "remain[ing] outside the United States for an uninterrupted period of 3 months." *Id.*

Consequently, the plaintiffs' attack on the "policy" of issuing permanent H–2A visas boils down to an attack on DHS's H–2A regulations, which is improper for two reasons. First, the plaintiffs do not raise such a claim in their operative complaint, and they expressly disavow making any such claim in their summary judgment briefing. *See* Pls.' Reply Supp. Mot. Summ. J. at 18 n.11. Second, as the government points out, *see* Gov't's Mem. Supp. Cross-Mot. Summ. J. at 23, the six-year statute of limitations to bring a facial challenge to the DHS H–2A regulations has passed, since the relevant provisions of the DHS H–2A regulations were last revised in 2008. *See* 28 U.S.C. § 2401 (setting a default of a six-year statute of limitations for civil claims against the United States); *see also Mendoza*, 754 F.3d at 1018 (noting that APA claims "are subject to the statute of limitations contained in 28 U.S.C. § 2401" and that "the statute of limitations contained in § 2401(a) is not subject to waiver" because it is jurisdictional).

The plaintiffs rely heavily on *R.I.L-R v. Johnson ("RILR")*, 80 F. Supp. 3d 164 (D.D.C. 2015), to argue that they may assert claims against DHS in this action for DHS's role in allegedly issuing permanent, non-seasonal visas to H–2A shepherds, but *RILR* is clearly distinguishable from the instant action. In *RILR*, the plaintiffs were Central American mothers and their minor children who had fled violence in their home countries to seek asylum in the United States. *Id.* at 170. After entering the United States illegally and being apprehended, "each [mother] was found to have a 'credible fear' of persecution, meaning there [was] a significant possibility that she [would] ultimately be granted asylum." *Id.* In the past, similarly situated individuals had been released while their asylum claims were processed, but for each of the plaintiffs, immigration officials determined that detention would be appropriate. *Id.* The

plaintiffs sued arguing that their "detention resulted from an unlawful policy that DHS adopted in June 2014 in response to the immigration spike" and that DHS adopted this practice of "detaining Central American mothers and children with the aim of deterring potential *future* immigrants," in violation of various federal laws and the U.S. Constitution. *Id.* (emphasis in original). The government "adamantly den[ied] that any reviewable policy exist[ed] and maintain[ed], as a consequence, that [the plaintiffs'] suit [could] proceed no farther." *Id.* at 173–74.

Given the parties' dispute, the Court had to decide in *RILR* "what, if any, policy [was] actually in place" based on evidence as to the number of individuals released pending the processing of their asylum petition over time. *Id.* at 174 (reviewing expert data analysis, and evidence from the agency, to determine whether a policy actually existed). The Court ultimately held that DHS had a policy of directing its line officers to consider mass migration deterrence as a factor in custody determinations. *Id.* at 176. Here, the dispositive question is not whether a policy of granting H–2A visa petitions for the same shepherds year in and year out exists. Assuming *arguendo* that such a policy does exist, DHS regulations expressly contemplate and sanction such a policy. Put differently, unlike in *RILR*, any policy at issue here is not an unwritten, informal policy, but is so intertwined with the DHS H–2A regulations that a challenge to that policy cannot proceed without challenging the formal rule undergirding that policy, 8 C.F.R. § 214.2(h). Accordingly, *RILR* does not alter the conclusion that the claims against DHS cannot proceed.[23]

---

[23] As the plaintiffs point out, Pls.' Reply Supp. Mot. Summ. J. at 7, the Court previously denied the defendants' motions to dismiss the plaintiffs' claims against DHS because the plaintiffs' second amended complaint "sufficiently puts the Federal Defendants on notice as to the nature of the plaintiffs' claim against DHS." *See HAP v. Perez*, 206 F. Supp. 3d at 372. The plaintiffs' claims and legal arguments have crystallized as the litigation has progressed, making clear, as explained, that DHS is not properly a party to this action.

### b.  The Plaintiffs' Claims against DOL.

The government contends that "the precise nature" of the plaintiffs' challenge to the "permanent work-visa policy" is "unclear" with respect to DOL because DOL simply issues labor certifications—not the actual visas that are allegedly being issued for non-temporary, multi-seasonal work. Gov't's Mem. Supp. Cross-Mot. Summ. J. at 24; *accord* Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 17 (noting that DOL merely "conducts a 'labor market test'" and "does not issue visas," and suggesting that the plaintiffs "misunderstand[] . . . the H–2A program"). According to the government, "[t]he only provision of the 2015 Rule that is even possibly relevant to this claim is 20 C.F.R. § 655.215(b)(2), which permits herding employers to request certification for a period of up to 364 days." Gov't's Mem. Supp. Cross-Mot. Summ. J. at 24. To the extent the plaintiffs argue that this provision of the 2015 Rule "leads to the issuance of H–2A visas for positions that are not actually 'of a temporary or seasonal nature,'" *id.*, the government maintains that the plaintiffs are "precluded from raising this claim because neither they, nor any other party, raised it in the rulemaking proceeding before DOL," *id.* The parties focus principally on the waiver issue.

As the D.C. Circuit has frequently reminded, "issues not raised before an agency are waived and will not be considered by a court on review." *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (quoting *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."))); *accord Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005). The waiver standard in the administrative context is demanding:

the question is whether the "specific argument" advanced by the plaintiffs—rather than "the same general legal issue"—was raised before the agency. *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013).

The plaintiffs repeatedly charge that DOL itself acknowledged "that it needed to design a shepherd policy that would 'reflect more appropriately . . . temporary or seasonal need as required by [the INA]." Pls.' Reply Supp. Mot. Summ. J. at 9 (quoting NPRM, 80 Fed. Reg. at 20,303); *see also* Pls.' Mem. Supp. Mot. Summ. J. at 6. The plaintiffs' citation to the NPRM, devoid of context, is misleading. DOL never concluded that a new policy would be necessary to ensure compliance with the INA's "temporary or seasonal" command. To the contrary, DOL solicited "*comments about whether* sheep and goat herding involve distinct temporary positions at different times of the year that require more than one certification to reflect distinct temporary and/or seasonal needs under the INA," and whether the 10-month limitation that applied to certifications involving work with all livestock other than sheep and goats "[s]hould . . . apply to sheep and goat herders, to reflect more appropriately their temporary or seasonal need as required by the INA." NPRM, 80 Fed. Reg. 20,303 (emphasis added). As the government points out, however, the NPRM "continued DOL's longstanding practice of certifying sheep or goat herding positions for periods of up to 364. . . days." Gov't's Reply Supp. Cross-Mot. Summ. J. at 7. Thus, although DOL sought comments concerning the distinguishing features of the seasonal nature of sheep and goat herding work compared to other herding, DOL did not admit that a new policy prescribing labor certifications for shorter time periods was required to "'reflect more appropriately . . . temporary or seasonal need.'" Pls.' Reply. Supp. Mot. Summ. J. at 9 (quoting NPRM, 80 Fed. Reg. at 20,303).

The plaintiffs also contend that their permanent work-visa argument was adequately before DOL during the rulemaking process because "the principal shepherd advocate comment . . . suggested [that] . . . 'the best way to reflect the distinct temporary and/or seasonal needs of sheep herding would be to have two separate certification periods that would reflect the nature of the work." Pls.' Reply Supp. Mot. Summ. J. at 9 (quoting Principal Worker Advocate Comment (June 1, 2015), AR at 1,996[24]). The government contends that the argument advanced by workers' advocates during the rulemaking process is distinct from the argument the plaintiffs advance here. The shepherd advocates' 35–page comment devoted a single page to responding to DOL's question "'whether sheep and goat herding involve distinct temporary positions at different times of the year that require more than one certification to reflect the distinct temporary and/or seasonal needs under the INA.'" Principal Worker Advocate Comment, AR at 1,996 (quoting NPRM, 80 Fed. Reg. at 20,302–03). Noting that the NPRM "only requires that the order be 'no more than 364 days' but does not otherwise limit the application," the advocates "recommend[ed] two certification periods . . . to reflect . . . the open range season that spans from summer through the winter and a separate spring season for birthing." *Id.* The advocates explained that "[t]he precise months may vary from year to year and by geographical location of the ranch" and, accordingly, suggested that the regulation "not specify the months but . . . limit applications for the open range season to nine months and for the birthing season to three months." *Id.* The advocates proposed that the spring birthing season visas should generally not

---

[24]        DOL received two joint comments from worker advocate groups. The first of these comments, which the plaintiffs refer to as the "principal" worker advocate comment, Pls.' Mem. Supp. Mot. Summ. J. at 5 n.4, provided a comprehensive evaluation of the NPRM. *See generally* Principal Worker Advocate Comment, AR at 1,990–3,459. The second worker advocate comment, submitted by many of the same signatories to the first comment, was much shorter and expressed general support for the NPRM while at the same time suggesting that the NPRM "does not go nearly far enough." Secondary Worker Advocate Comment (June 1, 2015), AR at 1,697 ("welcom[ing] DOL's proposed rule because it [would] improve conditions for herder and range livestock H-2A workers by strengthening the current 'special procedures' that govern the program for these positions").

be subject to special herder rules but to general H–2A provisions given that birthing season tasks "occur on or near a ranch or farm" and "local labor is more readily available for hire." *Id.* Thus, the clear import of the portion of the advocates' comment now cited and relied upon by the plaintiffs is not that the NPRM would create a permanent work-visa regime but rather that distinct seasonal tasks performed by herders warranted issuance of two different visas throughout a single year. The plaintiffs have not pointed to any comment in the administrative record advancing the "specific argument" they raise in this case. *Koretoff*, 707 F.3d at 398.

Perhaps recognizing the weakness of their contention that the permanent work-visa argument was raised to DOL during the rulemaking process, the plaintiffs further contend that the Court should "'excuse[] exhaustion requirements'" in this case. Pls.' Reply Supp. Mot. Summ. J. at 10 (quoting *Natural Resources Def. Council v. EPA*, 824 F.2d 1146, 1150–51 (D.C. Cir. 1987)). The plaintiffs rely heavily on *Ark Initiative v. Tidwell*, 64 F Supp. 3d 81, 94 (D.D.C. 2014), *aff'd* 816 F.3d 119 (D.C. Cir. 2016), in which another Judge on this Court explained that, "if the agency knew or should have known about the specific concerns [at issue in the rulemaking], then the plaintiff need not have . . . raised them during the comment period." Critically, however, *Ark Initiative* involved the question whether the *particular* plaintiff bringing suit against an agency waived an argument if the plaintiff did not "*personally* raise[] [the argument] during the comment period." *Id.* (emphasis added). The Court concluded that "although [the plaintiff] itself did not comment on the [policy at issue], a number of other commenters raised the same kind of environmental and administrative concerns alleged in Count 1 of the Amended Complaint," and, accordingly, "[the plaintiff] ha[d] not waived its right to bring this challenge." *Id.*

Consistent with *Ark Initiative*, the proper inquiry here is whether the "specific argument" the plaintiffs assert was before DOL—whether raised by the plaintiffs or any other commenter. *Koretoff*, 707 F.3d at 398. As previously explained, the plaintiffs have not pointed to a single comment in the administrative record that raises the permanent work-visa argument now advanced in this lawsuit. Likewise, DOL did not itself raise the issue whether H–2A labor certifications or visas could ever be deemed temporary or seasonal given that they are often issued for a period of up to three years. As the plaintiffs acknowledge, to the extent DOL addressed the temporary nature of H–2A visas, it did so only in the context of soliciting comments as to whether separate certifications should issue for different types of work performed at different times of year. *See* Pls.' Reply Supp. Mot. Summ. J. at 11 (explaining that DOL "considered and raised the issue of whether H–2A visas could be temporary and suggested that a solution was to have separate seasonal certification periods"); *see also* NPRM, 80 Fed. Reg. at 20,302 (questioning "whether sheep and goat herding involve distinct temporary positions at different times of the year that require more than one certification to reflect distinct temporary and/or seasonal needs under the INA"). This question is wholly different from the issues raised by the plaintiffs in this lawsuit regarding whether a "permanent shortage of domestic shepherds" exists, and whether the 2015 Rule allows "shepherds to work on multi-year contracts that are renewable for indeterminate lengths of time." Pls.' Mem. Supp. Mot. Summ. J. at 1. Those two issues simply were not raised to DOL.

Finally, the plaintiffs contend that "[w]aiver also cannot apply if a party 'had no way to raise [its] argument until [the agency] issued its final rule.'" Pls.' Reply Supp. Mot. Summ. J. at 11 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009)). The plaintiffs' contention that they had no notice that labor certifications would be issued for

364-day periods, and that "[n]o one could have predicted DOL's truly novel error," Pls.' Reply

Supp. Mot. Summ. J. at 11, is wholly unconvincing given the longstanding practice of issuing

certifications for that period of time, *see* NPRM, 80 Fed. Reg. at 20,311 (noting that DOL has

"long standing special procedures that allow sheep or goat herding employers to participate in

the H-2A program with a total period of need lasting up to 364 calendar days" and noting that

"[t]he [NPRM] retains the 364-day duration of need in sheep and goat herding on the open

range"). Indeed, this argument is further undercut by the plaintiffs' own assertion that "the 2015

Rule *continues with a policy* of allowing multi-year and multi-seasonal employment of shepherds

that can last indefinitely," Pls.' Mem. Supp. Mot. Summ. J. at 6 (emphasis added); *see also* Pls.'

Reply Supp. Mot. Summ. J. at 3 ("For example, the 2011 TEGL . . . explicitly acknowledges that

shepherd work is effectively indefinite by outlining the policy for renewal of labor certifications

'where the employer is requesting certification for a position which is already held by a

nonimmigrant foreign worker completing the first or second year of a planned 3-year work

period with the employer.'" (quoting 2011 TEGL, 76 Fed. Reg. at 47,260)). Given that, as the

plaintiffs themselves concede, the 2015 Rule essentially codified a policy that already existed

under the TEGLs, long before the Rule was promulgated, the plaintiffs cannot now argue that

they had no notice of this policy during the rulemaking process such that they were unable to

comment meaningfully on it.[25]

---

[25]    In a footnote, the plaintiffs question "whether waiver could apply to a challenge that an agency acted outside of its statutory authority, given that 'it is central to the real meaning of the rule of law . . . that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so.'" Pls.' Reply Supp. Mot. Summ. J. at 11 n.7 (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992)). In essence, the plaintiffs suggest that a § 706(2)(C) argument—as contrasted with a § 706(2)(A) arbitrary and capricious argument—can never be waived. The plaintiffs cite no caselaw establishing that a § 706(2)(C) argument cannot be waived. Indeed, at least one case holds the opposite. *See Alliance for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 126 (D.D.C. 2011) (holding that the plaintiffs' § 706(2)(C) argument that the agency had exceeded its statutory authority was administratively waived since the argument had not been raised during notice and comment rulemaking); *see also Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 25 F.3d 1063, 1074 (D.C. Cir. 1994) ("[F]ailure to raise a particular question of statutory construction before an agency constitutes

In sum, then, the plaintiffs have failed to demonstrate that their specific argument concerning DOL's alleged permanent work-visa policy was raised before DOL during the rulemaking process. Further, the plaintiffs' various arguments that an exception to the exhaustion requirement applies here are unavailing. Accordingly, that plaintiffs' permanent work-visa argument is waived, and the APA claims predicated on it against DOL cannot proceed.

### 2.  The Shepherd Wage Rate

The INA provides that "[a] petition to import an alien as an H–2A worker . . . may not be approved . . . unless the petitioner has applied to the Secretary of Labor for a certification that . . . the employment of the alien in such labor or services *will not adversely affect* the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1188(a)(1)(B) (emphasis added).  Toward that end, the standard H–2A regulations applicable to agricultural workers specify that H–2A employers must pay their hourly workers the highest of four rates: (1) the adverse effect wage rate ("AEWR"), as determined by DOL, (2) "the prevailing hourly wage or piece rate, [3] the agreed-upon collective bargaining wage, or [4] the

---

waiver of the argument in court."). Moreover, although the plaintiffs cite § 706(2)(C), *see* Pls.' Mem. Supp. Mot. Summ. J. at 14–15, their claims center on whether the 2015 Rule properly effectuates the INA's statutory command that H–2A labor certifications be issued only for temporary or seasonal work. Nowhere do the plaintiffs substantively advance a § 706(2)(C) argument that DOL was without statutory authority to engage in rulemaking in this sphere, pursuant to the INA. As the government points out, any such claim would be futile. *See* Gov't's Reply Supp. Cross-Mot. Summ. J. at 10 (citing 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(2), 1188(b)(1), 1188(c)(3)(B)(ii) and (iii), and 1188(c)(4)). "[C]laims that various provisions of the challenged regulations are 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' 5 U.S.C. § 706(2)(C), are reviewed under the well-known *Chevron* framework," *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012), but the plaintiffs do not so much as cite *Chevron*, let alone pursue any *Chevron*-based arguments. Accordingly, even if the plaintiffs were correct that § 706(2)(C) claims that an agency has exceeded the scope of its statutory authority cannot be administratively waived, the plaintiffs' § 706(2)(C) claim fails because they simply have not followed through on this theory and argued that DOL "lacks authority under [the INA] to promulgate a rule" implementing the H–2A labor certification process. *Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216, 220 (D.C. Cir. 2014), *rev'd on other grounds*, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016).

Federal or State minimum wage." 20 C.F.R. § 655.120(a).[26] The default AEWR "is a specially calculated wage based on the Department of Agriculture's Farm Labor Survey, which approximates what the prevailing wage would be if not for the hiring of foreign workers." *Mendoza*, 754 F.3d at 1008. Under the TEGLs, however, DOL prescribed a special AEWR for herder occupations in light of "the unique occupational characteristics of herding—including spending extended periods in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock." *Id.* at 1008–09. The TEGLs prescribed that the AEWR for herder occupations was "set at the prevailing wage rate of U.S. workers based on surveys conducted by the State Workforce Agencies (SWAs)." Final Rule, 80 Fed. Reg. at 62,986. As DOL described in the NPRM, these surveys had long returned statistically invalid results, leading to severe wage stagnation in all but two states. NPRM, 80 Fed. Reg. at 20,307.[27]

*Mendoza* addressed only the procedural aspects of the TEGLs, holding that any special H–2A procedures applicable to herders must be promulgated pursuant to notice and comment. *Mendoza*, 754 F.3d at 1025. Thus, as DOL observed, *Mendoza* "only required [DOL] to engage in notice and comment rulemaking, but did not require [the agency] to alter the standards as they were set in the applicable TEGLs." Final Rule, 80 Fed. Reg. at 62,960. Nevertheless, DOL elected to use the rulemaking process to solicit comments on and establish a new methodology for "determining and adjusting a monthly [wage] for [herding] occupations." NPRM, 80 Fed.

---

[26]   The INA does not define the term "adversely affect," and, as the D.C. Circuit has previously held, Congress has "entrusted [DOL] with" determining "how adverse effect is to be measured." *AFL-CIO v. Brock*, 835 F.2d 912, 914-15 (D.C. Cir. 1987) (noting that "calculating AEWRs has been left entirely to [DOL's] discretion").

[27]   "Two States have legal mandates that set wages for these occupations, which have typically been higher than the DOL-set AEWR for the occupations." *Id.* California law requires increases in sheepherder wages established by its Industrial Welfare Commission based on increases in the State's minimum wage. *Id.* (citing Cal. Labor Code § 2695.2(a)). Likewise, "Oregon's sheepherder wages are based on a court settlement reached two decades ago, which set a wage for sheepherders and required them to be adjusted annually to reflect adjustments to the State minimum wage and the Consumer Price Index." *Id.* (citing *Zapata v. Western Range Assoc.*, Civ. No. 92-10-25, 244L (Or. 1994)).

Reg. at 20,302; *see also id.* at 62,960 ("Therefore, we needed to engage in notice and comment rulemaking not only as a result of *Mendoza*; we also needed to address the inadequate wage methodology that over years contributed to herder wage stagnation.  It is a reasonable exercise of DOL's discretion to propose a new wage methodology in the NPRM on which commenters could and did provide input.").

The 2015 Rule prescribes that the special AEWR applicable to H–2A shepherds, phased in over a two-year period, will be $7.25 per hour, multiplied by 48 hours per week, multiplied by 4.333 weeks per month.  20 C.F.R. § 655.211(c)(1).  The plaintiffs contend that this wage rate "establishes an illegal subminimum wage policy that, contrary to Congressional intent, 'will . . . adversely affect the wages and working conditions of workers in the United States similarly employed.'"  Pls.' Mem. Supp. Mot. Summ. J. at 26 (quoting 8 U.S.C. § 1188(a)(1)(B)); *see also* Pls.' Mot. Summ. J. at 1 (arguing that § 655.211(c)(1) establishes "a wage that falls to as low as $3 per hour").[28]  In particular, the plaintiffs argue that "DOL arbitrarily endorsed the industry-derived figures on both the number of hours worked and the hourly wage, finding that shepherds work an average of 48 hours a week and should be paid the FLSA minimum wage of $7.25 per hour."  Pls.' Mem. Supp. Mot. Summ. J. at 27.  Each of these determinations is challenged by the plaintiffs, and they are addressed *seriatim* below.[29]

---

[28]    The intervenors take issue with the plaintiffs' tactic of "throw[ing] around the $3/hour figure on nearly every page of their Brief."  Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 25 n.8.  The intervenors point out that, at the current monthly salary, a herder would have to work 107 hours per week, or over 15 hours each day of the week, to earn only $3 per hour.  *Id.*  The government and association defendants underscore that the AEWR prescribed in the 2015 Rule "approximately doubled the [prior] required wage rate for sheepherders in a number of states."  Gov't Mem. Supp. Cross-Mot. Summ. J. at 11 (citing Final Rule, 80 Fed. Reg. at 62,997); *accord* Gov't Reply Supp. Cross-Mot. Summ. J. at 18 n.10; Ass'n Defs.' Cross-Mot. Summ. J. at 23.

[29]    The government frames the plaintiffs' two objections to the wage rate as a challenge to DOL's interpretation of the term "adversely effect" as used in the INA and therefore suggests that the standard set out in *Chevron* applies.  Gov't Mem. Supp. Cross-Mot. Summ. J. at 28.  In the government's view, "'[t]he explanation that renders the Secretary's interpretation of the statute reasonable also serves to establish that the final rule was not arbitrary and capricious.'"  *Id.* (quoting *Animal Legal Def. Fund v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000)).  The government misunderstands the plaintiffs' argument, which is not that DOL improperly interpreted the INA but rather that the two critical components of the AEWR—the hours worked per week and the hourly wage—were

### a.  Number of Hours Worked Per Week.

The plaintiffs contend that DOL underestimated the average number of hours shepherds work per week in adopting a 48-hour estimate, and that such an estimate is entirely arbitrary. *See* Pls.' Mem. Supp. Mot. Summ. J. at 27.  Initially, DOL proposed using a 44-hour work week to derive a monthly wage.  NPRM, 80 Fed. Reg. at 20,309.  The 44-hour work week was "an average of the 40-hour-per-week estimate suggested by ASI, Western Range, and Mountain Plains, and the 48-hour-per-week calculation submitted by Edward Tuddenham, the attorney representing workers in the *Mendoza* litigation, both of which were submitted before publication of the NPRM."  Final Rule, 80 Fed. Reg. at 62,995;  *see also id.* at 62,987 ("[W]e proposed to use an estimate of 44 hours worked per week, which was a compromise between the NPRM submissions of an attorney representing worker interests, Edward Tuddenham, and the three primary employer associations, Mountain Plains, Western Range, and ASI.").  The 40-hour estimate from employer associations was based on a settlement between employer associations and herders in Oregon, referred to as the "*Zapata* settlement."  *Id.* at 62,995.  Mr. Tuddenham "based the 48-hour calculation on estimates of hours submitted by employers on the Form ETA-9142A, which the comment characterized as a 'conservative estimate.'"  *Id.* at 62,995.  As DOL explained in the Final Rule, Mr. Tuddenham "stated that the 48-hour weighted average of employer-reported data from Form ETA-9142A is 'the most diverse data set available' on the number of hours worked by herders . . . [and] reported hourly estimates from the two primary

---

arrived at in an arbitrary and capricious manner. *See* Pls.' Reply Supp. Mot. Summ. J. at 18 (referring to the plaintiffs' "two-pronged attack on the methodology DOL used to calculate: (1) the number of hours that shepherds work, and (2) their hourly rate of pay").  In any event, although *Chevron* step two and arbitrary and capricious review can overlap, that is not always the case.  *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) ("Even where EPA's construction satisfies *Chevron*, we still must ensure that its action is not otherwise arbitrary and capricious."); *see also, e.g., Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1094 (D.C. Cir. 2015) (evaluating a regulation under both *Chevron* and the arbitrary and capricious standard); *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (same).  Here, the question is not whether the AEWR set out in the 2015 Rule is a reasonable interpretation of the term "adversely effect," but whether the AEWR is arbitrary and capricious.

employer associations, Mountain Plains (60 hours) and Western Range (40 hours)." *Id*. This data set was "the only data source identified by any commenter that includes data collected across States." *Id*.

While employers did not object to the 44-hour estimate proposed in the NPRM, worker advocates commented that the 44-hour proposal was too low. *Id*. With regard to Mr. Tuddenham's analysis, the worker advocates noted that employers have an incentive to "under-report hours on the Form ETA-9142A in order to recruit workers" and thus any estimate based on those forms would be inaccurate. *Id*. The worker advocates thus suggested that DOL directly survey shepherds to ascertain the number of hours worked per week, or, "if that [would] not [be] feasible because gathering data from remotely-located employees is difficult, include data from existing worker surveys in establishing an estimate." *Id*.; *see also* Principal Worker Advocate Comment, AR at 2,012 ("Ideally, [DOL] would . . . directly survey[] workers."). As for existing worker surveys, the worker advocates pointed to *Overworked and Underpaid: H–2A Herders in Colorado* ("the Colorado Study"), "conducted by Colorado Legal Services, in which Legal Services surveyed 90 H–2A Colorado sheep herders about their pay." Final Rule, 80 Fed. Reg. at 62,995; Colorado Study, AR at 3,991–4,022. This study suggested that 62 percent of herders "actively worked" at least 81 hours per week and that 35 percent worked at least 91 hours per week. Final Rule, 80 Fed. Reg. at 62,995; Principal Worker Advocate Comment, AR at 2,011; Colorado Study, AR at 4,008. The Final Rule recognized the results of the Colorado Study but also that "[t]wo individual employers expressly disputed the methodology in the Colorado Study, stating that it was not a reliable source and was based on biased [interview] questions." Final Rule, 80 Fed. Reg. at 62,995. An employee of a State Workforce Agency, in contrast, expressed that the 44-hour estimate was "unrealistic given the requirement to be available up to 24 hours a

day, seven days per week, but did not offer an alternative recommendation." Final Rule, 80 Fed. Reg. at 62,995. In the end, DOL rethought the 44-hour work week proposed in the NPRM and settled on a 48-hour work week for purposes of calculating the AEWR.

The plaintiffs take issue with both DOL's rejection of the Colorado survey as well as its endorsement of Mr. Tuddenham's 48-hour figure derived from the Form ETA-9124A submissions. *See* Pls.' Mem. Supp. Mot. Summ. J. at 28–32. As for the Colorado survey, DOL stated that the study was "informative, but very limited" insofar as the study pertained to a single state and was therefore "not representative of the industry as a whole." Final Rule, 80 Fed. Reg. at 62,996. The agency thus considered the study and rationally concluded that, to set a *national* AEWR, reliance on information supplied by employers across many states in Form ETA-9124A submissions would be more reliable.[30] Although, as the plaintiffs emphasize, DOL has in the past relied on data from one state to set wages in another, *see* Pls.' Mem. Supp. Mot. Summ. J. at 28–29, the agency did not act arbitrarily or unreasonably in choosing to rely on a geographically broader data set in this instance.[31] Moreover, as the government points out, the plaintiffs' assertion that DOL did not question the statistical validity of the Colorado survey, Pls.' Mem. Supp. Mot. Summ. J. at 9, is beside the point given DOL's reasonable conclusion that the survey was too limited in scope.

The plaintiffs separately contend that "DOL does not explain why the Colorado survey should not determine Colorado wages." *See* Pls.' Mem. Supp. Mot. Summ. J. at 29 ("DOL did

---

[30]     The Colorado study surveyed 93 shepherds in Colorado. AR at 4,000. By the plaintiffs' own estimate, however, more than 2,000 shepherds work in the United States. Pls.' Mot. Summ. J. at 25 n.20. Accordingly, the plaintiffs' contention that DOL failed to explain why the study of 93 shepherds was not representative of the national herding industry is unpersuasive.

[31]     Thus, even assuming, as the plaintiffs argue, that "DOL [has] defend[ed] in this Court the proposition that a Colorado survey of nine shepherds was sufficient to determine the wages of shepherds in nine states," Pls.' Mem. Supp. Mot. Summ. J. at 28, this does not mean that as a general matter, incomplete or unrepresentative data should be embraced by the agency, especially when more representative data is available.

not dispute that the Colorado survey is representative for Colorado but pegged Colorado shepherd wages to the lower 48-hour figure—underestimating the number of hours worked by a majority of Colorado herders by 1800 each year."). That is, the plaintiffs seem to suggest that even assuming that the study should not apply to herder wages in other states given its limited geographic scope, the agency's decision to impose an AEWR based on 48 hours of weekly work with respect to Colorado herders was arbitrary. Critically, however, DOL does state—at least implicitly—why the Colorado Study should not apply to Colorado herders. DOL opted for a national standard because "many of these workers travel across State lines, and because most living expenses are required to be provided from the employer free of charge, a single national rate is appropriate, unless a higher State wage applies." Final Rule, 80 Fed. Reg. at 62,994. Further, DOL expressed its view that "the hourly wage requirement of the current Federal minimum wage [is] the logical, non-arbitrary starting point on which to base the calculation of a national monthly wage rate, which sets the herder hourly wage no lower than the hourly minimum wage required for all other jobs in the U.S. economy," and this is "consistent with DOL's obligation to protect against adverse effect." *Id.* Thus, DOL offered at least two reasons for selecting a national AEWR and, in light of the determination that a national AEWR is warranted, sufficiently explained why a separate Colorado-specific AEWR was not established.

On the flip side of the coin, the plaintiffs argue that DOL's embrace of the 48-hour estimate also was "arbitrary," though the plaintiffs do not dispute that the 48-hour figure is the accurate average number of hours worked based on information contained in Form ETA-9124A submissions. Pls.' Reply Supp. Mot. Summ. J. at 18. In particular, the plaintiffs note that "it appears that this 48-hour figure derives from ranching associations pasting the number '40' or '60' into the relevant field used on labor certifications to estimate the number of hours worked."

Pls.' Mem. Supp. Mot. Summ. J. at 29–30.  Based upon this pattern in labor certifications, the plaintiffs surmise that the average "has no apparent connection to the real number of hours shepherds work."  *Id*. at 30.

Agreeing with worker advocates that "any estimate of hours will necessarily be imprecise," DOL ultimately concluded that the hourly projection should not be based "in any part" on the *Zapata* settlement and credited Mr. Tuddenham's assessment that "the 48-hour estimate from ETA's own data is based on the most comprehensive and detailed data source from which to establish an hourly calculation."  Final Rule, 80 Fed. Reg. at 62,995–96.[32]  As for the accuracy of Mr. Tuddenham's analysis of ETA's data, DOL noted that the worker advocate comment had replicated Mr. Tuddenham's calculation.  *Id*. at 62,996.[33]  DOL also concluded that although the 48-hour estimate was higher than the 44-hour estimate endorsed by employer associations, it was "unlikely to have a substantial effect on the ability of employers to absorb the wage increase."  *Id*.  Finally, the agency determined that because the 48-hour projection "more accurately reflect[ed] the likely actual hours worked, it also more accurately reflects the wage that will prevent adverse effects on U.S. workers."  *Id*.  These reasons are more than

---

[32]    DOL declined to collect its own data from shepherds in light of resource constraints and the difficulty associated with collecting such data. *Id*.at 62,996.  The plaintiffs impliedly challenge this decision. As the D.C. Circuit has previously explained, an agency "[p]ossessing imperfect . . . information" will often "ha[ve] to decide whether to proceed on that basis or to invest the resources to conduct the perfect study." *Am. Iron & Steel Inst. V. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997).  Courts "generally apply the deferential standard of 5 U.S.C. § 706(2)(A)" in evaluating an agency's decision to rely on imperfect information. *Id*.  Here, DOL expressly stated that conducting the survey requested by the worker advocates "would be very difficult and resource-intensive" given "the challenges with collecting data" from herders spread out across remote locations. Final Rule, 80 Fed. Reg. at 62,996.  As the plaintiffs are aware, moreover, DOL was under Court-imposed deadlines to complete work on the 2015 Rule.

[33]    The plaintiffs now criticize Mr. Tuddenham's analysis as inherently flawed because it is based on submissions by employers that result from a "copy and paste job" where the two largest employer associations invariably reported that their herders would work either 40 hours or 60 hours per week, respectively. *See* Pls.' Mem. Supp. Mot. Summ. J. at 30 (citing Pls.' Mot. Summ. J, Ex. P., ECF No. 93-16).  As noted, DOL recognized this pattern.  Faced with imprecise information, DOL was well within its discretion to opt for one imperfect data point (from Mr. Tuddenham) over another imperfect data point (from the Colorado survey). *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015) ("[E]ven if this dataset was less than perfect, imperfection alone does not amount to arbitrary decision-making." (citing *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1248 (D.C. Cir. 2014))).

sufficient to support the agency's reliance on ETA data, as reflected in Mr. Tuddenham's calculation. *See Am. Fed'n of Labor and Cong. of Indus. Orgs. ("AFL-CIO") v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991) (affirming DOL's AEWR methodology because "[DOL] chose, in the face of imprecise and inconclusive data, the USDA hourly wage as the AEWR because, in its opinion, that rate will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression").

DOL disagreed with worker advocates that "employers are likely to under-report hours on the Form ETA-9142A to make the job appear more attractive because employers already advertise in their job orders that herders must be available up to 24 hours per day, 7 days per week." Final Rule, 80 Fed. Reg. at 62,996. The plaintiffs now dispute this conclusion, arguing that even though the job orders advertise that herders must be available 24 hours per day, 7 days per week, "[c]learly, . . . a job advertised as having [a] constant call but only 40 hours of actual labor is more attractive than the same job advertised with 80 hours of actual labor." Pls.' Mem. Supp. Mot. Summ. J. at 31. Though plausible, the plaintiffs introduced no concrete evidence of such underestimation, and DOL was not obligated to credit speculative comments. *See Pub. Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("Indeed, the agency need not respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977))).[34] In sum, then, DOL supplied a "detailed and rational explanation," as well as "consideration of and answers to the criticisms of farmworker representatives" and therefore "meets the standard of

---

[34] The Colorado Study indicates that at least some Colorado herders actively work for more than 48 hours per week, thereby permitting the inference that employers may be underestimating hours worked in submissions to the ETA. DOL was not required, however, to credit herders' reporting over that of employers, particularly when the Colorado survey itself acknowledged "th[e] [study] was not intended to be an in-depth statistical analysis or an all-encompassing assessment of herders' lives in Colorado," let alone nationwide. Colorado Study, AR at 4,001.

'reasoned analysis' enunciated in *Motor Vehicle Mfrs. Ass'n*[, 463 U.S. at 42]." *AFL-CIO*, 923 F.2d at 186.

### b. Hourly Wage.

The plaintiffs also argue that DOL "arbitrarily determined" that the federal minimum wage as the hourly wage for herders. *See* Pls.' Mem. Supp. Mot. Summ. J. at 32. Initially, in the NPRM, DOL proposed to set the hourly wage "based on the Farm Labor Survey (FLS) conducted by the National Agricultural Statistics Service (NASS) of the U.S. Department of Agriculture (USDA)." NPRM, 80 Fed. Reg. at 20,308 The FLS, which is "[c]onducted annually in collaboration with [DOL]," reports estimates of "the number of hired workers, average hours worked, total wages by type of worker (field, livestock, supervisor/manager, and other) for a specified survey week, and provides wage rates at regional and national levels." *Id.* DOL utilizes the FLS to set the AEWR in the general H–2A program for other temporary agricultural workers, and, in the NPRM, DOL referred to the FLS as "the most comprehensive survey available for wages of livestock workers." *Id.* at 20,309.

DOL received hundreds of comments opposing an FLS-based herder wage rate from individual herding employers; employer associations, including intervenors Mountain Plains and Western Range; and state and local government officials, among others. Final Rule, 80 Fed. Reg. at 62,988. These comments counseled against using the FLS primarily on the ground that the proposed increase would triple the then-current herder wage rate in many states. *Id.* The comments projected that a wage increase of this magnitude would "jeopardize the entire herding industry" and "cause many employers to either go out of business entirely or to downsize and greatly reduce the number of workers employed." *Id.* For example, a comment from the Small Business Administration Office of Advocacy contained information from a sheep herding employer, F.I.M. Corporation, which explained: "For the period 2006 to 2013, our gross income

from sales of wool, lambs, sheep, and hay averaged about $1,100,000 per year. After our operative expenses our net income averaged about . . . $35,000 per year. This proposed tripling of sheepherder wages will require approximately $250,000 per year in additional wage payments, [and] [t]hat much money is simply not available." *Id.* As DOL noted in the Final Rule, this assessment from F.I.M. Corporation was merely "illustrative." *Id.* (noting that other individual employers submitted profit-and-loss statements showing the toll that tripled wages would take on their operations). Several commenters urged that lower wages would be "appropriate to reflect other costs paid by the employer, including food, housing, work supplies and protective clothing, and transportation." *Id.* Other commenters suggested that "low wages for these occupations [are] justified, given that workers [are] not required to engage in productive labor at all times while on the range, and ha[ve] time for relaxation and personal pursuits." *Id.*

Many employers and employer associations "further objected to the wage increase based on their view that the limited number of U.S. workers in these occupations foreclosed the need to provide for any adverse effect." *Id.* at 62,989. According to a comment from Western Range, only 22 U.S. workers applied for over 1,000 openings in 2012, and only two U.S. workers were qualified and hired. *Id.* Similarly, Mountain Plains commented that only two qualified U.S. workers applied for more than 1,000 openings in 2014. *Id.* Both employer associations commented that, "based on their experiences, higher wages in California have not resulted in increased numbers of U.S. workers applying for [herder] jobs." *Id.* Employers and employer associations expressed the view that U.S. workers do not apply for herding jobs due to the remote nature of the work rather than low wages. *Id.* One SWA employee suggested, however, that "'qualified job seekers often give low wages as one of the reasons they do not apply for

these jobs, even though housing and meals are provided'" and that "[i]ncreased wages could help to encourage more [U.S.] worker interest in the jobs." *Id.* Likewise, one employer acknowledged that it could not attract U.S. workers because "'Americans don't like the conditions or low pay.'" *Id.* Finally, some commenters opposed an FLS-based AEWR on the ground that the FLS is based on "generic agricultural operations," where workers are paid by the hour and do not receive benefits like housing and food, "making those rates of pay completely inapposite to the range production of livestock." *Id.*

Far fewer comments supported an FLS-based AEWR. *Id.* at 62,990. Most of these comments were, according to DOL, "undetailed and expressed only general support." *Id.* The worker advocates' comment "was by far the most detailed comment supporting the use of the FLS-based AEWR to set the monthly rate." *Id.* The comment attributed the "sustained scarcity" of U.S. workers in herding occupations to the fact that the federal minimum wage was significantly higher than the herder minimum wage and recommended that DOL immediately impose an FLS-based AEWR rather than phase the increases in over time. *Id.*

On review of the "record as a whole," *id.*, DOL ultimately chose not to rely on FLS data in the Final Rule, "but rather [to] rely[] on the current FLSA minimum wage of $7.25 as the starting point in the wage formula for 2016," *id.* at 63,022; *see also id.* at 62,987. The plaintiffs now challenge that determination as arbitrary. *See* Pls.' Mem. Supp. Mot. Summ. J. at 32. They contend that DOL (1) disregarded the data provided in the worker advocates' comment suggesting that some ranching operations already pay domestic shepherds a rate similar to an FLS-based rate and (2) impermissibly based its determination on "'whether employers using the current special procedures can absorb a wage increase of the scope proposed.'" *Id.* at 33 (quoting Final Rule, 80 Fed. Reg. at 62,991). As to the former assertion, the plaintiffs are

incorrect.  DOL certainly considered data provided by the worker advocates concerning domestic shepherd wages but ultimately found the data unpersuasive because "those occupations do not appear to be primarily engage in range work" and, "[t]o the extent that the worker advocates cited range jobs in Texas to support the proposition that ranchers overall can absorb a wage increase in the magnitude of the FLS-based AEWR, the data provided either reflects a prevailing wage rate significantly below the FLS-based AEWR or it is of such a small sample size to be unreportable."  Final Rule 80 Fed. Reg. at 62,991.

As for the plaintiffs' latter contention, DOL did determine that "the record provide[d] a reasonable basis to conclude that the proposed wage increase [was] too great to borne by the industry, and thus [would] result in adverse effect on U.S. workers because fewer herding jobs would be available."  *Id.* at 62,990–91; *accord id.* at 62,990 ("[U]sing the FLS-based AEWR to set the monthly wage for [herding] occupations, which would triple the wage costs of many employers, is likely to result in [an] adverse effect on U.S. workers by causing a substantial number of herding employers to close or significantly downsize their operations—leaving fewer herding jobs available to U.S. workers."); Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 26–28 (detailing studies submitted to DOL during the rulemaking process suggesting the detrimental economic effects of an FLS-based wage).  Having concluded that the FLS-based wage would harm U.S. herders, DOL had to identify another hourly wage rate for determining the AEWR. The agency "view[ed] the hourly wage requirement of the current Federal minimum wage as the logical, non-arbitrary starting point on which to base the calculation of a national monthly wage rate," as it "sets the herder hourly wage no lower than the hourly minimum wage required for all other jobs in the U.S. economy" and therefore "is consistent with DOL's obligation to protect against adverse effect. *See id.* at 62,994.  DOL further noted that, "[a]lthough $7.25 for each

hour worked is generally a floor, using the $7.25 wage rate multiplied by 48 hours is reasonable in this circumstance because of the necessity of setting a monthly wage and because employers must provide housing and food without charge to workers in these occupations." *Id.* In short, then, DOL rationally concluded on the basis of numerous comments that the FLS-based AEWR would not protect U.S. workers. Under these circumstances, the agency looked to the federal minimum wage and provided a non-arbitrary rationale for settling on that wage. This is sufficient to withstand APA review. *See Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) ("[T]he sole question before us is whether [the agency] has acted reasonably, not whether it has acted flawlessly.").

The plaintiffs' arguments to the contrary are unpersuasive. The plaintiffs primarily take issue with the threshold conclusion that the FLS-based AEWR would adversely affect U.S. workers, highlighting DOL's statement in the NPRM that the FLS data is the best available source for wage data related livestock work. *See* Pls.' Reply Supp. Mot. Summ. J. at 32 (citing 80 Fed Reg. at 20,309). While true, DOL's assessment of the FLS survey as a basis for setting the AEWR was appropriately reconsidered after numerous comments submitted to the agency explained that an FLS-based wage rate would cause herding operations to downsize or close altogether. That is, the FLS data may be the best data available concerning wages of livestock workers, but if a wage based on that data would adversely affect U.S. workers, then the agency was within its broad authority not to use the FLS data.

The plaintiffs argue that the Third Circuit rejected "similarly flawed reasoning" in *Comitè de Apoyo a los Trabajadores Agricolas v. Perez ("CATA")*, 774 F.3d 173 (3d. Cir. 2013), a case involving the "no adverse effect" provision applicable to the H-2B visa program, but that case is distinguishable. In *CATA*, DOL had promulgated a rule permitting "employers to rely on details

of a private survey when there was a valid [Bureau of Labor Statistics] wage survey available for use in determining the prevailing wage for the implicated employment." *Id.* at 189. The Third Circuit held that this policy was arbitrary and capricious because DOL itself had repeatedly endorsed the Bureau of Labor Statistics surveys as being "'among the largest, most comprehensive, and continuous statistical survey programs of the Federal Government,'" and yet had allowed employers to rely on alternative private surveys in establishing prevailing wages. *Id.* (quoting 78 Fed. Reg. at 24,053). Critically, however, in *CATA*, unlike here, there is no indication that DOL received comments attacking the government surveys as requiring wages that would destroy the viability of employers and result in job loss. Moreover, as the government points out, the Third Circuit in *CATA* was particularly troubled by the fact that the rule at issue "authorized different prevailing wage rates under the H-2B program for the *same positions, in the same market, at the same time of year.*" Gov't Mem. Supp. Cross-Mot. Summ. J. at 35 (emphasis in original); *see also CATA*, 774 F.3d at 190 ("DOL cannot offer any rational justification for this policy as it leads to similarly situated workers in the same market in the same season bringing home widely disparate paychecks.").

The plaintiffs also contend that the alleged adverse effect of using an FLS-based rate is merely "indirect" insofar as the causal chain is more attenuated: U.S. workers are harmed only if they lose their herding jobs. *See* Pls.' Reply Supp. Mot. Summ. J. at 24 ("DOL only claims that [the federal minimum wage based AEWR] protects [U.S. herders] *indirectly* because $7.25 is the wage DOL presumes is necessary to keep Western ranchers from shuttering their ranches," rather than the wage U.S. herders would be paid absent temporary foreign labor (emphasis in original)). As the government points out, however, *see* Gov't Reply Supp. Mot. Summ. J. at 18–19, nothing in the INA requires a "direct" adverse effect, and, in any event, job loss altogether would

appear to be the more severe adverse effect on a U.S. herder's wage.[35]  Accordingly,  DOL's decision to import the federal minimum wage into the AEWR equation was not in violation of the APA.  The wage provision of the 2015 Rule, 20 C.F.R § 655.211(c)(1), is upheld.

### 3.     The Scope and Location of Herder Work

Finally, the plaintiffs allege that the 2015 Rule "expands the geographical scope and nature of shepherd work to encroach on tasks for which there is ample supply of non-H–2A workers," and that it "does so in a manner at odds with the purported basis for creating separate H–2A shepherd rules in the first place." Pls.' Mem. Supp. Mot. Summ. J. at 11; *see also id*. at 37 ("DOL has created an illegally expansive definition of 'range,' which now encompasses urban cropland, and has illegally broadened the scope of shepherd work, which now includes ever-more ranch-based work."). This concern can be distilled into three discrete objections, which the plaintiffs contend operate in concert to show that the 2015 Rule converts ranch-hands into shepherds. *See* Pls.' Reply Supp. Mot. Summ. J. at 26–30.  First, the Rule provides that an H–2A shepherd need only spend more than 50 percent of his time on the range. Pls.' Mem. Supp. Mot. Summ. J. at 12 (citing 20 C.F.R. § 655.200(b)(2)).  Second, the Rule provides for the first time a definition of "range," 20 C.F.R. § 655.201, and the plaintiffs contend that definition is overbroad.  *Id*. at 37–38.  Finally, that same provision defines "production of livestock" in a way that plaintiffs allege allows shepherds to "perform more ranch-hand tasks." *Id*. at 38–39.

---

[35]     The plaintiffs also argue that DOL's "indirect" adverse effect argument presupposes that U.S. herders actually exist, when, in fact, "there are virtually no domestic shepherds on Western ranches." Pls.' Reply Supp. Mot. Summ. J. at 24.  For this proposition, the plaintiffs cite the Final Rule, 80 Fed. Reg. at 62,958.  That page of the Final Rule, however, does not state that no or even very few U.S. herders exist—the cited page has nothing to do with that topic.  As the government points out, moreover, Gov't's Reply Supp. Cross-Mot. Summ. J. at 19 n.11, available data indicate, *inter alia*, that, (1) in 2014, 18 U.S. sheep herders worked in states "with a statistically reportable wage result located in the mountain plains/western regions of the United States;" (2) "overall in 2012, 25 [U.S.] workers were included in surveys of sheep herders across those states;" and (3) "because completion of the SWA survey is not mandatory, there are likely a significant number of additional U.S. workers not reported in the survey." Final Rule, 80 Fed. Reg. at 62,991–92 n.32.

The plaintiffs assert that these new aspects of the 2015 Rule "violate § 706(2)(C) and are arbitrary and capricious because they fail to protect American workers as required by the INA," *id.* at 15, exceeding "the statutory constraints Congress placed on the H–2A program," *id.* at 1, and because, "in enacting [them], DOL failed to provide a rational explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 15 (internal quotation marks omitted) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Based on these claims, the plaintiffs "seek *vacatur* of" (1) "the requirement that work be performed on the range for just over fifty percent of the H–2A contract period," set out at 20 C.F.R. § 655.200(b)(2), and (2) "the definitions of 'production of livestock' and 'range' as provided in 20 C.F.R. § 655.201." Pls.' Reply Supp. Mot. Summ. J. at 26. The two provisions at issue are addressed in turn.

### a. 20 C.F.R. § 655.200(b)(2)

Section 655.200(a) provides that the purpose of the special herder regulations, 20 C.F.R. §§ 655.200–655.235, "is to establish certain procedures for employers who apply to [DOL] to obtain labor certifications to hire temporary agricultural foreign workers to perform herding or production of livestock on the range." Section 655.200(b), in turn, states that "[t]hese procedures apply to job opportunities with [three] unique characteristics." First, the work activities must "involve the herding or production of livestock (which includes work that is closely and directly related to herding and/or the production of livestock), as defined under § 655.201." *Id.* § 655.200(b)(1). Second, the work activities must be "performed on the range for the majority (meaning more than 50 percent) of the workdays in the work contract period," and "[a]ny additional work performed at a place other than the range must constitute the production of livestock." *Id.* § 655.200(b)(2). Finally, the work activities, whether on or off the range, must "generally require the workers to be on call 24 hours per day, 7 days a week." *Id.* § 655.200(b)(3).

At the outset, the plaintiffs conveniently ignore the first and third requirements set out in § 655.200(b), even though those two requirements significantly limit the class of workers whose work is eligible for DOL certification. Focusing only the second requirement, the plaintiffs appear to argue that the more than 50 percent threshold permits H–2A shepherds to spend too much time away from the range and is arbitrary. *See, e.g.*, Pls.' Reply Supp. Mot. Summ. J. at 30 ("What makes fifty percent the magic number at which point ranch hands will not be adversely affected?"). The plaintiffs do not argue that the shepherds should have to spend 100 percent of their time on the range, nor do they specify what percentage of time would be appropriate. The worker advocates' comment submitted during the rulemaking process recommended a 70 percent threshold. Final Rule, 80 Fed. Reg. at 62,964. Ultimately, the plaintiffs' concerns are misplaced; the more than 50 percent threshold is the result of reasoned and careful agency deliberation, as explained below.

In the NPRM, DOL proposed that workers spend "at least 50 percent of the workdays during the contract period[] in the herding or production of livestock on the open range." NPRM, 80 Fed. Reg. at 20,339. As described by DOL, comments concerning the 50 percent requirement primarily argued that this rule, in combination with the proposed definition of "open range," requiring the absence of fencing, would not be workable because "it is almost impossible to spend at least 50 percent of the contract period away from fences." Final Rule, 80 Fed. Reg. at 62,963. "Several commenters . . . stated that the NPRM's dual requirements of no fencing and that the herders must spend half of the year away from headquarters and livestock facilities would disqualify many herders from using these regulations." *Id.* Other commenters explained that the 50 percent rule would be "unworkable" or an "administrative nightmare" by not allowing for flexibility in the case of bad weather, emergencies, or other special circumstances. *Id.* The

intervenors in this action recommended that DOL adopt the FLSA range production exemption from minimum wage and overtime "principally engaged" rule, 29 C.F.R. § 780.325(a), which provides that "an employee who spends more than 50 percent of his time during the year on the range . . . [is] exempt . . . even though the employee may perform some activities not directly related to herding or the production of livestock," *id*. at 780.325(b).

The worker advocates, for their part, "expressed concern with the 50 percent threshold, asserting that this provision will adversely impact the wages and working conditions of U.S. workers because it allows too much time off the range and creates a loophole allowing employers to pay the herding and range livestock wage for up to six months of work on the ranch." Final Rule, 80 Fed. Reg. at 62,964. As noted above, the worker advocates proposed a 70 percent threshold. *Id*.

In the Final Rule, DOL opted to adjust the "at least 50 percent" threshold to a "more than 50 percent threshold." *Id*. at 62,963. DOL viewed the "more than 50 percent" rule as "more consistent with . . . the FLSA." *Id*. at 62,965. Furthermore, according to the agency "[t]he record demonstrates that a rule requiring a majority of the workdays under the contract be spent on the range is appropriate and necessary to confirm that occupations under the herding and range livestock regulations, earning the required wage rate, are indeed uniquely remote and thus distinguishable from other H–2A occupations." *Id*. Notably, DOL declined to adopt the intervenors' suggestion that the FLSA's "principally engaged" rule be used, as such a rule would allow herders and open range livestock workers to engage in tasks at the ranch beyond those duties constituting the production of livestock. *Id*. As addressed below, DOL also removed the "no fence" requirement from the definition of "open range," thereby addressing commenters' concerns that the interaction of these two provisions would be unworkable. *Id*. Additionally,

DOL expressed that the "more than 50 percent" requirement would "provide adequate flexibility to address changing circumstances due to weather, forage availability, and other factors." *Id.* This explanation is more than sufficient to support DOL's decision to adopt a "more than 50 percent" threshold. *See BellSouth Corp.*, 162 F.3d at 1222 (noting that arbitrary decisionmaking occurs when an agency "failed to provide a reasoned explanation," or when "the record belies the agency's conclusion"). Here, the Final Rule makes clear that DOL thoroughly considered commenters' concerns and suggestions and ultimately settled on a compromise that would ensure that individuals being hired as H–2A shepherds spend a majority of their time on the range, all of their time not on the range engaging in the production of livestock, and are generally on call 24 hours per day, 7 days per week.

### b.   20 C.F.R. § 655.201

The plaintiffs challenge two definitions set out in 20 C.F.R. § 655.201. First, the plaintiffs take issue with the definition of "range." They appear to argue that this definition is an unwarranted departure from prior understandings of what areas qualify as the range, and in particular, "takes the unprecedented step of including in the definition of 'range' large swaths of cultivated land where the work shepherds perform is neither necessarily remote nor difficult to track on an hourly basis." Pls.' Mem. Supp. Mot. Summ. J. at 38; *see also* Pls.' Reply Supp. Mot. Summ. J. at 27–28.

In evaluating these claims, some context is helpful. First, DOL proposed in the NPRM to define a number of previously undefined terms "to assist employers in understanding the type of work that qualifies for . . . special [shepherd] procedures." NPRM, 80 Fed. Reg. at 20,303. The NPRM proposed to define "open range" as "[u]nenclosed public or private land outside of cities and towns in which sheep, cattle, goats, horses, or other domestic hooved animals, by ownership, custom, license, lease, or permit, are allowed to graze and roam." *Id.* at 20,339. Further, the

NPRM provided that "[a]nimals are not meaningfully enclosed where there are no fences or other barriers protecting them from predators or restricting their freedom of movement; rather a worker must actively herd the animals and direct their movement." *Id.* Under the NPRM, "open range" could have "include[d] intermittent fencing or barriers to prevent or discourage animals from entering a particularly dangerous area." *Id.*

DOL received a number of comments to the proposed definition of "open range." *See* Final Rule, 80 Fed. Reg. at 62,970–72. Both intervenors in this action, as well as the worker advocates, "generally encouraged [DOL] to align the definition of 'range' with the [Fair Labor Standards Act ('FLSA')] regulations." *Id.* at 62,971. The FLSA exempts from minimum wage and overtime pay requirements certain classes of workers, including an employee whose "primary duty" is "the range production of livestock." 29 C.F.R. § 780.329. Toward that end, the FLSA regulations "generally" define "range" as "land that is not cultivated" and "that produces native forage for animal consumption, and includes that is revegetated naturally or artificially to provide a forage cover that is managed like range vegetation." *Id.* § 780.326(a). Further, "range may be on private or Federal or State land, and need not be open," and "typically," range "is not only noncultivated land, but [also] land that is not suitable for cultivation because it is rocky, thin, semiarid, or otherwise poor." *Id.* § 780.326(b). Finally, range land is also characterized by its size, since "range production of livestock is most typically conducted over wide expanses of land, such as thousands of acres." *Id.*

DOL effectuated revisions to the definition of "open range" in response to these comments. First, the Final Rule "remove[d] the qualifier 'open'" to avoid "unnecessary confusion," since "open range" is a term used in state law. Final Rule, 80 Fed. Reg. at 62,970, 62,972. This change in nomenclature is not challenged. Second, DOL "revise[d] the proposed

definition, using a multi-factor test based on a modified version of the definition of 'range' used in the FLSA range production of livestock exemption." *Id.* at 62,970. The Final Rule defines "range" as "any area located away from the ranch headquarters used by the employer,"[36] and sets out a multi-factor test for ascertaining whether land qualifies as part of the range. 20 C.F.R. § 655.201. "No one factor is controlling and the totality of the circumstances is considered in determining what should be considered range." *Id.* The factors to be evaluated include: (1) whether the land is uncultivated, (2) whether the land "involves wide expanses . . . such as thousands of acres," (3) whether the land is "located in a remote, isolated area," and (4) whether "range housing is required so that the herder can be in constant attendance to the herd." *Id.* Finally, the Rule specifies that the range "does not include feedlots, corrals, or any area where the stock involved would be near ranch headquarters," or "any area where a herder is not required to be available constantly to attend to the livestock and perform tasks, including but not limited to, ensuring the livestock do not stray, protecting them from predators, and monitoring their health." *Id.* In the Final Rule, DOL explained that the new definition of "range" "maintains a nexus to the longstanding purpose of the special procedures, to provide that herders can be available to tend to the flock in remote locations 24 hours a day, 7 days a week." Final Rule, 80 Fed. Reg. at 62,972.

The plaintiffs' contention that the 2015 Rule "allows basically any land to be 'range,'" Pls.' Reply Supp. Mot. Summ. J. at 30, is disingenuous and easily dismissed. Indeed, the Final Rule itself specifies a number of areas where shepherds commonly work that would not qualify as range. *See, e.g.*, Final Rule, 80 Fed. Reg. at 62,973 (suggesting that "a cultivated field near

---

[36]     Section 655.201 defines "ranch headquarters" as "a place where the business of the ranch occurs and is often where the owner resides, [and] is limited and does not embrace large acreage; it only includes the ranchhouse, barns, sheds, pen, bunkhouse, cookhouse, and other buildings in the vicinity."

the [ranch] headquarters where hours could be easily tracked (and where U.S. workers may be more interested in working)" would not constitute "range" (emphasis omitted)).  As explained above, as a threshold matter, land must be "located away from the ranch headquarters" to qualify as range.  20 C.F.R. § 655.201.  Beyond that, the Rule sets out a flexible test that takes into account four considerations, which plaintiffs do not dispute are relevant.  To the extent that the plaintiffs believe that cultivated land can *never* qualify as range, no matter how remote or expansive, that is a policy judgment that Congress entrusted to DOL, and DOL amply explained its rationale for allowing cultivated land to count as range in limited circumstances.  That is, DOL noted that "[a]lthough the FLSA definition of range provides a useful starting point, the Final Rule does not fully adopt the FLSA definition of range in three key respects."  Final Rule, 80 Fed. Reg. at 62,973.  One such deviation is the fact that cultivated land can, upon consideration of the "totality of the circumstances," constitute range.  DOL arrived at this decision "to accommodate the comments that many sheep are feeding on crop residue during certain months of the year, often on leased lands at a distance from the rancher's property as the herd trails to or from BLM or Forest Service allotments."  *Id.*  Thus, "[a]llowing for some work on cultivated land, depending on the other factors, is consistent with the purpose of [the shepherd] variance (that the work is unique because it is remote and requires 24/7 availability, which makes the hours more difficult to calculate)."  *Id.*  This explanation, which the plaintiffs do not mention, let alone meaningfully challenge, is entirely reasonable and non-arbitrary.

The plaintiffs also challenge the definition of "production of livestock" set out in 20 C.F.R. § 655.201.  The NPRM proposed to define the "production of livestock" as the "care or husbandry of livestock throughout one or more seasons during the year, including guarding and protecting livestock from predatory animals and poisonous plants; feeding, fattening, and

watering livestock; examining livestock to detect diseases, illnesses, or other injuries; administering medical care to sick or injured livestock; applying vaccinations and spraying insecticides on the open range; and assisting with the breeding, birthing, raising, weaning, castration, branding, and general care of livestock." NPRM, 80 Fed. Reg. at 20,339. Furthermore, the NPRM proposed that "any duties performed at the ranch or farm must either constitute the production of livestock or be closely and directly related to herding and/or the production of livestock, and that any such closely and directly related work must be minor, sporadic, and incidental." Final Rule, 80 Fed. Reg. at 62,966.[37]

The Final Rule adopted the list of duties that constitute "production of livestock" set out in the NPRM. *See* 20 C.F.R. § 655.201. In response to comments, the Final Rule additionally provided that the term "production of livestock" "includes duties performed off the range that are closely and directly related to herding and/or the production of livestock" and delineated a "non-exclusive" list of examples of ranch work that is "closely and directly related" to herding and the production of livestock, including: "repairing fences used to contain the herd; assembling lambing jugs; cleaning out lambing jugs; feeding and caring for the dogs that the workers use on the range to assist with herding or guarding the flock; feeding and caring for the horses that the workers use on the range to help with herding or to move the sheep camps and supplies; and loading animals into livestock trucks for movement to the range or to market." *Id*. The definition of "production of livestock" likewise provides a list of examples of ranch work that is not closely and directly related to herding or production of livestock: "working at feedlots; planting, irrigating and harvesting crops; operating or repairing heavy equipment; constructing

---

[37]   The NPRM proposed that "minor, sporadic, and incidental work" be defined as "[w]ork duties and activities that are closely and directly related to herding and the production of livestock and are performed on no more than 20 percent of the workdays spent at the ranch in a work contract period." NPRM, 80 Fed. Reg. at 20,339.

wells or dams; digging irrigation ditches; applying weed control; cutting trees or chopping wood; constructing or repairing the bunkhouse or other ranch buildings; and delivering supplies from the ranch to the herders on the range." *Id.* These examples were added to the Final Rule "to fulfill [DOL's] original purpose of providing that workers employed pursuant to the herding and range livestock regulations are not working as general ranch hands when they are not on the range, and to provide the requested guidance and clarity to both workers and the regulated community." Final Rule, 80 Fed. Reg. at 62,969.

The plaintiffs appear to take issue with the list of examples of tasks that count as closely and directly related to herding and the production of livestock. *See* Pls.' Reply Supp. Mot. Summ. J. at 29. In particular, the plaintiffs believe that tasks such as fence repair and feeding and caring for dogs used on the range should not count as "production of livestock." *Id.* The problem with the plaintiffs' argument, however, is that § 655.200(b)(2) already permits workers to spend up to 50 percent of their work time off the range. Given that fact, the definition of "production of livestock" in § 655.201 merely provides guidance on, and indeed limits, the activities a herder may engage in while at the ranch. *See* Gov't's Reply Supp. Cross-Mot. Summ. J. at 23 ("Although the 2015 Rule defines 'production of livestock' to include 'duties performed off the range that are closely and directly related to herding and/or the production of livestock,' including caring for the dogs and horses used on the range, 20 C.F.R. § 655.201, such work is limited by the corresponding requirement that the worker spend more than 50 percent of the work contract on the range." (citing 20 C.F.R. § 655.200(b)(2))).

The plaintiffs also argue that DOL "acquiesced to rancher requests that certain job duties—such as fence repair and constructing lambing jugs—fall within the definition of shepherd work so that shepherds have explicit authorization to perform more ranch-hand tasks."

Pls.' Mem. Supp. Mot. Summ. J. at 38 (citing Final Rule, 80 Fed. Reg. at 62,968).  Yet DOL

largely took these examples of what activities constitute work "closely and directly related" to

herding from the worker advocates' comment.  *See* Principal Worker Advocate Comment,  AR at

1,998 (suggesting that DOL provide examples of what type of ranch-based work is permissible,

including "repairing fences or corrals," as well as impermissible work, including "terracing,

reseeding, haying, and constructing dams, wells, and irrigation ditches" (citing the FLSA

regulations, 29 C.F.R. § 780.327)).

 DOL also provided a well-reasoned explanation as to why the delineated tasks were

being deemed closely and directly related to herding, or not.  *See* Final Rule, 80 Fed. Reg. at

62,968–69.  Specifically, DOL concluded that "closely and directly related work" should be

included "within the definition of production of livestock" to "provide[] employers with

sufficient flexibility to assign appropriate tasks to workers when they are not on the range," as

will from time to time inevitably be the case. *Id.* at 62,968.  DOL declined employers' request

for "unlimited latitude . . . to require workers employed pursuant to [the herder H–2A] rules to

perform any ranch duties that are necessary to meet the day-to-day needs that arise in ranch

operations."  *Id.*  For these reasons, the plaintiffs' arguments concerning the overbreadth of the

definition of "production of livestock" fail.

### c. The Combination of These Three Provisions.

 In their reply brief, the plaintiffs argue that these three challenged provisions "function *in

concert* to allow for [more] non-remote shepherd work that falls well outside the bounds of what

is permissible under the INA and envisioned by Congress."  Pls.' Reply Supp. Mot. Summ. J. at

26 (emphasis added).  Consideration of all three provisions together does not alter the analysis.

The collective effect of §§ 655.200(b)(2) and 655.201 is that H–2A herders must spend more

than 50 percent of their time on the range, which may in certain circumstances include cultivated

land; when these herders are not on the range, they may perform various tasks that are closely and directly related to herding.  For the reasons set out above, these regulations pass APA muster, even when looked at together.

The plaintiffs rely heavily on *Mencia v. Allred*, 808 F.3d 463 (10th Cir. 2015), a case the plaintiffs contend "shows how far from the old baseline the 2015 Rule strays." Pls.' Reply Supp. Mot. Summ. J. at 28.  In that case, an H–2A shepherd sued his employer, arguing that although his work was authorized pursuant to an H–2A visa, his employers had him engaged in almost exclusively ranch-hand work, and therefore he should have been paid the H–2A ranch-hand wage rather than the lower H–2A shepherd wage. *Mencia*, 808 F.3d at 466.  The Tenth Circuit agreed, citing three reasons why the plaintiff "was a ranch hand, not a sheepherder" under both the FLSA and the 2001 TEGL in effect at the time of the plaintiff's employment. *Id.* at 469.  First, "most of [the plaintiff's] work was anything but remote: he usually worked in the immediate vicinity of the ranch headquarters, close enough that [his employer] could see what he was doing and ask him to come help with odd jobs when they needed him." *Id.*  Second, the plaintiff's hours were easily computed. *Id.*[38]  Finally, "a great deal of [the plaintiff's] work was incidental to sheepherding," including "cleaning out sheep trucks, taking care of sheepdogs and horses, weeding alfalfa fields that produced hay for sheep, and so on." *Id.*  Importantly, the Tenth Circuit concluded that "[n]one of this is inappropriate work for an H–2A sheepherder," but because the plaintiff "spent much more time dong this sort of work than actually caring for sheep on the range, it cannot be said he performed ranch chores only 'on an incidental basis,' as the [TEGL] require[s]." *Id.*

---

[38]  This second factor pertained most relevantly to the FLSA, which expressly requires that the shepherd minimum wage and overtime exemption apply only to employees whose hours are difficult to track. *Id.*  The Tenth Circuit noted that the TEGL contained no such express requirement. *See id.*

The plaintiffs contend that, "[a]t base, [their] objection to the 2015 Rule is that it makes [the *Mencia* plaintiff] a shepherd again." Pls.' Reply Supp. Mot. Summ. J. at 30. This contention is divorced from the clear reasoning set out in *Mencia* and a clear-eyed review of the 2015 Rule. Contrary to the plaintiffs' contention, the *Mencia* plaintiff would not qualify as an H–2A shepherd under the 2015 Rule for at least two reasons. First, the plaintiff in *Mencia* worked within the "immediate vicinity of the ranch hedquarters" most of the time. This work plainly does not qualify as H–2A shepherd work under the 2015 Rule, since such shepherds must spend more than 50 percent of their time on the range, and the range is defined as "*any area located away from the ranch headquarters*." 20 C.F.R. § 655.201. Second, the plaintiff's hours apparently were easy to track because he was within eyesight of his employer for much of the time he was working. *Mencia*, 808 F.3d at 469. Under the 2015 Rule, this cannot be the case for the majority of the year since an H–2A shepherd must be away from the ranch headquarters for more than 50 percent of the time. 20 C.F.R. §655.201. Finally, the Tenth Circuit held that the *Mencia* plaintiff was a ranch-hand rather than a shepherd because the plaintiff "spent *much more time* doing [work incidental to shepherding] than actually caring for sheep." *Mencia*, 808 F.3d at 469 (emphasis added). Under the 2015 Rule, a shepherd could conceivably spend 49.9 percent of his time at the ranch performing work that is closely or directly related to shepherding. *See* 20 C.F.R. §§ 655.200(b)(2), 655.201. A shepherd could *not*, however, "spen[d] much more time" doing work closely and directly related to sheepherding at the ranch headquarters. *See id.*[39]

---

[39]     Under the TEGLs, H–2A shepherds could perform work related to shepherding "on an incidental basis." This term was not defined, *see* Final Rule, 80 Fed. Reg. at 62,966, but as the Tenth Circuit pointed out in *Mencia*, under the TEGL that preceded the 2015 Rule, "ranch chores must be a relatively small portion of the shepherd's duties, probably much less than 50% of the sheepherder's time but certainly no more than 50%." *Mencia*, 808 F.3d at 468. Thus, the 2015 Rule's provision allowing a shepherd to spend up to 50 percent of his time performing tasks closely or directly relating to shepherding is—contrary to the plaintiffs' assertions—consistent with the corresponding limitation in the TEGLs. *See also* Ass'n Defs.' Mem. Supp. Cross-Mot. Summ. J. at 29 ("'On an incidental basis' was never defined, but has always been interpreted by the Office of Foreign Labor Certification,

Accordingly, if anything, *Mencia* shows that the 2015 Rule is consistent with the previous TEGLs, and the plaintiffs' reliance on *Mencia* to show that the new Rule deviates wildly from the prior understanding of what shepherd work is, and where it may occur, fails.[40] Thus, the plaintiffs have not demonstrated any basis on which to vacate §§ 655.200(b)(2) and 655.201.

## IV.   CONCLUSION

For the foregoing reasons, the government's Motion to Strike is granted in part and denied in part. The plaintiffs' Motion for Summary Judgment is denied in full, and the government's and intervenors' Cross-Motions for Summary Judgment are granted in full.[41]

An appropriate Order accompanies this Memorandum Opinion.

**Date**: July 7, 2017

_____
BERYL A. HOWELL
Chief Judge

---

Wage & Hour Division, and employer community as something less than 50% of the worker's time[,]" consistent with "DOL's FLSA regulations for purposes of overtime exemptions.").

[40]   According to the government, the plaintiffs "neglect to identify the baseline from which DOL allegedly 'illegally expanded' the geographical scope and nature of shepherd work." Gov't's Mem. Supp. Cross-Mot. Summ. J. at 38. The plaintiffs respond that the "baseline" for what constitutes remote work is the requirement that "shepherds spend 'extended periods in isolated areas'" thereby making it difficult to track hours. Pls.' Reply Supp. Mot. Summ. J. at 26–27 (quoting *Mendoza*, 754 F.3d at 1008–09). The plaintiffs also draw heavily from the FLSA context in explaining the historical understanding of "remote" work, citing statements concerning the FLSA exemption for shepherds by sponsors of the FLSA, as well as case law involving the FLSA exemption. *Id.* at 27–28 (quoting *Hodgson v. Elk Garden Corp.*, 482 F.2d 529, 531 (4th Cir. 1973)). In *Hodgson*, the Fourth Circuit explained that "[t]o secure the [FLSA] exemption the employer must . . . show that the employees' duties make the computation of their working hours extremely difficult." *Hodgson*, 482 F.2d at 531. As explained by the Tenth Circuit in *Mencia*, a more recent case actually involving a precursor to the H–2A regulations, the FLSA is expressly concerned with the difficulty in tracking hours, but that is less emphasized in the H–2A context. *Mencia*, 808 F.3d at 466 ("Unlike the FLSA regulations, the [TEGL] do[es] not explicitly require that a sheepherder's hours must be difficult to compute," but "the regulation they are based on describes sheepherders as lacking 'a reasonably regular workday or workweek.'"). In any event, the 2015 Rule still requires that H–2A shepherds spend more than 50 percent of their time on the range and that they be on call 24 hours per day, 7 days per week. Tracking an employee's hours under these circumstances would be "extremely difficult." *Hodgson*, 482 F.2d at 531.

[41]   The parties spill much ink arguing over the proper remedy. *See, e.g.*, Pls.' Mem. Supp. Mot. Summ. J. at 40–42; Gov't's Mem. Supp. Cross-Mot. Summ. J. at 43–45. These arguments need not be addressed given that summary judgment is entered in favor of the government and the intervenors.